**UNITED STATES of America,**

v.

**Anthony George BATTLE.**

**Criminal Case No. 1:95–CR–528–ODE.
Civil Action No. 1:01–cv–2620–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

April 30, 2003.

William H. McKinnon, Assistant United States Attorney, Atlanta, GA, for Government.

Margaret O'Donnell, McNally & O'Donnell, P.S.C., Frankfort, KY, P. Bruce Kirwan, Atlanta, GA, for Defendant.

## *ORDER*

ORINDA D. EVANS, District Judge.

This federal death penalty case is before the Court for a ruling on Defendant's motion pursuant to 28 U.S.C. § 2255. Defendant seeks to set aside his conviction and his sentence.

The Court having heard the evidence at trial, the evidence presented in support of Defendant's habeas claims, and having the benefit of the arguments of counsel will set forth below its legal conclusions and, where specifically indicated its findings of fact. For the reasons stated, Defendant's motion is DENIED.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................... 1097

II. CONSTITUTIONALITY OF THE FEDERAL DEATH PENALTY ACT,
 18 U.S.C. §§ 3591–3597 ............................................ 1099
 A. Defendant's Challenge to His Sentence ............................... 1099
 B. Constitutionality of the Federal Death Penalty Act under the Fifth
 Amendment Indictment Clause .................................... 1103
 C. Challenge to the FDPA's Evidentiary Standard ......................... 1105

III. COMPETENCY–RELATED CLAIMS ..................................... 1107
 A. Authority of Magistrate Judge to Preside at Competency Hearing ......... 1107
 B. Substantive Competency Claim ................................... 1108
 1. Competency Proceedings ...................................... 1109
 2. Trial Proceedings ........................................... 1120
 3. Kearns' Declaration ......................................... 1122
 4. 2002 Psychiatric Report ...................................... 1123
 5. Findings and Conclusions ..................................... 1125
 C. Continuance to Permit Further Competency Evaluation ................. 1128

IV. CONTROL OF DEFENSE OF INSANITY ............................... 1129

V. CLAIMED INVESTIGATIVE FAILURES OF COUNSEL ................... 1137
 A. Adequacy of Social History Investigation .............................. 1137
 B. Mitigating Mental Health Evidence ................................... 1143

C. Pesticide Exposure ............................................1149
D. Defendant's Odd Behavior While in Prison Before the Murder ...........1150
E. Defendant's Complaints of Implants before Washington's Murder .........1151
 1. Complaints to Inmates ........................................1151
 2. Complaints to Family Members ................................1156
F. Findings and Conclusions ......................................1161

VI. FAILURE TO PROVIDE INFORMATION TO MENTAL HEALTH
 EXPERTS .....................................................1161
A. Disciplinary Records..........................................1161
B. Chaotic and Violent Environment at USP–Atlanta ......................1162
C. CT Scan Results .............................................1163
D. Information Concerning Defendant's Social/Family Background and the
 Development of His Mental Illness ..............................1167

VII. MISCELLANEOUS OTHER CLAIMS OF INEFFECTIVE ASSIS-
 TANCE OF COUNSEL IN VARIOUS STAGES OF THE CRIMINAL
 PROCESS ...................................................1168
A. Preindictment Phase..........................................1169
B. Pretrial Phase ..............................................1169
 1. Limitation on Butner Evaluation ............................1169
 2. Neurological Examination ..................................1170
 3. Continuance of Trial ......................................1170
 4. Exclusion of Robert Willis' Testimony ......................1171
 5. Appointment of a Treating Psychiatrist......................1173
 6. Testimony of Counsel at Competency Hearing...................1174
 7. Daubert Hearing ..........................................1175
 8. Failure to Coordinate Work.................................1176
C. Trial Phase .................................................1178
 1. Voir Dire ................................................1178
 2. Change of Clothes ........................................1179
 3. Expert Testimony on Effect of Defendant's Mental Illness ..........1179
 4. Expert Explanation of Outburst in Courtroom And Defendant's
 May 6, 1995 Telephone Conversation with His Father .............1180
 5. Failure to Call John Pannell as a Trial Witness ...................1180
 6. Evidence that the Government Can Safely Incarcerate Defendant....1181
 7. Conditions of Defendant's Confinement at the Atlanta Pretrial
 Detention Center ........................................1183
 8. BOP Role in Bringing About Washington's Death..................1183
 9. Preparation of Defendant to Testify at the Guilt Phase and
 Penalty Phase of the Trial .................................1184
 10. Deterioration of Defendant at Trial ..........................1185
 11. Failure to Call Dr. Rogers as Part of Defendant's Case in Chief....1185
 12. Failure to Investigate, Seek to Set Aside, and Mitigate 1987
 Conviction ..............................................1186
 13. Exclusion of Donovan Testimony .............................1187
 14. Jury Instruction On Unadjudicated Criminal Conduct ..............1188
 15. Jury Instruction that Life Sentence Defendant was Serving was a
 Parolable Offense.........................................1189
D. Appeal......................................................1189

VIII. JUROR MISCONDUCT ...........................................1190
A. Jurors Sleeping ..............................................1190
B. Other Juror Misconduct.......................................1192
 1. Presence of Bible and Discussion of Religious Scripture During
 the Trial................................................1192
 2. Presence of Alternate Jurors During Guilt Phase Deliberations .......1193
 3. Premature Penalty Deliberations ............................1194
 4. Cumulative Effect of Jury Misconduct.........................1194

IX. TRIAL COURT ERRORS ...........................................1194
 A. Limitation on the Penalty Phase Testimony of Defense Social Historian and Social Worker Jan Vogelsang ...................................1194
 B. Discharge of Jurors Craft and Tooley ...................................1196
 C. Refusal to Permit Juror Craft to Attend the Trial after She was Dismissed as a Juror ...........................................1197
 D. Failure to Instruct the Jury on the Consequences of a Not Guilty by Reason of Insanity Verdict ...........................................1198
 E. Insufficient Evidence of "Heinous, Cruel and Depraved" Aggravating Circumstance ...........................................1199

 X. BIAS OF TRIAL JUDGE ...........................................1200

 XI. PROSECUTORIAL MISCONDUCT ...................................1201

XII. CONFLICT ISSUES ...........................................1206
 A. Drs. Johnson and Hazelrigg ...........................................1206
 B. Trial Counsel ...........................................1206

XIII. VIOLATION OF RIGHT TO MEANINGFUL APPELLATE REVIEW .......1207

XIV. NEW TRIAL REQUEST ...........................................1207

 XV. CUMULATIVE EFFECT OF ERRORS ...............................1209

XVI. DEATH PENALTY CRUEL AND UNUSUAL...........................1209

XVII. CONCLUSION ...........................................1209

## I. INTRODUCTION

On November 21, 1995, Defendant was charged in a indictment with the murder of D'Antonio Washington, in violation of 18 U.S.C. § 1118. The indictment charged that:

> [o]n or about December 21, 1994, [Defendant] while confined in a federal correctional institution, the United States Penitentiary at Atlanta, Georgia, under a sentence of life imprisonment ... did unlawfully and with malice aforethought

commit the murder of D'Antonio Washington, by beating [him] with a hammer ...

Defendant entered a plea of not guilty on December 4, 1995. He simultaneously filed a notice of intent to rely on the defense of insanity at the time of the offense.

On July 26, 1996, the Government filed the statutorily required Notice of Intent to Seek the Death Penalty. *See* 18 U.S.C. 3593(a). The notice referenced the intent or gateway factors in 18 U.S.C. § 3591(a)(2)[1] and listed five statutory aggravating factors[2] along with several non-

---

**1.** The following intent factors were listed: (1) the defendant intentionally killed the victim; (2) the defendant intentionally inflicted serious bodily injury which resulted in the death of the victim; (3) the defendant intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be employed against the victim, which resulted in the death of the victim; and (4) the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of

death to a person, such that the act constituted a reckless disregard for human life and that resulted in the death of the victim.

**2.** The Government alleged the following statutory aggravating factors: (1) the defendant committed the offense while serving a life sentence in a federal penal institution; (2) the defendant killed a federal correction officer; (3) the defendant committed the offense of murder after previously having been convicted of another offense resulting in the death of

statutory aggravating factors which the Government sought to prove during the proceedings. After a determination of Defendant's competency to stand trial, the trial began on February 21, 1997.[3] The primary issue at the guilt-innocence phase of the trial was whether Defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts at the time of commission of the murder. *See* 18 U.S.C. § 17(a) (defining insanity defense). The Government's experts opined that Defendant has a mixed personality disorder,[4] with schizotypal, paranoid, and antisocial features and that Defendant was malingering, *i.e.*, faking his claimed delusion of having implants which harassed him and monitored his thoughts.

The defense experts testified that the Defendant is a paranoid schizophrenic, and that he likely was having a psychotic episode at the time of the murder. The jury was instructed that the defense had the burden of proving the defense of insanity by clear and convincing evidence. *See* 18 U.S.C. § 17(b) (burden of proof of insanity defense). The jury rejected the options of not guilty by reason of insanity and not

guilty and found Defendant guilty on March 12, 1997.

Following the conviction, a sentencing hearing occurred in which the jury unanimously found beyond a reasonable doubt all gateway intent factors and the following statutory aggravating factors: (1) that Defendant was previously convicted of another federal or state offense resulting in the death of a person, for which either a sentence of life imprisonment or a sentence of death was authorized; (2) that the offense was committed in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim; and (3) that Defendant murdered an employee of a United States penal or correctional institution while the employee was engaged in the performance of his duties. [Doc. 258]. The jury further made unanimous findings beyond a reasonable doubt of the existence of the following non-statutory aggravating factors: that Defendant has a low potential for rehabilitation and is a danger to the lives and safety of other persons and that Defendant caused harm to the family of the victim as a result of the killing. The jury determined that based on the preponderance of the evidence four mitigating factors existed.[5] Af-

---

a person, for which a sentence of life imprisonment or a sentence of death was authorized by statute; (4) the defendant committed the offense in an especially heinous, cruel or depraved manner in that it involved serious physical abuse to the victim; and (5) the defendant murdered an employee of a United States penal or correctional institution while the employee was engaged in the performance of his duties and because of the performance of his duties.

3. A synopsis of the testimony of each witness and the arguments of counsel is set forth in *United States v. Battle*, 235 F.Supp.2d 1301 (N.D.Ga.2001).

4. Personality disorders are classified as mental disorders by the *Diagnostic and Statistical Manual of Mental Disorders* "DSM-IV". *See*

DSM-IV at 673 (4th ed.1994). Psychosis, or separation from reality, is not an element of personality disorders. *See id.* at 629–673.

5. One or more of the jurors found the following mitigating factors by a preponderance of the evidence: that Defendant's capacity to appreciate the wrongfulness of his conduct was significantly impaired, even though not so impaired as to constitute a defense to the charge; that Defendant committed the offense under severe mental or emotional disturbance; that Defendant was under unusual or substantial duress, even though not of such a degree as to constitute a defense to the charge; and that there were factors in the Defendant's background, record, or character that weigh against imposition of the death penalty.

ter weighing the aggravating factors against the mitigating factors the jury determined that a death sentence was justified and returned a unanimous verdict of death on March 20, 1997. The sentence was imposed by the Court on that date.

The conviction and sentence were affirmed on appeal. *United States v. Battle,* 173 F.3d 1343 (11th Cir.1999), *cert. denied,* 529 U.S. 1022, 120 S.Ct. 1428, 146 L.Ed.2d 318 (2000). Thereafter trial/appellate counsel were allowed to withdraw and new counsel were appointed.

Defendant conducted an extensive investigation and engaged in discovery through new (habeas corpus) counsel. The instant § 2255 motion was timely filed in October 2001. Evidentiary hearings were held on March 18–19 and April 18, 2002, at which both live and written declaration testimony was proffered by Defendant in support of his motion. Subsequently each side presented proposed findings of fact and conclusions of law. Defendant filed a response to the Government's proposed findings and conclusions.

## II. CONSTITUTIONALITY OF THE FEDERAL DEATH PENALTY ACT 18 U.S.C. §§ 3591–97

### A. Defendant's Challenge to His Sentence

Defendant challenges his sentence and the constitutionality of the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591–97, on the following grounds: (1) that Defendant's death sentence must be vacated because the grand jury did not indict him on the gateway intent factors or the statutory and non-statutory aggravating factors necessary to support the death penalty; (2) that the FDPA is unconstitutional in that it does not specify that statutory aggravating factors are elements of the crime charged or require indictment by the grand jury on aggravating factors; and (3) that the FDPA is unconstitutional

as it allows for the admission of information at the penalty phase which is not subject to the Federal Rules of Evidence.

Defendant's initial argument is based on the Supreme Court's holding in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), that under the Sixth Amendment a state's aggravating factors necessary for imposition of the death penalty must be found by a jury rather than a sentencing judge. *Ring,* 122 S.Ct. at 2443. In so holding, the Supreme Court noted that the aggravating factors were the "functional equivalent" of elements of the charged offense. Prior to *Ring* the Supreme Court held in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that due process under the Fourteenth Amendment and the Sixth Amendment jury trial guarantee requires any fact, other than a prior conviction, that increases a sentence beyond the statutory maximum to be submitted to a jury and proved beyond a reasonable doubt. *Id.* at 490, 120 S.Ct. 2348. Defendant maintains that after the Supreme Court's decisions in *Apprendi* and *Ring,* any facts which increase a defendant's maximum penalty are elements of a greater offense which must be charged in the indictment. Defendant alleges that because his indictment did not recite the intent or "gateway" factors (*see* 18 U.S.C. § 3591(a)) or the statutory and non-statutory aggravating factors (*see* 18 U.S.C. § 3592(c)) his death sentence must be vacated. The Government disagrees with Defendant's interpretation of *Ring* and also submits that Defendant is barred from raising this issue on collateral review based on *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The Government also points out that the Supreme Court has not overruled *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), holding that elements of a crime but not factors which pertain only to sentencing

must be charged in the indictment. *Id.* at 228, 118 S.Ct. 1219. Only one Circuit Court has considered this issue. In *United States v. Jackson,* for the purposes of plain error review, the United States Court of Appeals for the Fourth Circuit assumed without deciding that *Ring* required all aggravating factors to be charged in the indictment. *U.S. v. Jackson,* 327 F.3d 273, 303–06 (4th Cir.2003). The court then held that the omission of some of the aggravating factors from the indictment did not require reversal of the death sentence because the error did not affect the defendant's substantial rights. *Id.* This was the ruling of two members of the appellate panel. The third member found that because one aggravating factor was charged in the indictment, the indictment satisfied any requirements under *Ring. Id.* at 289–91.

In *United States v. Quinones,* 313 F.3d 49 (2nd Cir.2002), a death penalty case, the United States Court of Appeals for the Second Circuit did not have the *Ring* indictment issue before it (because a superseding indictment had added the aggravating factors prior to defendant's trial). However, the Court noted in a footnote, in dictum, that under *Ring* aggravating factors must now be alleged in the indictment. *Id.* at 53 n. 1.

Because *Ring* did not *hold* that aggravating factors are elements of the offense conduct, but rather stated that they are the "functional equivalent" of such elements so as to require determination by a jury, *Almendarez–Torres* has not been overruled, and noting that the United States Court of Appeals for the Eleventh Circuit has yet to address this issue, this Court interprets *Ring* to hold only that a defendant in a capital case has a right to jury trial on aggravating factors. *Ring* does not compel the conclusion that Defendant's indictment, in addition to the notice of intent to seek the death penalty, should have set forth the aggravating factors.[6] Under this interpretation, *Ring* provides no basis for attacking Defendant's sentence.

■ Nonetheless, it is difficult to predict with certainty how the Supreme Court will ultimately clarify the scope and meaning of *Ring.* If the Court were to specify that statutory aggravating factors must be set forth in the indictment, it would be necessary to determine whether Defendant's claim is barred under *Teague v. Lane.*

■ Under *Teague,* a new constitutional rule of criminal procedure that has not been announced at the time a defendant's conviction became final cannot be applied retroactively on collateral review unless it falls within one of two narrow exceptions.[7] *See Teague,* 489 U.S. at 310–11, 109 S.Ct.

---

**6.** Neither *Apprendi* nor *Ring* directly addressed the issue of whether the Constitution requires that factors relevant to sentencing must be charged in an indictment. *See Ring,* 122 S.Ct. at 2437 n. 4 "Ring's claim is tightly delineated. . . . Ring does not contend that his indictment was constitutionally defective."; *Apprendi,* 530 U.S. at 476 n. 3, 120 S.Ct. 2348 "Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment. . . . We thus do not address the indictment question separately today.".

Both *Apprendi* and *Ring* involved state prosecutions and the Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to presentment or indictment of a Grand Jury." *Apprendi,* 530 U.S. at 477 n. 3, 120 S.Ct. 2348.

**7.** It is undisputed that Defendant's conviction became final on March 20, 2000, before the Supreme Court's decisions in *Apprendi* and *Ring.* The United States Court of Appeals for the Eleventh Circuit has already held that *Apprendi* establishes a procedural rule which is not retroactive. *See McCoy v. United States,* 266 F.3d 1245, 1255 (11th Cir.2001).

1060. Exceptions to *Teague's* non-retroactivity standards exist if a new rule "places certain kinds of primary private individual conduct beyond the power of the criminal law-making authority to proscribe," or is a type of "watershed" rule that "alter[s] our understanding of the bedrock procedural elements" essential to the fundamental fairness of a proceeding. *Id.* at 307, 313, 109 S.Ct. 1060.

Defendant first maintains that the rule in *Ring* is a matter of substantive law rather than a procedural rule. Defendant argues that *Ring* is a substantive decision because, in effect, it redefines the elements of a capital offense. Defendant cites to *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), for the proposition that facts increasing the maximum sentence become elements of the offense and contends that any resulting procedural benefits come from the initial determination that statutory aggravating factors are elements of the substantive offense, which is a substantive decision.

In *Bousley,* the Supreme Court reviewed whether its decision in *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)(holding that government must show active employment of a firearm for conviction under 18 U.S.C. § 924(c)(1)), was retroactively applicable to cases on collateral review. *See Bousley,* 523 U.S. at 620–21, 118 S.Ct. 1604. The Supreme Court found *Teague* inapplicable in this instance as *Bailey* interpreted the meaning of a statute defining a crime. The Court further distinguished decisions involving procedural rules from decisions that place certain types of conduct beyond the reach of substantive criminal statutes. *Id.* at 620, 118 S.Ct. 1604. There is no reason for retroactive application of a new criminal procedure rule unless " 'without [it] the likelihood of an accurate conviction is seriously diminished.' " *Id.* at 621, 118 S.Ct. 1604 (quoting *Teague,* 489 U.S. at 313, 109 S.Ct. 1060). Retroactivity is required where there is a substantive construction of a federal statute because of the "significant risk" that a defendant could be convicted for conduct which is not criminal. *Id.*

If the Court's decision in *Ring* does require that aggravating factors be set forth in an indictment, this does not result in a change in the elements of any death-eligible offenses in such a way that a defendant's conduct could no longer be considered criminal. Instead, it merely imposes the additional procedural safeguard of requiring that the aggravating factors be set forth in the indictment. The fact that most circuits have held that *Apprendi* is a rule of criminal procedure that does not apply on collateral review lends further support to the decision that *Ring* is a procedural rather than substantive rule. *See, e.g., McCoy v. United States,* 266 F.3d at 1257; *United States v. Moss,* 252 F.3d 993 (8th Cir.2001); *United States v. Sanders,* 247 F.3d 139 (4th Cir.2001); *Jones v. Smith,* 231 F.3d 1227 (9th Cir.2000).

■ Defendant also contends that *Ring* is not a "new" rule of criminal procedure. A rule is considered new when "it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague,* 489 U.S. at 301, 109 S.Ct. 1060. In deciding whether a rule is new, a court must review the state of the law at the time the defendant's conviction became final. *See O'Dell v. Netherland,* 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). If, at that time, it was reasonable for the trial court to not adopt the rule, then it qualifies as a new rule. *Id.* at 166, 117 S.Ct. 1969 (noting that *Teague* requires that judges act "reasonably, not presciently"); *see also Cain v. Redman,* 947 F.2d 817, 821 (6th Cir.1991)(stating that a rule is "new" as long as the correct-

ness of the rule is "susceptible to debate among reasonable minds"). A rule that aggravating factors must be set forth in the indictment plainly did not exist on March 20, 2000. Therefore, because the rule is both new and a rule of criminal procedure, it must fall within one of *Teague's* narrow exceptions in order to apply retroactively.

To fall within *Teague's* first exception requires that the rule place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority." *Teague,* 489 U.S. at 307, 109 S.Ct. 1060. However, even if *Ring* requires that aggravating factors be charged in the indictment, this is merely an additional procedural safeguard, not a rule that limits punishment for or decriminalizes certain conduct. Therefore, this exception does not apply.

The second *Teague* exception applies to "watershed rules of criminal procedure." *Id.* at 311, 109 S.Ct. 1060. Rules falling within this exception are "those new procedures without which the likelihood of an accurate conviction is seriously diminished" or in which the "procedure at issue [ ] implicate[s] the fundamental fairness of the trial." *Id.* at 312, 109 S.Ct. 1060. This is an extremely narrow exception exemplified by the "sweeping rule" announced in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), that counsel shall be provided in all criminal trials for serious offenses. *See O'Dell,* 521 U.S. at 167, 117 S.Ct. 1969. The Court has noted that "[i]t is 'unlikely that many such components of basic due process have yet to emerge.'" *Sawyer v. Smith,* 497 U.S. 227, 243, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (quoting *Teague,* 489 U.S. at 313, 109 S.Ct. 1060).

Assuming *arguendo* that *Ring* holds that the statutory aggravating factors were required to be in the indictment, it still does not meet the test for a watershed rule of criminal procedure. In *Apprendi,* the Court decided that any fact, other than a prior conviction, that increases a sentence beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. Like other circuit courts, the United States Court of Appeals for the Eleventh Circuit has considered whether *Apprendi* is *Teague*-barred and held that *Apprendi* is not the type of watershed rule that is applicable on collateral review. *McCoy,* 266 F.3d at 1257. Under Defendant's interpretation *Ring* is basically an extension of *Apprendi* in the capital sentencing context and therefore, the same logic would apply. It does not "alter our understanding of the bedrock procedural elements" that are essential to a fundamentally fair trial, nor does it affect the likelihood of obtaining an accurate conviction. Even if the Court assumes, *arguendo* that aggravating factors must be alleged in the indictment, Defendant still cannot rely on *Ring* to collaterally attack his sentence as *Ring* does not apply retroactively.

The concept that failure to include the statutory aggravating factors in the indictment does not implicate whether a defendant receives a fundamentally fair trial rings particularly true in Defendant's case. He had a jury trial on all claimed intent and aggravating and mitigating factors. He received formal written notice of the Government's intention to seek the death penalty, and of the intent or gateway factors and the statutory and non-statutory aggravating factors more than six months before the trial. While the indictment did not duplicate the statutory wording of 18 U.S.C. § 3591(a)(2) regarding the intent factor, it charged that Defendant committed the murder "with malice aforethought" which substantially duplicates "intentionally killed the victim" as set forth in § 3591(a)(2)(A). Although the indictment did not recite all statutory aggravating

factors, it did substantially charge one of the statutory aggravating factors, namely, the murder occurred while Defendant was already serving a term of life imprisonment. *See* 18 U.S.C. § 3592(b)(3). Finally, it is reasonable to assume that if the members of the petit jury found the existence of aggravating factors beyond a reasonable doubt, the grand jury would also have found probable cause of their existence. *See United States v. Patterson*, 241 F.3d 912, 914 (7th Cir.2001) (noting that if the evidence is strong enough that a petit jury makes a certain finding then a grand jury (which acts under a lower burden of persuasion) would have likely drawn the same conclusion).

B. Constitutionality Of the Federal Death Penalty Act Under the Fifth Amendment Indictment Clause

■ Defendant argues that, based on the holdings announced in *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (holding that the federal carjacking statute defined three separate offenses, differentiated by certain factual predicates which must be charged by indictment, submitted to the jury, and proven beyond a reasonable doubt), *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (holding that any fact, other than a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt), and *Ring* (holding that a defendant cannot be sentenced to death on the basis of an aggravating circumstance found by a sentencing judge sitting without a jury) the Federal Death Penalty Act is facially unconstitutional as it violates the Fifth Amendment's Indictment Clause.[8] Defendant maintains

that the statute fails to comply with Indictment Clause requirements because it does not specify that aggravating factors become elements of a capital offense and fails to require grand jury consideration of the aggravating factors and inclusion of such factors in the indictment. Because a statute is presumed to be constitutional, Defendant bears the burden of proving that the FDPA is unconstitutional. *See INS v. Chadha*, 462 U.S. 919, 951–52, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

Defendant's argument is based on the premise that every fact that increases the maximum punishment for an offense automatically becomes an "element" of the offense and therefore, the facts must be defined as elements in the statute and alleged in the indictment. Insofar as the constitutionality of the Federal Death Penalty Act is concerned, there are three flaws in this argument. First, *Ring* did not characterize aggravating factors as elements of the charged offense but rather as the "functional equivalent" thereof. Second, the context for the "functional equivalent" characterization was the question whether the right of jury trial attached to the fact-finding process for aggravating factors. Third, *Ring* specifically noted that there was no claim that the aggravating factors should have been placed in the charging instrument. Therefore, it is simply incorrect to assert that *Ring* held that aggravating factors must be charged in the indictment. While the Supreme Court may in the future clarify that that was its intent, it has not done so yet.

While it would not be particularly burdensome for the Government to present evidence of aggravating factors to a grand jury, and a prosecutor might in fact be pleased to do so, there are some good

---

**8.** The pertinent section of the Indictment Clause of the United States Constitution states that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const., Amend V.

reasons not to require this procedure. First, standard practice is to provide the indictment to the trial jury. Allowing the jury to view the claimed aggravating factors prior to determining whether the defendant is guilty of any crime could be unfairly prejudicial to the defendant. While redactions arguably could be made [9] for this purpose, why require adding something to the indictment which will often have to be redacted? The use of the notice of intention to seek the death penalty, which must state the aggravating factors, fulfills the function of formal notice just as well as an indictment but without this shortcoming. Another concern raised by requiring the grand jury to determine aggravating factors in death penalty cases is whether the judge empaneling the grand jury would be required to conduct a voir dire so as to exclude any potential grand jurors who would be unable to fairly determine aggravating factors on account of conscientious objection to the death penalty. If so, there would be no counsel present to assist the empaneling judge as by definition there would as yet be no case. The chance that this voir dire could be conducted to the satisfaction of counsel named after the indictment is returned would, at best, be nil.

The Court finds that the Federal Death Penalty Act is not rendered facially unconstitutional under the Fifth Amendment Indictment Clause merely because the aggravating factors are not defined as elements of a capital offense. *Cf. United States v. Sprofera*, 299 F.3d 725 (8th Cir. 2002) (upholding constitutionality of 21 U.S.C. § 841 after *Apprendi* and citing other circuits in agreement); *United States v. Brough*, 243 F.3d 1078, 1079 (7th Cir.) *cert. denied*, 534 U.S. 889, 122 S.Ct. 203, 151 L.Ed.2d 144 (2001) (upholding § 841 and stating that "the statute does not say who makes the findings or which party bears what burden of persuasion. Instead the law attaches effects to facts, leaving it to the judiciary to sort out who determines the facts, under what burden. It makes no constitutional difference whether a single subsection covers both elements and penalties, whether these are divided across multiple subsections (as § 841 does), or even whether they are scattered across multiple statutes (see 18 U.S.C. §§ 924(a), 1963).").

The Federal Death Penalty Act requires that a jury, rather than a judge, must make a unanimous finding that the intent requirement and any statutory aggravating factors exist beyond a reasonable doubt and that the jury must return special findings to this effect. *See* 18 U.S.C. § 3593(c),(d). In this respect, the statute complies with the constitutional procedures set forth in *Apprendi* and *Ring*.

Defendant also argues that the statute is facially unconstitutional because it does not require that the prosecution present the statutory aggravating factors to the grand jury for charging purposes and thereby leaves the decision to seek the death penalty to the prosecutor rather than the grand jury.[10] Under the FDPA, a prosecutor is required to file a notice of intent to seek the death penalty which

---

**9.** Of course, there is also an argument that no "element of the crime" should be redacted.

**10.** Defendant states that his trial counsel raised by pretrial motion the issue of whether the Constitution was violated by the fact that the grand jury did not indict Defendant on the non-statutory aggravating circumstances upon which the Government intended to rely and he renews that pretrial motion. While non-statutory aggravating factors must be referenced in the Government's notice according to the statute, these factors do not establish eligibility for a greater level of punishment, therefore it is not necessary for the non-statutory aggravating factors to be alleged in the indictment.

states the statutory and non-statutory aggravating factors that the Government intends to prove beyond a reasonable doubt. *See* 18 U.S.C. § 3593(a). The Act does not contain any requirement that the statutory aggravating factors be presented to the grand jury and treated as "the functional equivalents of elements" of the offense. This silence, however, is not enough to render the statute facially unconstitutional, even if *Ring* requires that such factors be set forth in the indictment.

■ A statute, whether it defines substantive crimes or sets forth sentencing factors, does not provide specifics indicating what must be presented to a grand jury. The requirements for what must be contained in the indictment are governed by Federal Rule of Criminal Procedure 7(c) and court decisions. Although the FDPA provides for a formal notice of intent it does not preclude the Government from alleging the intent factor and any statutory aggravating factors in the indictment. As noted by other courts, the fact that the statute does not expressly provide for a role for the grand jury does not render it unconstitutional. *See United States v. Sampson*, 245 F.Supp.2d 327, 336 (D.Mass.2003)("[t]he Federal Death Penalty Act does not conflict with or contradict the grand jury process that is now prescribed by [*Jones, Apprendi*, and *Ring* ]."); *United States v. Johnson*, 239 F.Supp.2d 924, 935–46 (N.D.Iowa 2003) (upholding constitutionality of death penalty provisions of 21 U.S.C. § 848); *United States v. Regan*, 221 F.Supp.2d 672 (E.D.Va.2002) (upholding constitutionality of death penalty provisions of FDPA).

C. Challenge to the FDPA's Evidentiary Standard

■ Defendant's final challenge to the constitutionality of the FDPA is based on the evidentiary standard used in the sentencing phase of a capital trial. The Act provides that:

> At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592.... Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

18 U.S.C. § 3593(c).

Defendant argues that this relaxed standard of evidence violates his Fifth Amendment due process rights and Sixth Amendment guarantees of confrontation and cross-examination. Defendant contends that based on the Supreme Court's concern for heightened reliability in capital cases and *Ring*'s statement that aggravating circumstances operate as the "functional equivalent of elements of a greater offense" the evidence proffered in support of these factors must be subject to the same constitutional protections as the evidence proffered in support of the guilt determination. Defendant relies primarily on the district court decision in *United States v. Fell*, 217 F.Supp.2d 469, 489 (D.Vt.2002), which held that the FDPA was unconstitutional as its relaxed evidentiary standard requirement did not provide the adequate constitutional protection required in a death-eligibility determination. According to *Fell*, this level of protection requires that the evidence be subject to the constraints of the Federal Rules of Evidence. *See Fell*, 217 F.Supp.2d at 488–89.

As in Defendant's challenge based on the Indictment Clause, the specific holding in *Ring* does not compel this result. Even

if the aggravating factors are to be treated as the functional equivalent of elements for the purposes of the Sixth Amendment right to a jury trial, the Federal Rules of Evidence are not constitutionally mandated. Congress has the authority to set forth rules of evidence in federal trials subject to the requirement that the rules comport with due process. *See Tot v. United States,* 319 U.S. 463, 467, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943); *see also United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) ("[R]ulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."). Therefore, as long as the Act's requirements provide a level of protection that ensures that defendants receive the right to a fundamentally fair trial, it satisfies constitutional requirements.

Evidentiary standards in the FDPA are in line with the Court's previous rulings on the admissibility of evidence at capital sentencing proceedings. *See Gregg v. Georgia,* 428 U.S. 153, 204, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ("[I]t [is] desirable for the jury to have as much information before it as possible when it makes the sentencing decision."); *see also Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) ("[I]n capital cases ... the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."). Under the FDPA standards, judges continue their role as evidentiary gatekeepers and retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair. *See* 18 U.S.C. § 3593(c) ("[I]nformation may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.") Therefore,

a defendant's constitutional rights are protected even if the Federal Rules of Evidence do not govern the admissibility of evidence at capital sentencing hearings.

This also applies with respect to any concerns raised under the Sixth Amendment Confrontation Clause. The Confrontation Clause promotes the "integrity of the factfinding process." *White v. Illinois,* 502 U.S. 346, 357, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). The United States Court of Appeals for the Fifth Circuit has stated that "the relaxed evidentiary standard does not impair the reliability or relevance of information at capital sentencing hearings, but helps to accomplish the individualized sentencing required by the constitution." *United States v. Jones,* 132 F.3d 232, 242 (5th Cir.1998). With respect to the admission of evidence, "where proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied." *See White,* 502 U.S. at 356, 112 S.Ct. 736. Therefore, the trial judge has the authority under the act to ensure that reliability requirements under the Confrontation Clause are met and that any information too prejudicial to the defendant is excluded from the proceedings.

Under the same reasoning, other federal courts have issued decisions upholding the evidentiary standards set forth in § 3593(c). *See United States v. Davis,* No. CR.A.01–282, 2003 WL 1837701 at *11 (E.D.La. April 9, 2003); *United States v. Regan,* 221 F.Supp.2d 672, 681–83 (E.D.Va.2002). Therefore, the undersigned finds that the evidentiary standards set forth in the FDPA do not render the act unconstitutional.

Defendant contends that his penalty phase hearing was "fraught with hearsay evidence that ... could not be challenged" and that the hearsay evidence was "inflam-

matory." Supplement filed Nov. 26, 2002 at 6. The Court disagrees. First, the testimony referenced by Defendant (without any citations to the record) is not properly characterized as inflammatory. Neither did defense counsel object to this testimony. The testimony about Defendant's threats and assaults on his wife's family and friends was direct, eyewitness testimony, not hearsay testimony. Defendant himself testified to his unhappy relationship with his wife and noted that he "smacked her", Tr. 1380; suggested to her that they get a divorce, Tr. 1383; fought with his wife's relatives, Tr. 1384; and that he fired a weapon in the air, Tr. 1385. Second, the Court sustained objections made by the defense to testimony which was not deemed to meet a proper reliability threshold, given the potential for undue prejudice. *See, e.g.,* Tr. 3551 (allegations too old and vague to permit response); Tr. 3666 (disallowing testimony of witness not personally present when Defendant broke out of jail cell); Tr. 4059 (inflammatory question to defense witness disallowed); Tr. 4248 (disallowing Government's cross-examination where timing of question unfair to Defendant). Therefore, Defendant not only could, but actually did object to penalty phase testimony which he believed was unfair.

## III. COMPETENCY RELATED CLAIMS

Defendant makes a number of claims related to the issue of his competency to stand trial.

### A. Authority of Magistrate Judge to Preside at Competency Hearing

 First, Defendant argues that the magistrate judge lacked the authority to preside at the competency hearing. He argues that competency proceedings may not be referred to magistrate judges under 28 U.S.C. § 636(b).

28 U.S.C. § 636(b)(1)(A) authorizes the designation of a magistrate judge to determine "any pretrial matter pending before the court" with certain exceptions not applicable here. The same subsection states that the judge, that is the Article III judge, may reconsider any pretrial matter where it appears that the magistrate's order is clearly erroneous or contrary to law.

28 U.S.C. § 636(b)(1)(B) allows the designation of a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to the district judge proposed findings of fact and recommendations for disposition of any of the types of hearings excepted by section (b)(1)(A). Proposed findings and recommendations made under subparagraph (B) must be submitted to the district court judge, along with any objections filed by the parties. Where objections are filed, the district court judge is required to make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which any objection has been made. At that point the district judge may accept, reject, or modify the findings or recommendations made by the magistrate judge.

Under Rule 58.1, Local Criminal Rules of the Northern District of Georgia, magistrate judges are authorized to hear both dispositive and non-dispositive pretrial motions in criminal cases, under the review procedures required by 28 U.S.C. § 636(b).

The magistrate judge's order finding Defendant competent to stand trial directed that any objections thereto be filed within ten days. Defendant Battle timely filed his objections. The objections did not contest the primary facts relied upon by the magistrate judge, but rather argued that the magistrate judge had incorrectly determined that the reasoning of Dr. Johnson and Dr. Hazelrigg (the court-appointed experts and witnesses for the Government)

on the issue of competency was more persuasive than that of Dr. Woods, Dr. O'Hagan, and Dr. Davis (the defense's experts). After reviewing the transcripts of the hearing before the magistrate judge and the exhibits admitted, the undersigned entered an order on February 5, 1997, that Defendant was competent to stand trial. The order specified that Defendant was able to assist his trial counsel. Thus, the objections to the magistrate judge's recommendation were overruled.

While the undersigned did not hear the live testimony of the witnesses at the competency hearing, she was able to hear the testimony of the same witnesses during the course of the trial. Having done so, the Court remains of the opinion that the reasoning presented by Drs. Johnson and Hazelrigg is more persuasive than that of Dr. Woods, Dr. Davis, and Dr. O'Hagan on the issue of Defendant's competency to stand trial. The record makes it clear that Defendant had a good understanding of the criminal trial proceedings, that he not only could but did talk to his lawyers about his various options, that he considered these options and that he had a good recollection of the events of December 21, 1994 which brought about the instant indictment.

Defendant does not cite relevant authority for his bare assertion that competency proceedings are not pretrial proceedings. *United States v. Johnston,* 258 F.3d 361 (5th Cir.2001), cited by Defendant, involved a situation where a magistrate judge had entered a final order dismissing a § 2255 motion. There was no review by the district judge. The Court of Appeals pointed out that it is inappropriate for a magistrate judge to adjudicate the propriety of previous actions by an Article III judge. *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.,* 725 F.2d 537, 544 (9th Cir.1984)(*en banc*),

which Defendant also cites, presented the issue whether the parties in a patent case could validly consent to the trial of a patent case before a magistrate judge. In finding that they could, the Court of Appeals noted that the procedure still left open appellate review by Article III judges. Therefore, there was no constitutional bar to this procedure. Thus, neither of these cases is helpful to Defendant.

In summary, the Court finds that the magistrate judge did have the authority to conduct the competency hearing; further, an intensive review of the magistrate judge's determination was undertaken by the undersigned. After conducting that review, the Court agreed with the magistrate judge's conclusion.

## B. Substantive Competency Claim

■ Defendant claims that the record of the competency and trial proceedings, plus certain new evidence introduced in the habeas proceedings, shows that he actually was incompetent during the trial which began February 18, 1997 and ended on March 20, 1997. This is a substantive due process claim which is not barred despite the fact that Defendant did not raise this claim on direct appeal.[11] *See Johnston v. Singletary,* 162 F.3d 630, 637 (11th Cir. 1998).

The trial of an incompetent defendant violates due process. *Medina v. Singletary,* 59 F.3d 1095 (11th Cir.1995). Incompetency to stand trial is defined as "suffering from a mental disease or defect rendering [defendant] mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a).

■ To obtain a post-conviction evidentiary hearing on a substantive due pro-

---

11. Neither was the Court's order finding Defendant competent to stand trial appealed.

cess claim, a defendant must show "clear and convincing evidence" that creates a "real, substantial and legitimate doubt" as to whether he was competent to stand trial. *Johnston,* 162 F.3d at 637 (quoting *Medina,* 59 F.3d at 1106). Here the only relevant new evidence proffered by Defendant—the declaration of one of Defendant's trial counsel, Stephanie Kearns, and the 2002 Psychiatric Report—was admitted into evidence at the March 18, 2002 habeas hearing without objection. The standard to be applied in resolving the substantive competency claim is set forth in *Johnston. Id.* at 637. Defendant must show by a preponderance of the evidence that he was not competent during the trial. The burden of persuasion is on Defendant.

■ In evaluating Defendant's substantive competency claim, the Court will consider the facts developed in the competency proceedings [12] which are summarized and evaluated in the order of February 5, 1997, finding Defendant competent; the record of the trial proceedings; the

Court's observations of Defendant during the trial; and the new evidence admitted at the habeas hearing which bears on the issue of competency at trial.

### 1. Competency Proceedings

■ On February 14, 1995, John R. Martin, an attorney in private practice with significant death penalty trial experience, and Stephanie A. Kearns, Director of the Federal Defender Program, Inc., for the Northern District of Georgia ("Federal Defender Program"), were appointed to represent Defendant. Russell Gabriel, an attorney then employed by the Federal Defender Program, also was assigned to work on the case and did so until the conclusion of the competency proceedings in November 1996. Defense counsel met with Defendant. At some point in the spring of 1995, they arranged for a psychologist from Vanderbilt University to meet with counsel for Defendant. According to Defendant, *see* 1996 Psychiatric Report ¶ 6,[13] they discussed an insanity defense. No written report of the meeting is in the record.[14]

---

**12.** These facts were largely repeated by the same experts who also testified at trial, even though the issue at trial was not competency but rather insanity at the time of the murder.

**13.** Numerous psychiatric reports are in the record. The 1987 and the 1996 Psychiatric Reports were prepared at FCI Butner pursuant to court orders appointing Dr. Sally Johnson and her assistants to evaluate Defendant's competency and also his sanity at the time of the 1987 and 1994 offenses, respectively. The 1987 Psychiatric Report is in evidence as Def. Ex. 2, 1996 Competency Proceedings, and the 1996 Psychiatric Report is in evidence as Def. Ex. 4, 1996 Competency Proceedings. Psychiatric reports in letter format prepared by the defense's trial mental health experts, are in the record as Sealed Docs. 261 and 363. A 2002 Psychiatric Report, which was prepared by mental health experts retained by habeas counsel, is in evidence as Def. Ex. 80, March 18, 2002 Habeas Hearing. The authors of the 2002 Psychiatric Report are Sophia Vinogra-

dov, M.D., a psychiatrist; Allison McInnes, M.D., a psychiatrist; and Karen Bronk Froming, Ph.D., a psychologist. The credentials of all mental health experts are set forth in an Appendix to this order.

**14.** The psychologist is variously referred to in the record as William Barnes, William Burnett, and William Bernet. Presumably they are all the same person. Before the Government's cross-examination of Defendant at trial, defense counsel moved in limine to prohibit the Government from inquiring about the meeting with Dr. Burnett based on a claim of privilege. Tr. 1421–22. The Government agreed not to ask about this meeting. The 2002 Psychiatric Report, p. 16, states, "Dr. Burnett diagnosed [Defendant] with a delusional disorder". However, there is no record evidence of this aside from the statement in the 2002 Psychiatric Report. Because there is no source given for this information, the Court cannot determine its reliability and hence will disregard it.

Counsel then arranged for Dr. Dave Davis, a forensic psychiatrist, to interview Defendant. Dr. Davis first saw Defendant in mid-August 1995. Davis spoke to Defendant through a food slot at FCI–Talladega. Based on the interview which lasted several hours and Dr. Davis' review of the report prepared by BOP psychiatrist Dr. Sally Johnson in 1987 ("1987 Psychiatric Report"),[15] Dr. Davis concluded that Defendant was suffering from paranoid schizophrenia. Dr. Davis prepared a written report of his findings dated August 15, 1995, and submitted it to trial counsel. The report discussed Defendant's claim that his thoughts were being monitored by microchips and that the monitoring had begun while he was at USP–Leavenworth in 1992 or 1993. Defendant said that at that time he was monitored by a guard who sat in a control booth and wore headphones. Defendant claimed he was having hallucinations. Davis also noted that during the interview Defendant was "cooperative, friendly, alert and fully oriented"; that "his thought processes were cogent and his associations were intact. There was no looseness. His speech was unremarkable, except for occasional stuttering"; "his judgment ... and his reality testing seemed impaired." [Sealed Doc. 363].

Defendant was indicted on November 21, 1995 and he was arraigned on December 4, 1995. [Docs. 1, 2]. Defense counsel filed a notice of intent to rely upon the defense of insanity. [Doc. 6]. The Government's motion to have Defendant evaluated for competency and sanity at the time of the offense was granted. [Doc. 12]. Pursuant to a court order, Defendant was then evaluated at FCI–Butner by Dr. Sally Johnson, a BOP forensic psychiatrist, and Dr. Mark Hazelrigg, a BOP psychologist.

The evaluation lasted about 75 days. Drs. Johnson and Hazelrigg submitted a report to the Court dated March 21, 1996 ("1996 Psychiatric Report") which concluded that Defendant has a mixed personality disorder with schizotypal, paranoid, and antisocial features and that he is malingering or faking his belief in the delusional system (the implants) and the hallucinations that he reported to them and to Dr. Davis. They concluded that Defendant was competent to proceed to trial.

After defense counsel received Drs. Johnson and Hazelrigg's report, they asked Dr. Davis to evaluate Defendant again. Dr. Davis did so in May 1996, and reaffirmed his diagnosis that Defendant was suffering from paranoid schizophrenia in a May 23, 1996 report. He found Defendant to be alert, talkative, and fully oriented. He found that Defendant was not faking his delusion. [Sealed Doc. 363].

Defense counsel also retained Dr. George Woods, a forensic psychiatrist with a specialty in neuropsychiatry, to examine Defendant. Dr. Woods interviewed Defendant in May, July, and September 1996. One of the interviews was a "structured competency interview" held on September 18 with Defendant and defense counsel Kearns. Apparently no recording was made of this interview. In any event it is not in the record. Dr. Woods concluded in a letter report to counsel dated September 26, 1996, that Defendant was suffering from schizophrenia, paranoid type, acute, and that he was not competent to stand trial. [Sealed Doc. 363]. Woods noted:

> Mr. Battle also fits neatly into the paranoid subtype for schizophrenia. He does have a preoccupation with one or more delusions or frequent auditory hallucinations. His delusion is very specific

---

15. The 1987 Psychiatric Report found Defendant had a personality disorder with paranoid and schizotypal factors. However, it did note

that Defendant could be in a prodromal phase to full blown schizophrenia.

and did not generalize to other topics. We rarely find disorganized speech, disorganized or catatonic behavior, or flat/inappropriate speech.

*Id.* at 2.

 &ast; &ast; &ast; &ast; &ast; &ast;

Mr. Battle is not capable of rationally assisting his attorneys in the preparation of his defense. Due to the nature of his mental illness, his delusions preclude him from being able to rationally provide his attorneys with an array of options in developing his defense theory.

*Id.* at 3.

Dr. Woods mentioned that in the structured competency interview, "Ms. Kearns was unable to have Mr. Battle agree that an insanity defense be included in the possible options for a defense." Woods rejected the idea that Defendant was faking his delusion regarding the implants noting that Defendant actually denied being mentally ill.

Trial counsel also employed Dr. Stephen O'Hagan, a forensic psychologist, to test and evaluate Defendant. In August and September 1996, Dr. O'Hagan interviewed Defendant six times and administered a battery of cognitive and neuropsychological tests. Based upon his interviews and tests, Dr. O'Hagan concluded in a September 22, 1996 letter to defense counsel that Defendant was paranoid schizophrenic and incompetent to stand trial. Regarding competency, he said:

> I do not believe that he has the capacity to work with his attorney in a meaningful and rationale [*sic*] manner at this time.

[Sealed Doc. 363].

Dr. Davis visited Defendant on November 26, 1996. He sent counsel a written report which stated in part "Mr. Battle was much more psychotic than I have seen him on previous occasions." [Sealed Doc. 261 at 2].

In October 1996 a lengthy competency hearing was held before United States Magistrate Judge Richard H. Deane, Jr. At the competency hearing the Government called Drs. Johnson and Hazelrigg and Defendant called Drs. Davis, Woods, and O'Hagan and lay witnesses. Defendant did not testify at the competency hearing.

Dr. Sally Johnson testified that she saw Defendant about forty times in January—March 1996. Competency ("Comp.") Hrg. Tr. 46. She also spent numerous hours reading the collateral information and records on Defendant. Comp. Hrg. Tr. 218. Dr. Johnson had a great deal of historical information about Defendant for her use during the evaluation, including his entire inmate file, his medical and psychological history beginning in 1987 within the prison system, a social history presented by the defense, and Defendant's two confessions to the murder of Officer Washington, among other items of written information. Dr. Hazelrigg did not review all of the written material on Defendant, but rather consulted with Dr. Johnson on her review of the file. Comp. Hrg. Tr. 793. Dr. Hazelrigg also participated in interviews with Defendant, saw him about fifty times, and conducted all of the psychological testing. Comp. Hrg. Tr. 819.

Further, Dr. Johnson herself had evaluated Defendant for competency in 1987 when he was accused of murdering his wife. She found him competent in 1987, diagnosed him as suffering from a personality disorder with paranoid and schizotypal features, and noted his history of substance abuse. Comp. Hrg. Tr. 34; *see also* 1987 Psychiatric Report. She found no evidence of psychosis. Defendant did not exhibit signs of psychosis during his stay at Butner during 1987–88. Comp. Hrg. Tr. 38, 41. She testified that nursing notes from Defendant's stay at Butner

during 1996 "provide documentation of his good and relatively nonpathological functioning," and that overall he did not evidence delusional ideas or hallucinations. Comp. Hrg. Tr. 756; Gov. Ex. 1, Comp. Hrg. Dr. Johnson testified that even after Washington's murder, a review of the record showed that Defendant did not show signs of psychosis or severe symptoms of mental illness at FCI–Talladega. Comp. Hrg. Tr. 44.

During Dr. Johnson and Dr. Hazelrigg's interviews with Defendant in 1996, Defendant was fairly consistent in his affect and mood presentation. Comp. Hrg. Tr. 49. He was cooperative, alert, willing to talk and seemed to enjoy their interactions; he answered questions and provided information, and was always oriented as to time, place, and situation. Comp. Hrg. Tr. 50, 821. Defendant had a very detailed understanding of the purpose of the evaluation and was able to maintain that understanding throughout the evaluation period. Comp. Hrg. Tr. 50–51, 821.

Defendant reported some delusional ideas and hallucinations to Dr. Johnson and to Dr. Hazelrigg. Comp. Hrg. Tr. 822. He claimed that the correctional officers were controlling him, causing physical pains and sensations. Comp. Hrg. Tr. 53. Defendant claimed that somehow he had been implanted with something which allowed this type of control and harassment. *Id.* He also claimed to be hearing voices.

In regard to Defendant's understanding of his current legal situation and legal procedure, Dr. Johnson reviewed this topic with him on a number of occasions, at least six, and from their first discussion he demonstrated his awareness of the seriousness of his legal situation. Comp. Hrg. Tr. 67. Defendant was able to describe in great detail how he murdered Officer Washington, demonstrating total recall of the incident. Comp. Hrg. Tr. 68. Defendant's report of the murder comported with other

reports Dr. Johnson reviewed. *Id.* Dr. Hazelrigg testified about Defendant's recollection of the murder of Officer Washington as well; he testified that it was remarkable that in discussing the murder, Defendant was not distressed, was not shy in talking about it, and seemed to enjoy it. Comp. Hrg. Tr. 831. Dr. Hazelrigg believed Defendant viewed his murder of the officer as an accomplishment and with a sense of pride. *Id.* Dr. Hazelrigg opined that part of an antisocial personality is showing no remorse, having a lack of empathy for other people and their problems; he felt that Defendant certainly fit into this profile, as he had virtually no remorse for his actions in this case and in other incidents in which he violated other people's rights. Comp. Hrg. Tr. 831–32.

Defendant was able to discuss with Dr. Johnson a plea of not guilty by reason of insanity, and recalled it as having been an option presented to him in his first murder trial in 1987. Comp. Hrg. Tr. 69. Defendant was able to carry on "an intelligent, detailed conversation about the defense with me, with Dr. Hazelrigg." Comp. Hrg. Tr. 70. It was also evident to Dr. Johnson that Defendant was considering that plea as an option. Comp. Hrg. Tr. 70.

Dr. Johnson further discussed with Defendant a jury trial, a bench trial, a guilty plea, and plea bargaining; in her opinion Defendant demonstrated a good understanding of the various plea options available to him. Comp. Hrg. Tr. 70. They discussed the appellate process, both from the standpoint of his previous experience and potential future experience. Comp. Hrg. Tr. 71. Defendant was aware of the fact that he could face the death penalty. *Id.* They spoke at length about Defendant's ability to make legal decisions, such as whether or not to testify or whether or not to enter a plea of insanity. *Id.* Defendant was able to consider these options,

and to weigh his attorneys' advice on that issue. He had a good grasp of the issue of testifying. *Id.*

Dr. Hazelrigg also testified that Defendant had a very clear understanding of various plea options, including that of not guilty by reason of insanity; he also clearly understood the concept of jury trial and the appellate process. Comp. Hrg. Tr. 832. They also discussed the fact that he could face the death penalty; in these discussions, Defendant would demonstrate his ambivalence by saying he would rather be put to death than spend the rest of his life in prison, while other times Defendant would speak of his desire of wanting to live out his life. Comp. Hrg. Tr. 833–34. Dr. Hazelrigg felt Defendant could rationally discuss all of these different possibilities and the implications for his life. Defendant was faced with bad choices, none of which he wanted to make. Comp. Hrg. Tr. 833. The fact that he cannot make up his mind is different from his ability to reason through the options and understand what the outcomes would be. Comp. Hrg. Tr. 834.

Dr. Johnson and Defendant spoke of his ability to assist his attorneys. Dr. Johnson testified that he has a very good ability to interact with his attorneys, trusts their judgment, yet maintains a healthy interest in being the one to ultimately make decisions. He can clearly consider his attorneys' advice, and is demonstrating that he is thinking about the choices he has to make. Comp. Hrg. Tr. 72–73. Dr. Johnson further testified in this regard that Defendant has been able to maintain contact with his attorneys, that he talks intelligently, is not disruptive in the interactions and that he tracks information. He demonstrated to Dr. Johnson that he was consulting with his attorneys and processing information received from them by comments he made such as "This is something I should talk to my attorney about,"

or "My attorney has advised me this way or that." Dr. Johnson concluded that he clearly has the capacity to discuss all of the potential decisions with his legal counsel. Comp. Hrg. Tr. 73.

Dr. Hazelrigg also discussed Defendant's ability to assist his attorneys with him; it was his opinion that Defendant has had experience with the legal system and could explain the roles of the various parties accurately and in a fair amount of detail. Comp. Hrg. Tr. 830. Dr. Hazelrigg testified that Defendant is absolutely capable of assisting his attorneys, in that he understands and has a detailed memory of the offense, and could easily help with confronting witnesses, analyzing whether witnesses were being truthful or not, or providing details about the situation that could help uncover evidence. Comp. Hrg. Tr. 835.

Dr. Johnson also opined that Defendant had some ambivalence about what he wanted to do, but that his understanding of his legal situation is not impaired in any way by mental illness. Comp. Hrg. Tr. 208. Dr. Johnson testified that Defendant has "significant insight into his current situation, is able to consider the issue abstractly and on a very personal level." Comp. Hrg. Tr. 74.

Dr. Johnson testified that Defendant did not meet the DSM IV criteria for schizophrenia. Comp. Hrg. Tr. 78. She testified that he actually isn't hallucinating and isn't delusional. He did not have any disorganized speech or behavior and he doesn't have a flat affect, but rather has a full range of affect. Moreover, she testified that the symptoms he reported did not seem to have any effect on his daily functioning, and that he has not shown any deterioration in his functioning over the last nine years. Comp. Hrg. Tr. 79. She testified that schizophrenia is typically an incapacitating mental illness, though not

necessarily equally incapacitating every day; the symptom pictures do wax and wane. However, the general course is one of deterioration, especially without treatment, and Defendant has not had any treatment for a psychotic disorder over the last nine years. She would have expected deterioration if he was truly suffering from schizophrenia. Comp. Hrg. Tr. 79.

During Defendant's stay at Butner in 1996, his behavior was consistent in that he ate well, slept well, exercised, cooperated with personal hygiene issues, and was always clean. Comp. Hrg. Tr. 81, 734. Further, Dr. Johnson and the other staff observed that he was appropriate in his interactions, demonstrated by the fact that he would strike up conversations, talk about current events and sports, read the paper, listened to the news on the radio, and was able to compare his own case to other cases that were public during the year. Comp. Hrg. Tr. 81–82. Defendant compared his situation to the Oklahoma bombing case defendants, and talked about the O.J. Simpson trial. Id. Dr. Johnson testified that when she and Dr. Hazelrigg went over their findings with Defendant, he did not disagree with them. Comp. Hrg. Tr. 731.

Doctors Johnson and Hazelrigg had another opportunity to see Defendant on September 27, 1996, prior to the competency hearing which began on October 15th. Comp. Hrg. Tr. 90. They interviewed him again on the issue of competency, to determine if there had been any changes since they had last seen him in April of 1996. Comp. Hrg. Tr. 90. One of Defendant's attorneys, Stephanie Kearns, was present during the entire interview and tape recorded most of it. Comp. Hrg. Tr. 90. This tape was played for the Court during the competency hearing to illustrate Defendant's rational and factual understanding of his legal situation. A transcript of part of the interview is in evidence. Gov. Ex. 8, Comp. Hrg.

Dr. Johnson testified that at this meeting, Defendant looked better than the last time she had seen him, and that he was engaging even to a greater degree. Comp. Hrg. Tr. 91. It was evident to her that he had undertaken considerable, additional consideration as to his options and potential defenses since the last time they had talked. They again discussed his legal situation and the consequences of the courses he could take. Comp. Hrg. Tr. 91. Defendant again demonstrated his rational and factual understanding of his legal situation. Comp. Hrg. Tr. 92. In fact, she found that he was even more open in his discussion of some of his options during the interview than he had been at Butner. Comp. Hrg. Tr. 211. She found no mental deterioration, nor the development of any new symptoms of any mental disease. Comp. Hrg. Tr. 92. In Dr. Johnson's opinion, Defendant's ability to use abstract reasoning in these kinds of discussions is not consistent with someone suffering from schizophrenia, especially chronic schizophrenia. Comp. Hrg. Tr. 93. Moreover, she testified that even if he was schizophrenic, he could still be competent to stand trial. Comp. Hrg. Tr. 94. In her opinion, a diagnosis of schizophrenia does not equate to a lack of competency. Comp. Hrg. Tr. 95. She testified that the fact that Defendant might not agree with his attorneys does not impact on his competence, but that the important thing is that he have the capacity to consider the information that is available and his options. Comp. Hrg. Tr. 105.

Dr. Johnson also commented on Defendant's behavior during her deposition two weeks prior to the hearing. Comp. Hrg. Tr. 95. The deposition lasted two days, and Defendant was present for both days. She described his demeanor as alert, that

he made comments on the subject matter to his attorneys, he shook his head yes on occasion, or laughed appropriately in context with the material; overall, he was very interactive in the process. Comp. Hrg. Tr. 95. Further, she noted that he was not distracted by any perceptual problems or hallucinations. Comp. Hrg. Tr. 96.

Dr. Johnson testified that she disagreed with the diagnoses contained in reports of Dr. Davis, Dr. Woods, and Dr. O'Hagan. She testified that it is difficult in an outpatient kind of setting for a few sessions "to weed out or weed in" a diagnosis or the issue of malingering. She found the reports inadequate to substantiate the diagnoses stated therein. Comp. Hrg. Tr. 99–100. She testified that the defense experts did not spend enough time with Defendant to firmly establish their diagnoses. Comp. Hrg. Tr. 773. She felt that the defense experts bought Defendant's verbalized story "hook, line and sinker, taking it at face value." Comp. Hrg. Tr. 101. In her experience, she stated that it was odd for forensic experts to do that. Moreover, she testified that even if she felt Defendant's symptoms as reported by him were real, he could still be competent to stand trial, and that what he says he is experiencing does not impact on his ability to factually or rationally understand the situation. Comp. Hrg. Tr. 107.

Dr. Hazelrigg gave Defendant a battery of psychological tests at Butner in 1996. First, he determined that Defendant could read, and had no trouble following his instructions. Comp. Hrg. Tr. 794. Dr. Hazelrigg testified that Defendant had no trouble taking the tests, was cooperative, and completed all of the tests with no questions. Comp. Hrg. Tr. 794–95.

Dr. Hazelrigg (Butner doctor) administered the Wechsler Adult Intelligence Scale Revised; the results were that Defendant's I.Q. is 86, which is at the low end of the average range. Comp. Hrg. Tr. 795.

An average I.Q. is 100. Dr. O'Hagan (Defendant's expert) also gave this test, with the same result of I.Q. of 86. Comp. Hrg. Tr. 853. Hazelrigg commented that Defendant's performance on the digit span test, part of the WAIS–R, was "exceptional." Comp. Hrg. Tr. 797. Defendant was able to repeat from memory a series of nine non-sequential digits going forward and a series of eight non-sequential digits backwards. Comp. Hrg. Tr. 797.

Dr. Hazelrigg gave 4 of the 12 parts of the Wechsler Memory Test Revised, consisting of immediate and delayed verbal memory tests and immediate and delayed visual memory tests. Defendant performed poorly on these parts of the test. Dr. Hazelrigg administered the Trailmaking Text, a timed connect-the-dots test which tests the ability to concentrate and work quickly. Comp. Hrg. Tr. 798. Defendant's score was in the low average range. Hazelrigg felt that the group of security guards standing around Defendant while he took these tests distracted him. Dr. Hazelrigg felt Defendant generally showed excellent ability to concentrate. Comp. Hrg. Tr. 799.

Hazelrigg administered the Rorschach Test, which seeks interpretation of inkblots from the test-taker to determine the relative degree of odd interpretations. The test was machine-graded using the Exner scoring system, a widely accepted scoring system for the Rorschach Test. Defendant's schizophrenia index was rated a "3", which is not considered to be suggestive of schizophrenia but which leaves open the possibility of schizophrenia. Defendant received a WUSM6 score of 7 (the WUSM6 is another scoring index for the Rorschach which reflects unusual or strange responses). Hazelrigg testified that schizophrenics on average score a 44 on this index. He pointed out that on the Rorschach Defendant took for Dr. O'Ha-

gan he scored a 17 on the WUSM6, also within the normal range. Hazelrigg testified that a person with a personality disorder on average scores 11.3 on the WUSM6, with a standard deviation of 10.

Hazelrigg played chess with Defendant. Comp. Hrg. Tr. 843. He said Defendant played "a pretty good game" and that he could concentrate and plan ahead. *Id.*

Dr. Hazelrigg also gave personality tests—the Minnesota Multiphasic Personality Inventory (MMPI–2) and the Personality Assessment Inventory (PAI). The MMPI–2 is divided into two categories of scales, the validity scales and the clinical scales. Comp. Hrg. Tr. 801. The validity scales seek to ascertain how accurately and/or honestly the person takes the test. The clinical scales test for clinical syndromes. Comp. Hrg. Tr. 801. Dr. Hazelrigg testified that on the validity scales, Defendant's scores were well below the critical level of 65, which means that he did not show any particular effort to present himself in an unrealistically positive way or in an unrealistically negative way. Comp. Hrg. Tr. 806. He testified that since Defendant answered honestly, that this is a clearly valid MMPI profile. Comp. Hrg. Tr. 806.

Dr. Hazelrigg testified that Defendant's scores were "almost a normal profile." The only score above the clinical level was the mania score. Comp. Hrg. Tr. 809, 927. He termed Defendant's profile a 4–9 profile, with the highest scores being scales 4 and 9, which is very strongly associated with antisocial personality disorder. Comp. Hrg. Tr. 810. He testified that the only thing that makes this result somewhat less than a classic Antisocial Personality Disorder MMPI profile was that scale 4 (psychopathic deviate) isn't quite elevated above the level of statistical significance. Comp. Hrg. Tr. 810.

Dr. Hazelrigg testified about the results of the PAI that he gave Defendant. The PAI is somewhat similar to the MMPI–2. Comp. Hrg. Tr. 838. The validity scales on Defendant's PAI were unremarkable. Comp. Hrg. Tr. 838. On the clinical scales he had only one elevation and that was in the area of alcohol or substance abuse. Comp. Hrg. Tr. 838–39. The scales for schizophrenic thought disorder and paranoid thought disorder were not elevated. Comp. Hrg. Tr. 839. The results of the PAI were very much consistent with the diagnosis of antisocial personality disorder. Comp. Hrg. Tr. 839.

Dr. Hazelrigg also administered the SIRS—the Structured Interview of Reported Symptoms. Comp. Hrg. Tr. 839. The person conducting the interview asks prescribed questions regarding the test-taker's symptoms which offer the opportunity to endorse very bizarre, unusual or totally implausible symptoms. Defendant stuck to his symptom report of the monitoring and the voices and did not endorse a high number of bizarre symptoms. Within the scoring system set by the test makers, his score was 72.2%, indicating a 72.2% probability of honest responding. Hazelrigg pointed out, in effect, that this still left a 27.8% chance of malingering. He found the test result "not definitive." Comp. Hrg. Tr. 1003.

Dr. Steven O'Hagan, a forensic psychologist, testified for the defense at the competency hearing concerning various cognitive and neuropsychological tests he had performed. He had administered the WAIS–R, and determined that Defendant has a verbal I.Q. of 88, a performance I.Q. of 88, and a full scale I.Q. of 86. He also administered the Bender Gestalt with Background Interference Procedure, a test to measure distractibility, and Defendant performed better on the portion of the test which added the feature of background interference. This indicated to him that

Defendant had no diffuse organic brain impairment. Comp. Hrg. Tr. 1680.

O'Hagan administered the Trailmaking Test, a timed connect-the-dots test. Defendant's performance on the first part of the test was adequate; his performance on the harder part of the test was quite good. He concluded there was no indication of gross or diffuse organic impairment. O'Hagan also administered the Wechsler Memory Scale Revised to Defendant. Defendant's scores on the test were as follows: verbal memory index 79 (poor); visual memory index 93 (average); and attention and concentration index 118 (very good).[16] He said that overall that these scores indicated some variability in Defendant's memory, indicating not diffuse brain damage but the possibility of a functional disorder, such as schizophrenia. Comp. Hrg. Tr. 1400–01.

On the Rey 15 Item Memorization Test which requires reproducing 15 figures from memory after viewing them, Defendant performed exceptionally well, reproducing 14 of the 15 items correctly. This result showed O'Hagan that Defendant was trying to do well and it also showed that Defendant has very good ability to remember visually observed material.

O'Hagan testified about his administration of the MMPI. He had given Defendant the MMPI, which has been superceded by the MMPI–2. O'Hagan's administration of the MMPI showed Defendant as having a normal profile— none of the scores were elevated above a level of clinical significance. O'Hagan sought to explain this by saying that Defendant had taken the test in a defensive manner. Therefore, it could not

be relied upon to reflect his true profile. However, the Court notes that validity scales which are built into the MMPI had already been applied to adjust Defendant's scores. Specifically, Defendant's "K" score of 18–K being a correction scale to account for defensive test taking—had already been used to adjust upwardly some of the clinical scales including the schizophrenia scale, the psychopathic deviate scale, and the psychasthenia scale. Even with the adjustment, Defendant's scores did not reach the level of clinical significance in any of those categories. O'Hagan sought to explain that by applying a formula of subtracting the K score from the F score, it could be determined that a further adjustment should be made to account for Defendant's level of defensiveness.[17] While the Court can understand how subtracting the F score from a higher K score could arguably give a better measure of defensive test taking, subtracting a higher K score from a lower F score to achieve a negative score does not make sense. Both because O'Hagan admitted that Defendant's MMPI scores were valid using the criteria established by the makers of the test, and also because O'Hagan's explanation of the negative F minus K score did not make sense, the Court rejects his testimony to the extent that he was seeking to imply (if indeed he was) that Defendant's scores on the test were not valid. The Court does agree that he took the test in a guarded manner, but the test result is valid as this consideration has already been factored into the result.

---

16. The scoring system for the Wechsler equates to the WAIS–R scoring system. Thus, 118 on the Wechsler would be the equivalent of 118 on the WAIS–R.

17. Defendant's K scores on the tests given by both O'Hagan and Hazelrigg were greater than his F scores. The F scale measures responses to infrequently endorsed items. A higher F score suggests malingering or exaggerating.

O'Hagan also administered the MCMI–II or Millon Test, which is also a measurement of personality. Defendant had no clinically elevated scores, except the score for "narcissism." Again, Dr. O'Hagan discounted this test result by saying that Defendant had taken the test defensively; however, this test result is also valid within the parameters set by the makers of the test.

O'Hagan also administered the Wide Range Achievement Test, which measured Defendant's achievement in reading, spelling and arithmetic. His scores on this test were low: reading, eighth grade level; spelling, fourth grade level; arithmetic, sixth grade level. These scores were somewhat below what would be expected of a person with Defendant's intellectual level.

O'Hagan's administration of the Hooper–Visual Orientation Test, a test of visual organization, yielded an average performance by Defendant, higher than would be expected based on his I.Q.

Another neuropsychological test O'Hagan administered, the Stroop Color Word Test, a test of interference, showed Defendant's color score to be above average and that Defendant's performance on the word portion of the test was well below average. O'Hagan testified that the test shows Defendant has the ability to sustain attention and also shows the possibility that he has problems with verbal function.

O'Hagan also gave the Rorschach Ink Blot Test. The test was hand scored by a colleague of O'Hagan's and the schizophrenia index was determined to be a "4." A score of "4" is considered to be consistent with schizophrenia, but not diagnostic of schizophrenia. O'Hagan discounted this result by pointing to Defendant's tendency toward guarded responses, which he felt caused an unduly low rating.

O'Hagan then gave Defendant the Holtzman Ink Blot Test. He testified that Defendant declined[18] to generate a response to 19 of the 45 pictures. He said this indicated that Defendant had a guarded profile.

O'Hagan's administration of the Finger Tapping Test revealed that Defendant achieved 39.7 taps per ten second trial with his right hand whereas with his left he had 46.5 taps per ten second trial. He testified this indicated some type of dysfunction affecting the motor area of his brain in the left cortex. Comp. Hrg. Tr. 1543.

The California Verbal Learning Test, which tests the ability to remember lists of items read to the test taker, showed weakness in verbal functioning and verbal memory, with a score roughly equivalent to an I.Q. in the low 80s. Comp. Hrg. Tr. 1546. O'Hagan testified this raised the question whether there was dysfunction in the left frontal area of the brain. Comp. Hrg. Tr. 1549.

O'Hagan administered the Categories Test, which is part of the Halsted Reitan Battery. This is a general test of neurological functioning. Defendant scored in the above average range. Comp. Hrg. Tr. 1552. This showed no neurological impairment and also showed that Defendant was not trying to fake the test.

On the Wisconsin Card Sorting Test, Defendant scored in the low-average range on the third administration of the test. Comp. Hrg. Tr. 1571. The Wisconsin Card Sorting Test is frequently used as a tool in the diagnosis of schizophrenia.[19] O'Hagan testified that the result on the

---

**18.** It is unclear whether O'Hagan meant Defendant said he had no interpretation of these pictures or that he refused to answer.

**19.** The Wisconsin Card Sorting Test is described in a previous order, *United States. v. Battle,* 235 F.Supp.2d 1301 (N.D.Ga.2001).

Wisconsin Card Sorting Test "very strongly points to the probability of a schizophrenic disorder. It points to neuropsychological dysfunction that has been found to relate to the presence of a schizophrenic disorder." Comp. Hrg. Tr. 1573. O'Hagan's statement that the test result "very strongly points to the probability of a schizophrenic disorder" is an exaggeration. Because the analysis is necessarily inferential, the more correct statement would have been that the result on the Wisconsin test points to the possibility of a schizophrenic disorder.

O'Hagan concluded his testimony by stating that he agreed with the diagnosis of paranoid schizophrenia. He felt the prominence of delusions as a symptom, the absence of grossly disorganized speech and behavior, and the absence of negative symptoms of schizophrenia such as apathy or flat affect pointed toward a diagnosis of the paranoid type of schizophrenia. Dr. O'Hagan felt that because Defendant had tried to do well on the tests he administered, Defendant probably was not making up his symptom of delusions. He said he felt Defendant lacked sufficient insight to assist his attorneys, and that this was evidenced by the fact that "he was unable to fully engage with me and participate in the psychological evaluation." Comp. Hrg. Tr. 1581. However, it seems to the Court that Defendant did participate rather fully in the sense that he willingly took all of the tests, albeit in guarded fashion.

Dr. George Woods then testified for the defense. He testified that a limitation of executive functioning impacts a person's competency. He discounted Defendant's adequate performance on many of the tests given by Dr. O'Hagan by pointing out that the deficits seen in schizophrenia are not global. The important areas to consider in diagnosing schizophrenia are attention, memory, and executive function. He pointed out that paranoid schizophrenics

have a higher level of neurological organization than other schizophrenics. Also, paranoid schizophrenics don't think they are crazy as is the case with Defendant. Woods pointed out that a personality disorder, unlike a psychosis, is stable. It does not wax and wane. He said this is a counter-indicator to the diagnosis of a personality disorder for Defendant.

Woods discussed the fact that frontal lobe dysfunction is associated with schizophrenia. He said frontal lobe dysfunction can be caused by a number of things: a tumor, a blow on the head, or substance abuse as well as schizophrenia. Comp. Hrg. Tr.2093. Woods stated that in reaching his diagnosis of paranoid schizophrenia for Defendant, he had relied in particular on the results of the Wisconsin Card Sorting Test, the Rorschach Test, and the Wechsler Memory Scale.

Judge Deane issued a lengthy Report and Recommendation containing his findings of fact and conclusions of law regarding the competency issue. Judge Deane concluded that Defendant was competent to stand trial. [Doc. 146]. Defendant filed objections to the report. Thereafter, the undersigned carefully reviewed the transcript and exhibits from the competency hearing and adopted the Report and Recommendation of Judge Deane. [Doc. 171].

The undersigned's order approving the determination of competency did not reject or discredit the testimony of any of Defendant's mental health experts concerning Defendant's reports to them of his implants, monitoring, or other bizarre symptoms. The only real question was whether Defendant had made up these reports, which he began making after the murder of Officer Washington. On this question, the Court found Dr. Johnson's and Dr. Hazelriggs' observations of Defendant over a 75-day period, persuasive. The fact that Defendant had not reported these symp-

toms to prison health care personnel before Washington's murder, while reporting other problems such as depression and anxiety and a large number of physical ailments, also is persuasive. Also, objectively graded personality tests done by experts for both sides pointed away from the existence of a thought disorder of psychotic proportions.

### 2. Trial Proceedings

The trial commenced on February 18, 1997. Defendant initially objected to being present in the courtroom and requested that he be excused. The Court had a lengthy colloquy with Defendant wherein Defendant stated that he had "been through this once before, so I'm aware of what is to be taking place." Tr. 19. This was an obvious reference to Defendant's 1987 murder trial. Defendant stated that he understood from discussions with his attorneys that he had a right to testify or not testify. Tr. 20–21, 24. Defendant stated that he understood the role of the prosecutor would be to present evidence of things he had done in the past to show that he was a violent person and a danger. *Id.* Defendant knew that the outcome of the trial was the verdict. Tr. 23. Defendant stated that he understood from discussions with his attorneys that the first step in the trial would be to question jurors. Tr. 24. Defendant responded appropriately to the Court's statements and questions indicating that he understood what the Court was saying to him. As an example, on one occasion the Court told Defendant, "I'm going to insist that you stay here for a while." Defendant responded, "Why are you insisting?" Tr. 25. On another occasion Defendant referred back to the Court's rationale for why Defendant should be in the courtroom for jury selection. Tr. 26. The Court finds that throughout this colloquy, Defendant demonstrated his understanding of the tri-

al process and the proceedings that were occurring at that time.

The second morning of the trial the Court again discussed with Defendant that it would be better for Defendant's case if he remained in the courtroom during the jury selection process. Tr. 129. The Court explained specifically that "What we are doing right now is picking the jurors, or getting ready to pick the jurors. That has nothing to do with the evidence. It is more of a question of which of the jurors look better to you than others." Tr. 130. Defendant responded, "yes, I understand that." *Id.* The Court then advised Defendant that he would be allowed to leave the courtroom and watch the proceedings via closed circuit television. When the Court asked if there was anything else before Defendant left, Defendant responded, "Yes, I will participate in this.... I can be here." Tr. 132. For the next several days of the trial, nothing notable occurred regarding Defendant's conduct.

On the afternoon of the sixth day of the trial Defendant raised anew his request that he be excused from the courtroom. Defendant did so after the jury was excused from the courtroom. Tr. 1237–38. Even though Defendant did complain about burning sensations, he responded appropriately to the Court such that it was clear that he was oriented to the proceedings. He also demonstrated that he continued to understand that the judge was in charge of the proceedings and that the judge was the person to whom he should direct his request to be excused. *Id.* Despite Defendant's contention that he was in pain and wanted to be excused, the record establishes that Defendant did not act out in front of the jury during the rest of the day.

The next day Defendant again waited until the jury was not present in the courtroom to renew his request to be excused.

Tr. 1369–70. During a colloquy with the Court this day, Defendant again demonstrated his understanding that his lawyer was advising him that testifying in his own behalf would not be in his best interest. Tr. 1372. Defendant also demonstrated that he understood that the Court was telling him that his lawyers had his best interests in mind. Tr. 1373. Defendant stated that he understood that if he testified the lawyers would ask him questions and he would have to answer them. Tr. 1374.

Then Defendant gave lengthy testimony before the jury. Tr. 1379–1522. He explained in detail his recollection of the events leading up to his wife's death. Tr. 1380–88. While much of Defendant's direct examination was a narrative, when he and trial counsel got to the events of December 21, 1994, Defendant answered questions responsively. Tr. 1410–15. Defendant showed that he had been listening to the testimony of the other witnesses. Tr. 1413–14.

On cross-examination Defendant acknowledged that he understood that it was wrong to kill another human being. Tr. 1425–26. Defendant also admitted that he knew that Officer Washington was a correctional officer and that he would be sent to segregation for assaulting a correctional officer. Tr. 1426–27. Defendant admitted that he read the newspapers regularly and that he had followed the Olympic Park bombing case involving Richard Jewell, the O.J. Simpson murder case, and the Jon-Benet Ramsey murder case. Tr. 1436. Defendant stated repeatedly that he did a lot of reading. *Id.* An examination of the questions asked and the answers Defendant gave on cross-examination establish

that Defendant answered the questions responsively.

Defendant also testified during the penalty phase. He admitted that he acted alone in the murder of Officer Washington. Tr. 4496. Given the fact that there had been evidence that other inmates were allegedly involved in the murder, this testimony was an obvious reference to that evidence. Defendant also demonstrated that he was aware of the impact that his actions had on Officer Washington's family. Tr. 4496–97.

The Court had ample opportunity to observe Defendant's conduct and hear his statements during the trial.[20] He paid good attention and was focused on the proceedings. At times Defendant appeared angry or stressed. The Court noticed from time to time the facial grimacing and eye blinking [21] noted by the mental health experts. Similarly, Defendant tapped his foot from time to time and sometimes rocked back and forth in his chair, but for the most part he sat still and listened.

The Court further observes that Defendant appeared to have a good recollection of the events on the day of the murder. The Court infers that Defendant and his counsel had gone over the events of that day in detail and that they had a good understanding of his version. Further, when Defendant testified during the guilt-innocence phase of the trial, he presented his case in a sympathetic manner. He did indicate remorse over the death of his wife, and he discounted his responsibility for Officer Washington's murder by reference to his implants. Contrary to Defendant's argument, his testimony before the jury, at least during the guilt-innocence

---

**20.** The Court does not believe Defendant's in-court statements were digressive, vague, or incoherent. *Cf.* 2002 Psychiatric Report at 22 § 2, Def. Ex. 80, March 18, 2002 Habeas Hrg.

**21.** Defendant evidently wanted to make sure the eye blinking was noted by the Court: "You know, I am sitting here and smirking with my eyes and everything." Tr. 1376.

phase, was not harmful to his defense. The evidence supporting the Government's claim that Defendant had struck the fatal blows to Officer Washington's head was so strong that Defendant's admission during his testimony that he had done so was not significantly prejudicial.

The Court finds, however, that Defendant's testimony at the penalty phase was very damaging to any chance he might have had for a life sentence. Specifically, Defendant in referring to Washington said, "The guy, you know, he acted like a dog. You know, he talked to you like a dog, and you know, he died like a dog." Tr. 4496. The Court believes Defendant did this deliberately. This conclusion is reinforced by the Defendant's comment which he made after the death sentence was imposed. At that time he said, in a matter-of-fact tone, "Could I just do away with the appeals and everything at this moment?" Tr. 4672.

### 3. *Kearns' Declaration*

At the habeas hearing on March 18, 2002, the declaration of Stephanie Kearns was admitted into evidence. The declaration stated in part:

> I was stunned that Drs. Johnson and Hazelrigg found Anthony Battle to be competent, and not suffering from a psychotic disorder. He is one of the most mentally ill clients I have ever represented. He maintained from the first time I met him that the Bureau of Prisons had put implants in him, implants that controlled his thoughts and caused him pain. Sometimes I could communicate with Anthony, sometimes I could not. It made sense to me when mental health professionals told me that the symptoms of schizophrenia "wax and wane", as that described the relationship with Anthony. It was so clear to me that Anthony was severely mentally ill and psychotic and I believe that lulled me into the belief that any competent

> mental health professional would agree. During trial, his mental condition further deteriorated, he quit changing his clothes, he did not bathe, he began to smell, and he quit talking with us. His mental condition during trial was the worst we had ever seen it. This was probably due in part because he did not want an insanity defense put on, in part because he was frustrated we had not found the implants that he believed had been put into him, and in part because he was a seriously mentally ill man who was just further decompensating under the stress of trial....

Kearns Decl. ¶ 10, Def. Ex. 50, March 18, 2002 Habeas Hrg.

Regarding the statement that Defendant quit changing clothes, it is not unusual for an in-custody inmate to utilize one set of street clothes during a trial. This trial was more lengthy than average; the record does not disclose whether or not defense counsel provided Defendant with an alternate set of clothes which he might have used had he so chosen. Kearns' declaration does not provide this information. The Court did notice that Defendant wore the same black sweater each day of the trial, but believed this was his and his counsel's preference, inasmuch as the black sweater tended to conceal the black velcro straps which were kept around Defendant's wrists. While the Court's view of Defendant was from a distance far greater than that of defense counsel, the Court could not observe anything about the Defendant's hygiene which was visually out of the ordinary. Finally, the Court notes that Dr. Davis, one of the defense's expert witnesses, testified that when he visited Defendant on February 8, 1997, Defendant's condition seemed improved since his last visit in November 1996.

Kearns has offered her opinions as to why Defendant allegedly refused to com-

municate with counsel. Her opinion is that it was probably due in part to the fact that Defendant did not want an insanity defense, in part because counsel had failed to find his implants, and in part because he was seriously ill and was decompensating under the stress of the trial. The Court notes, however, that those are simply Kearns' opinions about what was in Defendant's mind. Her declaration does not refer to statements made by Defendant. It is just as likely that Defendant was angry because he could not find a way out of a very difficult situation. He undoubtedly knew that his chance of avoiding conviction was low, and that he would probably get either a non-paroleable life sentence or a death sentence. A number of times he expressed that a death sentence would be preferable to a non-paroleable life sentence. Finally, the Court believes that Kearns' opinions are colored by her position as advocate for the Defendant, a role which she has not relinquished even though she is no longer his counsel.[22]

### 4. 2002 Psychiatric Report

A portion of the 2002 Psychiatric Report is devoted to criticism of the administration of cognitive and neuropsychological tests by Dr. Hazelrigg and Dr. O'Hagan to Defendant in 1996. Def. Ex. 80, March 18, 2002 Habeas Hrg. After considering those criticisms, the Court finds that they do not call for a change in the Court's earlier decision finding Defendant competent to stand trial.

First, the 2002 Psychiatric Report states that Dr. Hazelrigg's 1996 administration of the MMPI–2 was not properly scored. *Id.* at 35. Hazelrigg hand-scored the test, which is permissible. However, according to the 2002 Psychiatric Report, he failed to note that when Defendant took the test he omitted 14 items.[23] The authors of the 2002 Psychiatric Report had the test re-scored by a standard scoring service (National Computer Systems) and when that was done, an interpretive report was issued which suggested that further interpretation of Defendant's scores should be undertaken. The interpretive report as described in the 2002 Psychiatric Report does not appear to suggest a greater likelihood that Defendant is schizophrenic. It may suggest a greater likelihood that Defendant has a score above the level of clinical significance on the psychopathic deviate scale. If so, this re-scoring would result in a so-called "4–9" profile which would more strongly support the idea that Defendant has antisocial tendencies. However, the Court does not believe that the interpretive report[24] as discussed by Defendant suggests schizophrenia more strongly than the 1996 test results, or that it shows Defendant was incompetent.

**22.** In light of Kearns' adamance that Defendant is psychotic, it is odd that counsel did not raise on direct appeal the Court's determination that Defendant was competent. Neither is the failure to appeal this finding one of those described by Kearns as being an oversight. *See* Kearns Decl. ¶ 16, Def. Ex. 50, March 18, 2002 Habeas Hrg.

**23.** Actually, Hazelrigg noted that 13 questions did not have scorable answers. Most involved marking both of the "true" and the "false" options. *See* Gov. Ex. 7, Comp. Hrg. The MMPI–2 Manual states that tests with more than 30 omitted (including double-marked) items should be considered highly suspect or invalid. Graham, a leading expert on the MMPI–2, states that his own practice is to proceed with caution in interpreting protocols with more than 10 items omitted. *See* John Robert Graham, *MMPI–2: Assessing Personality and Psychopathology* 72 (3d ed.2000).

**24.** Neither of the interpretive reports obtained by the authors of the 2002 Psychiatric Report were provided to the Court. Defendant has the burden of proof, and better practice would be to submit the full report.

The 2002 Psychiatric Report also states that the PAI was machine-scored and an interpretive report generated. Apparently, this is a reference to the machine-scored report which Dr. Hazelrigg relied on when he testified. Hazelrigg testified that the only striking finding of the report was its finding of personality attributes strongly associated with alcohol dependence. While the 2002 Psychiatric Report points out various other material within the report, it does not appear to undermine Hazelrigg's testimony that the only clinically significant finding within the parameters set by the test was that Defendant has the profile of an alcohol dependent person.

The 2002 Psychiatric Report also points out that when Hazelrigg's administration of the Rorschach test was machine scored, the report indicated that there is "a significant deficit in perceptual accuracy such as often exists when reality testing is impaired." Def. Ex. 80 at 36, March 18, 2002 Habeas Hrg. This report was admitted into evidence at the 1996 competency hearing and reflects (as Hazelrigg testified) a schizophrenia index of 3 based on the machine scoring. Gov. Ex. 7, Comp. Hrg. Both Hazelrigg and O'Hagan agreed that the Rorschach scores are only suggestive of the absence or presence of schizophrenia. The trial evidence showed that in a study involving 320 known schizophrenics, 33% had an SCZI (schizophrenia index) score of 6; 26% had a score of 5; 23% had a score of 4; and 18% had a score below 4. Def. Ex. 42A, Trial. The same study determined that within a pool of 180 persons with known personality disorders, 98% had SCZI scores below 4.

The 2002 Psychiatric Report also criticizes the test administrations by Dr. O'Hagan. First, the Report states that when the MMPI given by O'Hagan to Defendant was re-scored by machine, it was determined that "the level of guardedness masks the clinical elevations and prompts interpretations of scales within the 60–65 range, rather than the typical cutoff of 70." Def. Ex. 80 at 36, March 18, 2002 Habeas Hrg. In support of that assertion, the Report cites "Graham, 1994, p. 49, 51." However, the title of the Graham text is *MMPI-2: Assessing Personality and Psychopathology*. There is no 1994 edition. The 1993 edition, p. 51, and the 2000 edition, p. 58, respectively, do indicate that with the MMPI-2 the scores of a person presenting a defensive profile should be considered significant if they fall in a 60–65 range. For the MMPI-2, the level of clinical significance is set at 65. However, Dr. O'Hagan gave the MMPI, in which the level of statistical significance is 70. Therefore, it is not clear that Defendant's score of 65 on the psychopathic deviate scale [25] should be adjusted upward to over 70 so that it would exceed the level of clinical significance. However, assuming that it should be, the Court does not see how considering the psychopathic deviate score to be above 70, and thus at a level of clinical significance, helps Defendant to prove that he has schizophrenia rather than a personality disorder, or that he was incompetent.

The 2002 Psychiatric Report also notes that the MCMI-II ("Millon") which was administered by Dr. O'Hagan reveals severe personality pathology as well as the clinical personality pattern of narcissism. That appears to be true, but again the

**25.** The psychopathic deviate scale on the MMPI administered by O'Hagan appears to be the only clinical scale near enough to the level of clinical significance to be affected. Scale 8, the schizophrenia scale, is measured at 52 on O'Hagan's test after the K scale correction is factored in. This is close to the mean of 50, which represents the response of an average test-taker.

Court does not see how that determination assists Defendant in proving that he suffers from schizophrenia or that he was incompetent in 1996–97.

Finally, the 2002 Psychiatric Report argues that Defendant's performance on the Rorschach Ink Blot Test and Holtzman Ink Blot Test as given by Dr. O'Hagan was significant in a manner not appreciated by Dr. O'Hagan. Specifically, the Report argues that the fact that all of Defendant's responses on the two 1996 and the 1987 Rorschach tests were, apparently, the same means that Defendant remembered and was repeating the same responses as a mechanism to avoid revealing his psychotic thought processes. Defendant had told Dr. O'Hagan that he had tried to make the test results consistent by remembering previous responses. If Defendant indeed did remember and simply copied previous responses, the reason seems a matter of speculation.[26]

In summary, the Court finds that the 2002 Psychiatric Report's criticism of the tests administered by Dr. Hazelrigg and Dr. O'Hagan is insufficient to undermine confidence in the earlier conclusion that these tests tend to point away from a diagnosis of a serious thought disorder and that they do not show that Defendant was incompetent in 1996–97.[27]

### 5. *Findings and Conclusions*

After considering the foregoing evidence, the Court makes the following findings of fact regarding Defendant's substantive competency claim:

Defendant has an I.Q. of 86, which is low average. As evidenced by the results of cognitive tests, the testimony of both sides' experts, and also by Defendant's statements and testimony during the trial, it is clear beyond any doubt that Defendant has the ability to understand, and actually did understand the charge against him, the potential consequences of the charge, and the Court proceedings which occurred.

The Court also finds that Defendant had the ability to assist his counsel in preparation for and during the trial, and that he did assist counsel. He discussed the facts of his case with counsel during the pretrial phase and cooperated with defense investigators who sought information from him concerning his background and childhood. The interview memoranda which are in evidence reflect that he gave detailed information.

The Court's observations of Defendant and communication with him during the trial revealed that Defendant was alert and focused throughout the proceedings. Defendant's claimed belief in his implants did not prevent him from agreeing with his counsel, albeit reluctantly, to raise an insanity defense. This decision was rational. Defendant did not like the idea of an insanity defense, which he considered demeaning but ultimately did realize that it was in his best interest to pursue this defense.

Defendant also indicated in his discussion with Drs. Johnson and Hazelrigg that he was open to considering a plea bargain. The record also indicates that Defendant

---

**26.** If Defendant's response on the Rorschach tests given by both O'Hagan and Hazelrigg in 1996 indeed were exactly the same, the question arises as to why the schizophrenia index on Hazelrigg's test was 3, but on O'Hagan's it was 4.

**27.** The 2002 Psychiatric Report notes that its authors administered the SIRS tests to Defen-

dant. On this administration, Defendant had one score in the probable feigning range, three in the indefinite range and four in the honest range. According to the SIRS Professional Manual, Table 18, this means there is a 50% likelihood of feigning and a 50% likelihood of honest responding. *See* Manual, Def. Ex. 41, Trial.

pleaded not guilty. These were rational decisions as well.

The Court further finds that during the trial, there was some friction between Defendant and his trial counsel. Defendant felt the trial was not going well and blamed his lawyers. He complained to counsel that they should have found his implants. Defendant had no chance of being found not guilty but did have a chance of being found not guilty by reason of insanity. Once he was found guilty, he lost interest in the outcome of the sentencing phase.

All of the evaluators for both sides who interviewed and tested Defendant in 1996 agreed that he was alert and cooperative. They all agreed that he made his best effort. He approached the tests in a guarded or defensive manner. There is no evidence that he was trying to do poorly on the tests so as to suggest mental illness. The question therefore arises whether this conduct is consistent with the notion that Defendant has been making up his implant delusion and his claimed hallucinations. One reasonably satisfactory answer is that Defendant has taken diagnostic tests a number of times over the years. At least following the tests at Butner, he was given feedback on the results and the meaning of the tests including the validity scales. Also, Defendant maintained contact with his counsel during the 1996 evaluation at Butner. He was allowed to consult with counsel. Therefore, he probably was aware that cheating on the tests may be detected. Also, the Court believes Defendant does want to be perceived as capable and intelligent and that he performed well for that reason also.

Another question is whether Defendant, with an I.Q. of 86, could successfully fool an experienced psychiatrist such as Dr. Davis regarding the genuineness of his claimed belief in his implants. Reluctantly, the Court concludes that he could and that he did. Defendant does not have the ability to contrive a grand scheme, but he does have knowledge of the main features of paranoid schizophrenia—delusions and hallucinations. Between 1987 and 1990 he was incarcerated at FCI–Butner, which has a large population of inmates with schizophrenia. He has the ability to copy and to exaggerate. The Court believes and finds that he did exaggerate in his discussions with the defense mental health experts. While he was at USP–Leavenworth Defendant believed, correctly, that the guards in the control booth were "monitoring" i.e., watching him. His current claimed belief in microchip implants is an extension and enlargement of that idea. Defendant probably has given a lot of thought to the possibility of microchips in his head. Defendant did urge his counsel to find and present evidence of the implants at trial. Without hearing Defendant's own testimony regarding his state of mind during the trial[28] it is difficult to determine whether this was because Defendant had some hope that counsel might find some tangible evidence of implants or whether this was a form of manipulation, i.e., that Defendant knew his demand could not be met and that this could be used as an excuse to try to avoid a trial. As mentioned previously, Defendant is a manipulative individual. Defendant has the burden of proof and has failed to persuade the Court that he had a firm and fixed belief in his alleged implants at the time of the trial. The fact that he told his trial counsel in May 1995 that the guards had gotten into his mind somehow and that implants were one possible explanation among others suggests that in May 1995

28. Defendant offered no declaration or other statement in the habeas proceeding regarding his state of mind at the time of trial.

he did not have a fixed belief in the implants. Also, he did not mention implants to any of the investigators who interviewed him after Washington's death. He had never mentioned the implants either to his relatives or to other inmates prior to Washington's murder, although he did complain of "monitoring" beginning when he was at USP Leavenworth. The first reflection in the record of an unequivocal complaint about implants was in the interview with Dr. Davis in August 1995. Even if Defendant did believe he had implants by the time of the trial in 1997, it did not unduly interfere with Defendant's participation in the trial.

Defendant has read a lot while in prison,[29] and his cognitive level as measured by standardized tests improved in the intervening time between 1987 and 1996. It is clear that he has an intense interest in his psychopathology. The authors of the 2002 Psychiatric Report noted that "Anthony could appear deceptively organized when talking about well-rehearsed subjects (such as his legal troubles and symptoms)." Def. Ex. 80 at 23, March 18, 2002 Habeas Hrg.

In Dr. Davis' written report and also when he testified at the competency hearing and during the trial, he quoted some of Defendant's statements which he especially thought could not be malingered and which he testified were "classic signs" of schizophrenia. The most striking testimony during trial was the following:

There were certain things that are very bizarre and unusual that a malingerer doesn't come up with. *One of the things he told me is that the guards could do such things as open up his pores, cause him to dehydrate, wither*

*up, drain out the fluids from his body, make his heart beat fast, and make catches in his breathing.*

Now, I have never seen anybody malinger who could make things up like that. That's just a bizarre description typical of schizophrenia. (Emphasis supplied.)

Tr. 2284.

The Court credits Dr. Davis' testimony that the referenced statement was made and that it is typical of schizophrenia. However, it is also noteworthy that these phrases are strikingly different from Defendant's normal speech pattern. As the cognitive tests indicated, Defendant has a somewhat limited vocabulary and while he can express himself clearly enough, the quality of his verbal expression is below average. Given the time Defendant has to think about his symptomatology, plus his good ability to memorize and remember written material, and his past association with large numbers of schizophrenic inmates, the Court believes he is capable of rehearsing and delivering descriptions of his symptoms which are not original to him. This could be because Defendant wants to deflect blame for Washington's murder away from himself; it also may be that he finds the interaction with the evaluators stimulating and enjoys the attention which discussion of his implants brings.[30]

Accordingly, because Defendant has failed to carry his burden of showing by a preponderance of the evidence that he actually was incompetent during his trial in 1997, the Court concludes that his legal challenge based on a claim of substantive incompetency is without merit.

---

29. All of the Court's findings are as of 1996–1997.

30. The Court stresses that Defendant is not a normal person. He is suspicious and odd in his thinking and manner of expression. He was not psychotic or incompetent during his trial, however.

### C. Continuance to Permit Further Competency Evaluation

 Defendant also claims the Court erred in not continuing the trial to permit Dr. Davis to re-evaluate Defendant's competency. Just before jury selection began and also at the end of the first day of jury selection, Defendant made requests for a continuance for this purpose which were denied. This is a procedural due process claim which depends on a determination whether there was a "bona fide doubt" regarding competency at the relevant point in time. *Johnston v. Singletary*, 162 F.3d 630, 634 (11th Cir.1998). On February 18, defense counsel said:

MR. MARTIN: As we have told the Court in the past, Mr. Battle tends to be a day-to-day thing as to what he is willing to agree to in his defense, or how to conduct his defense. We met with him this morning basically just to give him some clothes we had for him to wear in the courtroom, and just sort of touch base with him.

THE COURT: Right.

MR. MARTIN: And he told us at that time—first of all, he refused to put the clothes on. And secondly, he told us he did not want to participate in the trial. He offered as his explanation for that that we have not adequately represented him by finding the implants that are in his system.

Feb. 18, 1997, Ex Parte Proc. Tr. at 2.

In declining to grant the continuance to conduct a further competency review at that time, the Court said:

THE COURT: Well, the problem is I'm not at all sure things will be any better tomorrow, and it's very hard from where I'm sitting to know how much is going on that is real, and how much, if any, is going on that is calculated just to delay the trial. I mean I think trying to put myself inside Mr. Battle's head, the way it is looking to me based on what I

know about the case is that the Government has got a reasonably strong case against him on the guilt/innocence issue, and, you know, I'm guessing that he knows that.

I understand that he has said at certain times in the past that being locked up for life is totally unacceptable to him. At points he said he wants the death penalty, and I think at other points has said no, and, you know, his objective is to look for some way out of the whole situation.

I guess, you know, I'm a little bit concerned that that's really what is going on. I'm not suggesting that you all are egging him on in that respect. I just think that's a possibility.

*Id.* at 5.

With respect to Defendant's argument that the Court should have ordered a further competency examination immediately prior to the beginning of the trial, Defendant points to colloquy between the Court and defense counsel during the February 18, 1997, ex parte hearing in which the Court related its desire to obtain some advice from a psychiatrist regarding medication which might be administered involuntarily to the Defendant. *Id.* at 5–8. The context of those remarks, however, related to security considerations, not the Court's belief that Defendant was incompetent or psychotic, as is discussed in more detail below, p. 171.

The Court's plan, as jury selection got under way, was to observe Defendant during jury selection, before the jury was sworn. Observation and direct communication with Defendant reinforced the Court's view that Defendant was competent to stand trial. There was no bona fide doubt as to Defendant's competency and no need to have a further competency evaluation.

Defendant argues that the Court erred in failing to grant his request for continuance to permit a further competency evaluation at the end of the first day of jury selection. Counsel premised the request on the fact that on that day Defendant had "Stared at the wall. Didn't move. Wouldn't communicate." Tr. 112. This also is a procedural due process claim.

By the time the trial started the Court had a substantial amount of information concerning Defendant's mental condition. The first day of the trial began in the courtroom (for jury selection) at 3:08 p.m. At that time the Court had a direct conversational exchange with Defendant and also had the opportunity to observe him in the courtroom. Tr. 19–27. After that, voir dire was held until the end of the day (approximately 5:30 p.m.). Counsel's observation at the end of the day that Defendant stared at the wall during jury selection, wouldn't move, and didn't communicate was insufficient to cause a bona fide doubt concerning his competency in the face of the Court's own observations. The Court was convinced that Defendant did have the ability to confer with his counsel. Lack of defendant communication with counsel during the questioning of jurors is not at all unusual. In fact it is the norm. Furthermore, had counsel desired that Dr. Davis evaluate Defendant that evening, they could have done so. A continuance was not needed.

Accordingly, the Court makes the following finding of fact: There was no bona fide doubt concerning Defendant's competency so as to warrant a continuance of the trial for a further competency proceeding, either before the jury selection began or at the conclusion of the first day of jury selection. The Court further concludes that Defendant has failed to establish a procedural due process violation.

## IV. CONTROL OF DEFENSE OF INSANITY

 Defendant contends that his trial counsel presented an insanity defense over his objection in violation of the Fifth and Sixth Amendments. In making this argument Defendant relies on the declaration of Stephanie Kearns. The pertinent part of Kearns' declaration is as follow:

It was clear to us that Anthony Battle did not want to present an insanity defense. We lead him to believe that filing a notice of insanity defense, and going through the evaluations by the various doctors, was the way in which we could expose what he believed the Bureau of Prisons had done to him, i.e., put implants in him that controlled his thoughts and caused him pain. Anthony realized during the competency hearing proceedings that we were in fact labeling him "insane". As a result, he wanted new lawyers. We filed a motion to be relieved as counsel at a hearing before the Magistrate Judge. The Magistrate Judge urged Anthony to work with us, believing that we (Anthony Battle, Jack Martin and me) could work things out on what defense should be presented, and denied the motion. Thereafter, Anthony made it clear to Jack Martin and me that he did not want an insanity defense presented. The first time he became aware that we were actually presenting an insanity defense was when it was mentioned in open court during his trial.

Kearns Decl. ¶ 9, Def. Ex. 50, March 18, 2002 Habeas Hrg. John Martin, Defendant's other trial counsel, has filed a declaration which does not specifically address Defendant's contention that the insanity defense was forced on him, though it does state in part: "Based on my information and belief, I agree with the contents of [Stephanie Kearns'] declaration."[31] Mar-

---

**31.** The Court finds the "information and be- lief" qualification odd. It implies reliance on

tin Decl. ¶ 6, Def. Ex. 55, March 18, 2002 Habeas Hearing.

While the Court does accept counsel's assertion that Defendant did not "want" an insanity defense in the sense that he found the suggestion of insanity or the diagnosis of schizophrenia insulting, the evidence before the Court preponderates in favor of a determination that Defendant did consent to an insanity defense although he voiced some ambivalence about it.

The Court alerted counsel at a January 30, 1997 pretrial conference that no later than opening statement, Defendant would have to announce his decision as to whether he was pursuing an insanity defense. Jan. 30, 1997, Conf. Tr. at 5. On February 13, 1997, another pretrial conference was held. Initially, the discussion centered on the wording of a questionnaire which was to be distributed to prospective jurors.

THE COURT: Okay. (Referring to a draft questionnaire).... [W]hat about the reference to the insanity defense?

MR. MARTIN: *Our position on insanity at this very moment, and given the nature of the client it can always change, is that we would want to present an insanity defense. ...*

\* \* \* \* \* \*

THE COURT: Well, we could say an insanity defense may be presented, and if the penalty phase of the case is reached, evidence will be offered pertaining to the Defendant's mental condition.

MR. MARTIN: That would be good.

\* \* \* \* \* \*

THE COURT: Okay. If you all are going to go with the insanity defense, I guess we don't need to talk about what kind of evidence from experts would

facts as to which Martin has no firsthand knowledge. This seems odd because Martin

come in solely on the issue of specific intent.

MR. MARTIN: I see both issues are in the case.

THE COURT: I mean you are in the driver's seat as far as whether you are going to do an insanity defense.

MR. MARTIN: I understand.

THE COURT: And you are telling me you are.

MS. KEARNS: Mr. Battle is in the driver's seat.

MR. MARTIN: Unfortunately.

\* \* \* \* \* \*

THE COURT: I guess I will just have to wait and see when we get there. In looking over the packet of psychiatric testimony that you all submitted, I don't think much of it would make it into evidence solely on the issue of specific intent.

\* \* \* \* \* \*

THE COURT: And I guess I just wanted to make sure before the experts are referred to in opening statement and before they start testifying, you know, that you all are committed to the insanity defense.

\* \* \* \* \* \*

MS. KEARNS: *Judge, I think you have dealt with both Jack and I long enough to know we wouldn't customarily sandbag the Court, but I have to be honest with you. It's a three or four week trial, and Mr. Battle is in control of some of these decisions, and I can't assure the Court that he's not going to change his mind about something that we have represented we are going to do earlier, and later instruct us we can't do it anymore.*

was lead counsel.

THE COURT: *But, you see, what I'm going to do once we start the trial is take the position that the determination has been made, and, you know, if the testimony of the experts, which is really insanity defense testimony, if that is brought out in opening statement or in evidence during the trial, then I'm going to give an insanity charge even if Mr. Battle changes his mind, and that's why I'm bringing this up now, just to highlight that it's important to really make that decision now.*

It sounds like you all have made it for now, and as I said previously, *once the opening statements begin, you will be irrevocably locked into that course.* (Emphasis supplied).

February 13, 1997, Conf. Tr. at 36–39.

The Court finds that defense counsel had recommended and Defendant had not rejected an insanity defense before trial. On February 13 counsel said essentially that Defendant had decided to pursue an insanity defense although he might change his mind later. The Court warned counsel that if an insanity defense was presented in opening statement, that defense could not be subsequently withdrawn. The very purpose of that admonition was to avert a mid-trial request, strategic or otherwise, to withdraw the insanity defense after the expert testimony on insanity had been presented.

On February 21, 1997, after jury selection had been concluded, the following conversation ensued between the Court and counsel in Defendant's presence.

MR. MCKINNON: Judge, I have one other matter. I'm sorry. I guess it's a little out of the ordinary in the procedure, but it is my intention to anticipate the insanity defense and address issues regarding the testimony of those witnesses in my opening.

MR. MARTIN: We will address it too.

THE COURT: So, it is clear for the record, there will be an insanity defense, and the defense will be asking the jury to consider as one option not guilty by reason of insanity?

MR. MARTIN: Right.

Tr. 703–704.

After the lunch break, and prior to the opening statements, defense counsel informed the Court before the jury was brought in that Defendant wished to be excused from the proceedings. Counsel did not make any comments about Defendant's decision not to present an insanity defense. Defendant then related that he wanted to be excused because "I'm not in agreement with what my attorneys have to offer on my behalf as evidence." He then said, "There's more credible evidence I would have preferred to have here in this case." After the Court informed him that the law required his presence, Defendant then said, "It's not so much I'm not in agreement with my attorneys. I'm in slight pain. I feel slight pain sensations also. So I'm in a little discomfort also, and I don't know. I can sit here and everything, but, you know it would be very endurable (*sic*). I would have to really go to great lengths to endure the situation. I'm physically just draining myself to stay focused most of the time." Tr. 708. When the Court reiterated that Defendant should be present in the courtroom, Defendant replied, "You are probably right. I should be here for those alleged theories that you just pronounced. It's just so many things are going on in this situation I'm just not in total agreement with." Tr. 708.

At the time of the foregoing colloquy both defense counsel clearly knew that the Court was relying on their announcement that Defendant was proceeding with an insanity defense. The Court was entitled to rely on the representation of officers of

the Court.[32] Neither Defendant nor his counsel said Defendant had not agreed to an insanity defense. Defendant complained of the lack of an "implant defense", but that is different from the issue whether he had consented to an insanity defense.

Following that the jury was sworn. In the opening statement the defense outlined what it contended the evidence on insanity would show: Defendant was degenerating into mental illness at the time he killed his wife in 1987. In 1987 the psychiatrist at FCI–Butner had opined that while Defendant had a personality disorder this might be a precursor to full-blown schizophrenia. Defendant behaved strangely while in prison, and exhibited signs of mental illness while in prison. Dr. Davis, an experienced psychiatrist, would testify that Defendant was a paranoid schizophrenic and that he was not faking his symptoms. Dr. Woods, a neuropsychiatrist, would testify concerning Defendant's paranoid schizophrenia. Dr. O'Hagan, a psychologist, would testify that Defendant was suffering from paranoid schizophrenia, which may signify separation from reality. Numerous cognitive, personality and neuropsychological tests had been done which supported the diagnosis of schizophrenia.

In addition, the following relevant colloquy occurred between the Court and counsel on the morning of March 4, 1997. At that time, Defendant had not been brought into the courtroom and the jury was not present.

MR. MARTIN: Is there a problem with Mr. Battle?

THE COURT: I was informed by the deputy marshal who is in charge of this detail that when they went to the jail this morning to get Mr. Battle, he was in bed and announced he was not going anywhere. He didn't want to participate any further. They put the cuffs on his feet, took the blanket off of him, and cuffed his hands. He didn't want to come. They picked him up and carried him to the Marshal's van. When they got to the courthouse he did walk in under his own power, but he still announced he did not want to come upstairs to the proceedings, that he was disgusted, and didn't want to participate and so forth.

I told Deputy Marshal Warren to go back downstairs to the holding cell, and to tell Mr. Battle again that he needs to put on the clothes that have been provided for court appearances, but I also told him that if Mr. Battle would not cooperate in putting on the clothes, to bring him upstairs and sit him down in his chair in the courtroom, and I presume that has been done while we have been sitting here talking.

MR. MARTIN: I did want to mention something. I don't want to delay things, but I feel sometimes in this case we are in sort of uncharted waters. The client keeps saying he is uncomfortable with this defense. *He has given us what we consider to be implicit authority early on in rambling conversation that I seized upon,* and I think it is in his best interests to present this evidence, and that's what I'm proceeding on.

THE COURT: Right. Let me say this: *As far as I am concerned at this point, you are off the hook because I*

---

**32.** If Kearns intends her declaration to imply that Defendant did not *consent* to an insanity defense, it is a matter of great concern that she did not speak up before opening statements, as she should have consistent with her ethical obligation as an officer of the Court. It is difficult to square Kearns' statement in the pretrial conference that her client was in charge of the decision on the insanity defense with her current statement that Defendant did not know until opening statement that an insanity defense was being asserted. Unfortunately, at this point Kearns' credibility must be questioned.

*indicated before the trial started that once we started into the insanity evidence, that I was not going to allow the Defendant to withdraw his insanity defense.*

MR. MARTIN: Okay.

THE COURT: So, I do not think— regardless of what he is saying at this point, I'm not going to let him withdraw it.

MR. MARTIN: I'm not saying he has made any unequivocal statement one way or the other. It's just vague and rambling. So, I'm proceeding on that basis, and we are going forward with it, but I expect him—I don't say it is going to happen, but I wouldn't be surprised that he'll object from time to time.

Tr.1932–33 (Emphasis supplied).

The Court finds that Defendant has failed to carry his burden of showing that he did not consent to an insanity defense. Defendant may not have liked the idea of an insanity defense or being referred to as schizophrenic, but counsel urged him to adopt an insanity defense, and despite some equivocation [33] he did not reject their recommendation. Counsel undoubtedly told him that an insanity defense was his only chance of avoiding conviction. That advice was absolutely correct. In all likelihood, they also told him that the same evidence of his mental condition would be presented at the sentencing hearing if he was found guilty. Therefore, the jury would learn this information in any event. Defendant has failed to convince the Court that he did not at least tacitly consent to the insanity defense. The Court also notes that Defendant is a manipulative in-

dividual, and was a difficult client for his trial counsel to deal with.[34]

The record does not contain much evidence regarding Defendant's discussions with his counsel on the question whether to raise an insanity defense. Defendant has not himself testified that he did not authorize an insanity defense. Defendant has offered some selective evidence from one of his defense counsel. However, taking into account other evidence in the record, it is not enough to convince the Court, by a preponderance of the evidence, that he did not consent to the insanity defense or that his will was overborne. Defendant has the burden of proof on this issue, and the evidence he has offered is insufficient.

The Court finds particularly apt the admonition and holding of the United States Court of Appeals for the Second Circuit in *Dean v. Superintendent, Clinton Correctional Facility*, 93 F.3d 58, 62 (1996), as follows:

[A court in] reviewing an ineffective assistance of counsel claim based on the imposition of an insanity defense must be careful not to confuse, through the prism of hindsight, persuasion with coercion and disagreement with objection. Rather, the court must review such a claim in the context of an adversarial process which the Constitution advances as the essential ingredient of a fair trial.... In accordance with our acknowledgment of the vigor with which competent defense counsel advises a client on a strategic decision as significant as an insanity defense or plea, a petitioner who does not state an objection on the record must show not only that he "disa-

---

33. At a post-trial conference with the Court on August 15, 2000, defense counsel Kearns recalled, "One day he [Defendant] would tell us to do this, do that, raise insanity, don't raise insanity." August 15, 2000, Hrg. Tr. at 13.

34. The Court is skeptical that Defendant expressly agreed to anything with his counsel. The Court also believes that Defendant thought his best option was to stop the trial altogether.

greed" with counsel, but that his "will was 'overborne' by his counsel." See *Teague*, 953 F.2d at 1535 (affirming district court's determination that the defendant's "will was not 'overborne'" on the decision not to testify). Disagreement colored by acquiescence is not sufficient.

*Id.*

■■■ Assuming *arguendo* that Defendant could establish that he did not consent, either expressly or tacitly, to an insanity defense, the Court still finds that Defendant's attempt to set aside his conviction based on improper assertion of the insanity defense would fail.

Defendant argues that his counsel violated his Fifth Amendment due process rights and his Sixth Amendment right to effective assistance of counsel by presenting an insanity defense over his objection. He argues that an insanity defense under federal law is the equivalent of a plea of not guilty by reason of insanity. He also asserts, without authority, that "raising the insanity defense concedes commission of the act."

Initially, the Court disagrees with Defendant's argument as a matter of law. Technically, under federal law, there is no provision for a plea of "not guilty by reason of insanity." *See* Fed.R.Crim.P. 11(a)(1) ("A Defendant may plead guilty, not guilty, or nolo contendere.").[35] Under Rule 12.2, a defendant desiring to raise the defense of insanity at the time of the alleged offense, "shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the Government in writing of such intention and file a copy of such notice with the clerk." Fed. R.Crim.P. 12.2(a). In addition, 18 U.S.C.

§ 17(a) makes it clear that insanity is an affirmative defense and that the Defendant has the burden of proof of the defense of insanity by clear and convincing evidence. Contrary to Defendant's suggestion, there is nothing in the Federal Rules of Criminal Procedure or federal law which requires a Defendant to admit his guilt as a condition of raising an insanity defense.

ABA Standard 4–5.2 "Control and Direction of the Case", ABA Standards for Criminal Justice, Part 5, cited by Defendant, does not support Defendant's proposition that he had a fundamental Fifth Amendment due process right to direct his counsel not to raise an insanity defense. Instead, the Standard relied upon by Defendant currently provides as follows:

> (a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel include:
> (i) what pleas to enter;
> (ii) whether to accept a plea agreement;
> (iii) whether to waive jury trial;
> (iv) whether to testify in his or her own behalf.
> (v) whether to appeal.

Defendant cites two Eleventh Circuit cases, *Alvord v. Wainwright*, 725 F.2d 1282, 1289 (11th Cir.1984), and *Foster v. Strickland*, 707 F.2d 1339, 1343 (11th Cir. 1983), as supporting his position that the law of this Circuit requires that a competent defendant control the decision whether to raise an insanity defense. However, the issue in these cases was whether counsel's failure to raise an insanity defense constituted ineffective assistance of coun-

---

**35.** Effective December 1, 2002, the Rule was modified to require the court's consent for a nolo contendere plea.

sel. Also, both of these § 2254 cases predate the passage of the Insanity Defense Reform Act of 1984, Pub.L.No. 98–473, 98 Stat.2057 (codified as amended at 18 U.S.C. §§ 17, 4241–4247). At that time, federal law required that the Government carry the burden of proving Defendant's sanity beyond a reasonable doubt when insanity was raised as a defense. The Government's proof obligation was the same on the issue of Defendant's sanity as on the issue of guilt. In that sense, it was more like a plea.

Under current federal law, insanity is an affirmative defense. Because Defendant has the burden of proof on insanity, but the Government must prove *mens rea* beyond a reasonable doubt, tactical and strategy issues are raised in considering an insanity defense which did not exist before the Insanity Defense Reform Act of 1984. Defendant's decision whether to assert an insanity defense may turn on an assessment of how much expert testimony bearing on Defendant's mental state at the time of the crime may be admitted into evidence without asserting an insanity defense. In a particular case the better, though risky, strategic choice might be to forego an insanity defense even though it is an option.

Defendant also cites three other cases which are germane to consideration of this issue, but none set a binding Eleventh Circuit precedent holding that a competent defendant has an absolute or fundamental right to reject an insanity defense in a federal case. The Eleventh Circuit case is *United States v. Moody,* 763 F.Supp. 589 (M.D.Ga.1991), *aff'd,* 977 F.2d 1420 (11th Cir.1992), in which Defendant elected to withdraw an insanity defense during the trial against his attorney's advice, but subsequently claimed on a motion for new trial that the trial court had erred in

granting his request. The district court entered a thorough opinion reviewing the state of federal law at that time. The District Court's opinion was adopted by the United States Court of Appeals for the Eleventh Circuit. The opinion evaluated two different approaches which had been taken in federal courts outside the Eleventh Circuit, *Frendak v. United States,* 408 A.2d 364 (D.C.1979), and *Whalem v. United States,* 346 F.2d 812 (D.C.Cir. 1965).[36] In *Whalem* the court held that in determining whether a defendant had the right to insist that an insanity defense not be raised, the court should weigh all of the surrounding facts, including the quality of the evidence on the defense of insanity and the degree of defendant's competence. In *Frendak,* on the other hand, the court held that a competent defendant has the absolute right to reject an insanity defense, where there is a voluntary and intelligent waiver of the defense. In *Moody,* the trial court noted that regardless of which holding should be applied, the same conclusion would be reached: That it was not error for the trial court to have accepted defendant's informed and voluntary decision to withdraw his insanity defense. The court cited defendant's high intelligence and his rational tactical motive, preferring to rest solely on the argument that the government had failed to prove the element of *mens rea.*

The facts of this case are far different from *Moody.* There, the trial evidence showing possible insanity was weak. In this case, however, mental health experts at FCI–Butner had noted in 1987 that Defendant could be in a prodromal phase to full blown schizophrenia. The Court has had considerable experience with pretrial psychiatric evaluations conducted by Dr. Johnson and others at FCI–Butner.

---

**36.** *Whalem* was overruled in 1991 by the United States Court of Appeals for the District of Columbia Circuit, en banc, in *United States v. Marble,* 940 F.2d 1543 (D.C.Cir.1991).

Dr. Johnson previously has testified before the undersigned in another criminal case. The Court has a favorable opinion of the quality of the work of Dr. Johnson and of Butner mental health experts generally, and is aware that they deal with large numbers of schizophrenic inmates. The Court and presumably defense counsel did not take lightly the admonition in the 1987 Psychiatric Report that Defendant could be in a prodomal phase to full blown schizophrenia. In addition, two psychiatrists and a psychologist who evaluated Defendant for the defense in 1996 opined that Defendant was neither competent to stand trial nor sane at the time of committing the murder which is the subject of the instant case. One of these experts, Dr. Davis, has testified before the undersigned in other cases and the Court has a favorable opinion of the quality of his work as well. Despite the fact that the Government's experts determined, in 1996, that Defendant was competent to stand trial and that he was not delusional at the time of Washington's murder, there were clear red flags indicating the potential viability of an insanity defense. Also, Defendant's level of intelligence is low average; Moody's was above the average range. In summary, neither established precedent nor the facts of this case compel a conclusion that Defendant had a fundamental Fifth Amendment right to reject an insanity defense.

■ With respect to Defendant's Sixth Amendment claim, Defendant necessarily argues that counsel's raising of an insanity defense was below the standard of reasonably competent counsel. This argument is entirely meritless. Defendant further argues that the raising of the insanity defense rendered the entire proceeding fundamentally unfair and constituted structural error, so that he need not show prejudice flowing from his counsel's decision. However, if indeed this was not Defendant's decision but solely that of counsel, it did not render the proceedings "fundamentally unfair" such that Defendant's conviction should be vacated. Having heard the trial evidence, the Court knows with certainty that Defendant had no viable defense except for insanity. The insanity defense might have avoided his conviction. The evidence of claimed insanity presented during the guilt/innocence phase also was helpful as a mitigating factor in the penalty phase of the trial. Had Defendant been found not guilty only by reason of insanity, he would not have been sent to a mental hospital; rather, he would have continued to serve his life sentence in a high-security prison which has a mental health unit. No additional stigma would accrue from this outcome. Finally, the insanity defense was unsuccessful. The jury determined that Defendant was not insane when he killed Washington. For all these reasons, the Court finds that Defendant has failed to show prejudice flowing from the raising of an insanity defense.

The Court notes Defendant's argument that the allegedly distasteful nature of the insanity evidence forced him to blurt out comments in the jury's presence which prejudiced him in the eyes of the jury. If Defendant's comments in fact were caused by this—as opposed to an effort to "look crazy"—then it is logical that the same blurted-out comments would have been made during the sentencing proceeding had all of the mental health evidence been deferred to that part of the proceeding as Defendant now argues it should have been.

In summary, the Court makes the following findings of fact:

(1) Defendant consented to his trial counsel's raising of an insanity defense on his behalf.

(2) Defendant had no defense other than insanity.

(3) The insanity defense was unsuccessful.

(4) The testimony relied upon by the defense to support the insanity defense would have been presented at the sentencing phase if it had not been presented at the guilt/innocence phase.

(5) Had the insanity evidence been deferred to the sentencing phase, the result at the guilt/innocence phase and at the sentencing phase would have been the same as they were in the February 1997 trial.

(6) Defendant suffered no prejudice from the raising of an insanity defense.

The Court further concludes that Defendant had no Fifth Amendment due process right not to have an insanity defense asserted. Defendant has cited no law supporting this claim, and the Court is unaware of any binding precedent for it. Further, the Court concludes that Defendant's Sixth Amendment right to effective counsel was not violated by the assertion of an insanity defense. Also, Defendant suffered no resulting prejudice.

## V. CLAIMED INVESTIGATIVE FAILURES OF COUNSEL

The Sixth Amendment provides that, "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. The standard for evaluating ineffective assistance of counsel was set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Yordan v. Dugger,* 909 F.2d 474 (11th Cir.1990).

A party seeking relief must first show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. The Court must be "highly deferential," and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. In order to meet the second prong of the test, the movant must also demonstrate that counsel's unreasonable acts or omissions prejudiced him. That is, the movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

The Court may "dispose of ineffectiveness claims on either of its two grounds." *Atkins v. Singletary,* 965 F.2d 952, 959 (11th Cir.1992)(citing *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052).

It is well established that counsel has an obligation to conduct a reasonable investigation for the purpose of seeking mitigating evidence in a capital case. *See, e.g., Lambrix v. Singletary,* 72 F.3d 1500 (11th Cir.1996), *rehearing en banc denied,* 83 F.3d 438 (11th Cir.1996), *certiorari granted in part,* 519 U.S. 958, 117 S.Ct. 380, 136 L.Ed.2d 298, *affirmed* 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).

### A. Adequacy of Social History Investigation

■ Defendant complains generally of the adequacy of counsel's social history investigation. He contends that an adequate investigation would have disclosed additional mitigating evidence, including evidence discussed in sections B, C, D and E herein.

The record reflects the following investigation of Defendant's social history [37] was

---

**37.** The term "social history" as used herein includes the history of Defendant's childhood,

adolescence, young adulthood, and time in

conducted by trial counsel. Defense counsel met with Defendant in February 1995. They discussed his mental condition at that meeting. Defendant's counsel obtained a copy of the 1987 Psychiatric Report which contains considerable social history information, as well as the presentence report from 1987 which presumably contains social background information. Counsel also obtained Defendant's complete Bureau of Prisons ("BOP") file which chronicles his incarceration from 1987 until sometime after Washington's murder. This included his medical/mental health records, as well as his disciplinary records. All of Defendant's visits to medical and mental health staff are documented and reflect the nature of his complaints, and what treatment was provided. His behavior problems in prison are documented in the disciplinary record.

Between February and July, 1995, Susan Miller, an investigator for the Federal Defender Program, assisted in the investigation of Defendant's case. She collected background information on Defendant and his family, including birth and death records and Defendant's school records. She also interviewed an unspecified number of inmates. Miller Decl., Def. Ex. 56, March 18, 2002 Habeas Hrg. No interview memoranda are in the record. At least one of those inmates, Charles White, testified at trial that Washington had been an abusive guard.

In May 1995, Stephanie Kearns prepared a 4½ page memorandum which described Defendant's social history both as told by him and from the standpoint of family members. The sources of information for the memo included Defendant, Defendant's father Jim Battle, and his sisters, Gloria and Carolyn. *See* Court's Ex. 1, April 18, 2002 Habeas Hrg.[38] While Kearns' declaration does not expressly so state, it is obvious that this memorandum was based on interviews of family members which were conducted in or prior to May 1995. These interviews covered the subject of whether Defendant had complained of implants prior to Officer Washington's murder. They were unable to remember any specific complaints. It is inferable that those interviews were conducted either by Stephanie Kearns, Russell Gabriel, or Susan Miller, or some combination thereof.

On August 15, 1995, Dave M. Davis, M.D., a psychiatrist, met with Defendant at the request of the defense to perform a psychiatric evaluation. Dr. Davis' interview lasted several hours. His written report of that meeting contains a developmental history section and a discussion of the circumstances preceding the murder of Defendant's wife in 1987.

Between July 1995 and May 1996, Rashid Abdul Salam, an investigator for the Federal Defender Program, was assigned the task of interviewing inmates and investigating Defendant's life history. According to Kearns, "[his] work was subpar, and he did not do the work required of him." Kearns Decl. ¶ 4, Def.Ex. 50, March 18,

---

prison. It also includes information concerning family members and friends of the family, most especially their views of Defendant. It includes information concerning Defendant's physical, medical, and mental status and social adjustment at various points in his life. The Court uses the term "social history investigation" because that is the term chosen by Defendant.

**38.** All of the Court's exhibits were admitted into evidence at the April 18, 2002 Habeas Hearing. Kearns brought those exhibits to the hearing and testified about them. The Court requested counsel to arrange for her appearance after noting references to these exhibits in the declaration of Cheryl Abernathy, Def. Ex. 12, March 18 2002 Habeas Hearing and the declaration of Dr. George Woods, Def. Ex. 77, March 18, 2002 Habeas Hearing.

2002 Habeas Hrg. Kearns also states: "He conducted a few interviews of inmates, and a few of family members." *Id.* at ¶ 4.

Defendant was indicted on November 21, 1995. He immediately filed a notice of his intent to raise an insanity defense, and the Court entered an order appointing Dr. Sally Johnson, chief psychiatrist at FCI–Butner, and licensed psychologists of her choice to conduct an examination of Defendant's competency to stand trial and of his sanity at the time of the offense conduct. The examination at FCI–Butner lasted from January 10 to mid-March, 1996. A comprehensive written evaluation dated April 4, 1996, was sent to the Court and also provided to counsel for both sides. The report ("the 1996 Psychiatric Report") contains a lengthy social history section including a history of Defendant's behavior during incarceration.

Between March of 1996 and the fall of 1996, Mike Chavis, an investigator with the Federal Defender Program, interviewed inmates for Defendant's case. He also visited Defendant a number of times. Neither his declaration nor that of Kearns states how many interviews he attempted or completed. No memoranda of those interviews which were conducted are in the record. Kearns' declaration simply states, "He did not accomplish much investigation." *Id.* at ¶ 4.

Kearns' declaration acknowledges that she, Russell Gabriel (an attorney then employed by the Federal Defender Program) and Susan Miller "did several interviews ourselves." *Id.* at ¶ 4.

In January 1996, the Federal Defender Program hired Alfonso and Associates, an investigating firm, to conduct a mitigation assessment for Defendant's case. The primary investigator was Cheryl Abernathy. Between February 9, 1996 and May 6, 1996, she interviewed Defendant and his family members. Altogether, she conducted three interviews of Defendant, and

fourteen interviews of family members or in one case a family friend. Each of these interviews resulted in a typewritten, detailed and generally lengthy memorandum documenting the family member's or friend's perspectives concerning Defendant's social history. These memoranda were sent to Kearns and are in the record. *See* Court's Exs. 2–8, April 18, 2002 Habeas Hrg.

In addition, Abernathy interviewed two of Defendant's former teachers, Katherine Cowery and Lonnie B. Parker. These interviews were conducted by telephone and apparently resulted in an interview memorandum which was sent to Kearns and then to Dr. Woods. Tr.2066.

In March 1996, Abernathy sent Kearns a preliminary assessment identifying nine possible mitigating factors identified by the investigation to date, all of which are derived from Defendant's social history. *See* Abernathy Decl., Def. Ex. 12, March 18, 2002 Habeas Hrg; Court's Ex. 3, April 18, 2002 Habeas Hrg. At trial, Defendant in fact relied to some degree on all of the mitigating factors suggested by Abernathy, except the factor of "drug abuse."

In April 1996, Cheryl Abernathy sent a letter to Stephanie Kearns, enclosing a six-page timeline which showed the important events in Defendant's social development from the time of birth until the time of his incarceration. In July 1996 she sent Kearns a genogram, a multi-generational chart of Defendant's family, including comments about features of various family members which she deemed to be important. For example, she had noted on the genogram that particular family members had been abusive or had had problems with alcoholism or mental/emotional disorders. This genogram served as the basis for the genogram which was admitted into evidence at trial as Defendant's Exhibit 78.

Abernathy continued her investigation in the fall of 1996, with interviews of several of Defendant's childhood friends, an interview of his youngest brother Jimmy Battle, and a re-interview of Defendant's father, Jim Battle. All of these interviews, likewise, resulted in interview memoranda which were sent to Kearns. *See* Abernathy Decl. ¶ 5, Def. Ex. 12, March 18, 2002 Habeas Hrg.

Altogether, Abernathy's investigation yielded interviews of Defendant; Defendant's father; his sisters Gloria, Carolyn and Christine; his brothers Leon, Carl and Jimmy; his aunt, Gracie Whitaker; a neighbor, Delores Pittman Bandy; a former teacher, Cozetta Gray; a former school secretary, Rebecca Taylor; neighbors Junior, Wayne and Ervin Pittman; and Defendant's father's girlfriend Annie Bell Hawkins. Defendant and the immediate family members were each interviewed more than once.

Beginning January 1997 and continuing during the trial investigators Susan Miller[39] and Rebecca Cohen, Federal Defender Program, worked on Defendant's case. Cohen contacted BOP mental health staff and BOP guards who had known Officer Washington. Cohen Decl., Def. Ex. 32, March 18, 2002 Habeas Hrg. Neither Miller's nor Cohen's declarations state how many individuals Cohen contacted or how many were interviewed. Cohen's declaration does state that she interviewed John Pannell, a physician's assistant at USP–Lewisburg and prepared an interview memorandum. This memorandum is not in the record. Miller's declaration states that she interviewed witnesses from the Government's witness list, and assisted with other pretrial preparation. Miller Decl., Def. Ex. 56, March 18, 2002 Habeas Hrg.

In October 1996, Defendant's sisters Gloria and Christine testified at the competency hearing concerning Defendant's impoverished childhood, beatings he received as a child, their mother's early death, their father's alcoholism, and their recollection of Defendant as a child, adolescent and young adult. They testified about Defendant's troubled marriage, and the depression, anxiety, and paranoid thinking he experienced in prison. Obviously, this testimony was obtained through trial counsel's investigation.

In January or February 1997, near the beginning of the trial, the defense team hired Janet Vogelsang, a licensed social worker who specializes in biopsychosocial assessments and expert testimony in capital murder prosecutions. Her objective in such cases is to provide a picture of Defendant's life history that either "supports a psychiatric diagnosis or just mitigates punishment." Vogelsang Decl., Def. Ex. 72, March 18, 2002 Habeas Hrg. Kearns' declaration states that a decision was made to utilize Vogelsang as the trial witness rather than Cheryl Abernathy, because "I did not realize the amount of work done by Ms. Abernathy." Kearns Decl. ¶ 7, Def. Exh. 50, March 18, 2002 Habeas Hrg. However, this explanation does not make sense and is rejected by the Court. Kearns had received a large volume of investigative materials from Abernathy. In fact, at the habeas hearing on April 18, 2002, she agreed that she had received all of the materials Abernathy had sent to her, except for a January 8, 1997 letter which she could not recall receiving.

Presumably, the defense team furnished to Vogelsang the memoranda reflecting the interviews with Defendant's family members and family friends, the geno-

---

**39.** Miller left the Federal Defender Program in July 1995 and became re-employed there in January 1997. Kearns must have felt the quality of her 1995 work was at least adequate.

gram and the time line.[40] Nonetheless, Vogelsang, accompanied by Susan Miller, investigator, traveled to North Carolina to conduct further interviews of Defendant's relatives and family friends. Between February 26, 1997 and March 17, 1997 she interviewed Defendant's father, some of his brothers and sisters (Leon, Carl, Gloria and Christine); a family friend, Deloise Pittman; Laura Mae Battle, Defendant's stepmother; as well as Gracie Whitaker, a maternal aunt of Defendant. Vogelsang states that she did not prepare any memoranda from these interviews. She did testify as Defendant's mitigation specialist during the penalty phase of the trial.

Abernathy's declaration states she was never informed that she had been replaced by Janet Vogelsang. She learned of this fact for the first time when she attended a capital defense seminar in March 1997 and heard Vogelsang speak about her experience as an expert witness in the instant case.

Between the interviews of family members and friends conducted by Abernathy and those conducted by Vogelsang, the Court counts in excess of 30 interviews. This does not include any of the interviews conducted by Kearns herself, or by other lawyers or investigators on her staff.

While the record is insufficient to establish the number of inmates and BOP employees the defense investigators contacted, it is clear that they undertook this task. Five BOP employees and seven inmates did testify on behalf of Defendant at trial. The fact that some inmates and BOP employees did not want to talk to the investigators and that some interviewees had no helpful information does not mean that the investigators did not make an adequate effort. Kearns' opinion that their work was inadequate is not very helpful to

the Court because her opinion is largely conclusory. For the most part she does not distinguish between efforts which failed to yield helpful information and lack of effort. Also, it is unclear to what extent Kearns' opinion of inadequacy simply reflects the fact that her investigation did not yield the same information as that discovered by habeas counsel's investigators. In short, Defendant does not show, by a preponderance of the evidence, that defense counsel failed to undertake adequate efforts to locate inmates and BOP employees who would testify that Defendant had complained of implants before Washington's death.

The Court notes that habeas counsel's investigators interviewed relatives, friends, or neighbors which the trial defense team did not interview: Defendant's half-brother Paul Battle; his aunt and uncle, Marie and William Langley; his childhood friend, David Bandy; his brother-in-law, Andrew Taylor; his former employer, Don Anderson and Don's son Sylvester; and Silas E. Smith, the son of another former employer. It does not appear that these interviews provided new, material evidence.

While it is true that defense counsel did not investigate the matter of Defendant's childhood exposure to pesticides, the Court has found elsewhere, pp. 120–122, that this was not a necessary part of the investigation despite trial counsel's current opinion to the contrary.

Both Cheryl Abernathy's investigation and the 1987 and 1996 Psychiatric Reports reveal considerable information concerning Defendant's heavy drug abuse beginning at an early age. While Defendant does not criticize trial counsel's investigation for failing to uncover evidence in this area, the

---

**40.** At the April 18, 2002 habeas hearing Kearns testified she believed Susan Miller had furnished these materials to Vogelsang.

results of this part of the investigation should be noted as it is an important part of Defendant's social history.[41] In an interview on February 28, 1996, Defendant told Abernathy the following:

> Mr. Battle recalled being introduced to marijuana as early as eight years old. He explained that his Uncle Leroy (his mother's brother) and his wife, Joyce, from Washington, D.C., introduced him to the drug. They were at his maternal grandma's house at the time. Anthony recalled that he enjoyed the feeling that marijuana gave him.
>
> \* \* \* \* \* \*
>
> At age ten years, Anthony began drinking Boone's Farm wine and getting drunk on a frequent basis.
>
> \* \* \* \* \* \*
>
> As Anthony progressed into his teens he began to get high every day.

Court's Ex. 3, April 18, 2002 Habeas Hearing. A cover letter sent to Stephanie Kearns with the memorandum stated in part: "Anthony had begun to use drugs by the age of 8 and was introduced to it by an adult. He was encouraged to drink beer and smoke marijuana...." Court's Ex. 3, April 18, 2002 Habeas Hrg. In an interview on April 5, 1996, Defendant made the following statement to Cheryl Abernathy: "He stated he began to lose interest in school for several reasons. Anthony explained that he started using marijuana heavily as well as drinking beer." Court's Ex. 4, April 18, 2002 Habeas Hrg.

The 1987 Psychiatric Report states the following regarding Defendant's history of drug use:

[Defendant] does admit a long history of alcohol and drug use. In regard to drugs, Mr. Battle states that he has "tried almost everything", but has primarily used marijuana and cocaine excessively. He states that he first began smoking marijuana when he was nine years old and has continued to use it during adulthood. He reports that he smoked marijuana on an almost daily basis for at least one year prior to his arrest. Mr. Battle has used cocaine since 1981, estimating that his average use was three-quarters gram per week. He states that he has both snorted and smoked cocaine, but has never free based. He has drunk alcohol since he was fourteen years old, but denies being an alcoholic. Nevertheless, he reports that, in recent years, he simply drank until his money ran out, with this often resulting in intoxication. He has had "black outs" from alcohol, stating he would later be unable to remember some events which had occurred during intoxication, but denies ever having serious withdrawal symptoms from alcohol.

1987 Psychiatric Report, Def. Ex. 2, Comp. Hrg.

The 1996 Psychiatric Report adds the following:

> In regard to alcohol and substance abuse, Mr. Battle has given somewhat conflicting accounts. He admits to regular alcohol use and use to excess beginning in his teenage years and continuing until the time of his marriage. He also admits to regular use of marijuana when

---

**41.** The 2002 Psychiatric Report discounted Defendant's cocaine abuse based on statements of family members that Defendant probably did not have enough money to buy cocaine. 2002 Psychiatric Report, Def. Ex. 80 at 10, March 18, 2002 Habeas Hrg. The Report also opined that Defendant's marijuana use and drinking probably began when

Defendant moved in with Minnie, in 1985. These statements are seriously in error. The authors of the 2002 Psychiatric Report obviously ignored the information in the 1987 and 1996 Psychiatric Reports and perhaps did not have access to the memoranda prepared by Abernathy.

in the community and has also used cocaine.

1996 Psychiatric Report, Def.Ex. 4, Comp. Hrg.

Finally, the psychiatric evaluation report prepared Dave M. Davis, M.D. on August 15, 1995, states:

> He [Defendant] did use drugs, beginning in early adolescence, including alcohol, marijuana, and on occasion, cocaine and LSD. He denies that he used heroin, crack, speed, or downers.

[Sealed Doc. 363].

Habeas counsel's investigators obtained declarations of family members which minimize Defendant's drinking and which do not mention illegal drugs:

> Danny started to drink after getting together with Minnie. He had not been a drinker before that, just drinking at times.

Leon Battle Decl., Def. Ex. 21 at ¶ 21, March 18, 2002 Habeas Hrg.

> [After Danny married Minnie] Danny got to drinking which was a real change for him.

Carolyn Battle Decl., Def. Ex. 19 at ¶ 4, March 18, 2002 Habeas Hrg.

The Court is skeptical that Leon or Carolyn has adequate knowledge of Defendant's teenage drinking habits to support their statements that Defendant did not drink much as a teenager. Defendant did not live with either of them much when he was a teenager. Also, he was not close to either one of them. The Court believes the information Defendant gave both the FCI–Butner and the defense's mental health experts as well as the defense's trial investigator regarding his history of heavy drinking and drug abuse is more reliable than the information in Leon's and Carolyn's declarations. The Court is satisfied that the record establishes regular alcohol and other drug abuse beginning at least by his teens.

Taking into account the social history information reflected in the 1987 and 1996 Psychiatric Reports, Defendant's complete BOP file including his medical, mental health and disciplinary records, Dr. Davis' evaluation, the time line, the genogram, the large number of interviews of Defendant's family members and family friends conducted by the defense, the fact that the defense attempted to interview inmates and did interview some inmates, and the fact that the defense attempted to interview BOP employees and did interview some BOP employees, the Court finds that counsel conducted an objectively reasonable investigation of Defendant's social history.

**B. Mitigating Mental Health Evidence**

Defendant claims that a more thorough investigation of his childhood, teenage and young adult years would have disclosed evidence of developing schizophrenia. While Defendant has argued previously that counsel had no right to present mental health evidence at the guilt/innocence phase of the trial, he argues that counsel not only had an obligation to present this evidence at the sentencing phase, but also that they performed inadequately in not uncovering and presenting more and better evidence of mental illness than they did.

*Evidence of Onset of Schizophrenia*

Citing to the declaration of defense counsel Stephanie Kearns, Defendant asserts that "trial counsel never uncovered evidence of the obvious symptoms of schizophrenia observed by others during petitioner's early years." The Court is unable to find such a reference in the declaration. Rather, the declaration states the following:

> . . . We never completed the investigation of Anthony's background, including

the historical investigation of his background as requested by Dr. Woods.

Kearns Decl., Def. Ex. 50, March 18, 2002 Habeas Hrg. The declaration further describes that the work product of the defense's investigators was not up to her expectations. She blames this for an alleged lack of information about Defendant's background.

*Childhood*

Defendant's proposed findings do not point to newly uncovered evidence of "the obvious symptoms of schizophrenia observed by others during Petitioner's early years." The Court notes that a psychiatric evaluation of Defendant prepared at the instance of habeas counsel purports to identify such evidence, specifically, "He was described as an energetic, busy child who preferred to be alone." 2002 Psychiatric Report, Def. Ex. 80 at 4, March 18, 2002 Habeas Hrg. Based solely on that, the 2002 Psychiatric Report concludes Defendant had a "preteen history indicating likely early signs of schizophrenia (e.g., inappropriate affect, preferred to be alone, quiet, limited social relationships)." *Id.* at 4.

There is some evidence in the record that Defendant preferred to be alone as a child, but it is not new evidence and it is contradicted by other evidence in the record. This evidence was obtained during trial defense counsel's investigation, as follows:

[A]ccording to Gloria ... Anthony had been a loner and stayed to himself.
Gloria stated that Anthony was not close to many people.

Statement of Gloria Battle Bandy to Cheryl Abernathy, Court's Ex. 3, April 18, 2002 Habeas Hrg.

Trial counsel's investigators also obtained other evidence from family members describing Defendant as close to some

of his siblings or as gregarious and fun-loving in his early years:

As a child on the farm, [Anthony] played with other children his age.

\* \* \* \* \* \*

[Anthony] would play basketball after school with other boys in the neighborhood.

\* \* \* \* \* \*

[Anthony] was quite an outgoing person. . . .

Test. of Gloria Battle Bandy, Comp. Hrg. Tr. 1257–1269.

Anthony stated he was approximately nine years old when he relocated to his maternal grandmother's house. He related that he did not like living with her because she lived in a remote area, far away from his friends.

\* \* \*

At age ten years, Anthony began drinking Boone's Farm wine and getting drunk on a frequent basis. He stated he had a lot of freedom and often times he and his friends, David, Daniel and Larry would raid peoples' properties to steal fruit from the trees. They had a clubhouse and would meet there to plan their next activity. Anthony related that he had fun during those times.

Mem. of February 28, 1996, Interview of Defendant by Cheryl Abernathy, Court's Ex. 3, April 18, 2002 Habeas Hrg.

Mr. Battle (Jimmy Battle, Defendant's youngest brother) related that when he and his brother were growing up, they were very close. He stated that Anthony was protective of him ... not a troublemaker or someone who got into conflicts with others.

Mem. of September 26, 1996, Interview of Jimmy Battle by Cheryl Abernathy, Court's Ex. 9, April 18, 2002 Habeas Hrg.

Mr. Battle (Defendant) was asked to recall his friendship with Ervin Pittman. He stated that he and Ervin, who were very close in age, attended N. Whitaker's Elementary School from the first grade until he left the area. He explained that they didn't actually become close friends until approximately age eight or nine. . . . He recalled that he had other friends as well. He stated that he was fairly close with the Carter boys who lived in Whitaker as well as the Statons.

Mem. of December 13, 1996, Interview of Defendant by Cheryl Abernathy, Court's Ex. 8, April 18, 2002 Habeas Hrg.

Carl describes his brother Anthony as easygoing, and protective. He joked, and he liked to "play the fool". When they were in school, which was not very often, and someone would pick on Carl, Anthony would try and protect him.

Mem. of February 10, 1996, Interview of Carl Battle by Cheryl Abernathy, Court's Ex. 3, April 18, 2002 Habeas Hrg.

Habeas counsel's investigation also uncovered conflicting opinions:

Danny and I were close as children and we were close as adults. . . .

Christine Battle Parker Decl.(Defendant's sister), Def. Ex. 3, March 18, 2002 Habeas Hrg.

I first met Anthony Battle who I called Danny when I was five years old. I was in kindergarten, and he was in first grade. We stayed right down the street from each other and became good friends. We spent just about every day together. We played together; we played sports and went off in the woods with our dogs. If you saw him out somewhere, you saw me. We were just about always together.

Earl David Bandy Decl.(Defendant's brother-in-law), Def. Ex. 2, March 18, 2002 Habeas Hrg.

Danny and I were very close growing up, in part because we were one year apart. We spent a lot of time together when we were growing up.

Carl Battle Dec.(Defendant's brother), Def. Ex. 4, March 18, 2002 Habeas Hrg.

As a child, Danny was quiet and kept to himself.

Leon Battle Decl.(Defendant's oldest brother), Def. Ex. 21, March 18, 2002 Habeas Hrg.

I remember Anthony used to always play by himself. When the other children played together in a group, Anthony just kept to himself. I remember watching Anthony play with a stick, hopping around like he was riding a horse. When the other children tried to come play with him, they ended up fighting, because Anthony wanted to be alone.

Laura Mae Battle Decl. (Defendant's stepmother), Def. Ex. 20, March 18, 2002 Habeas Hrg.

Anthony was quieter than the other kids in the house, and he mostly stayed to himself.

Paul Battle Decl.(Defendant's half-brother), Def. Ex. 22, March 18, 2002 Habeas Hrg.

Danny was a very quiet kid who often sat in the corner by himself.

Sheven Taylor Decl. (Defendant's uncle), Def. Ex. 70, March 18, 2002 Habeas Hrg.

The foregoing evidence shows that Defendant had close relationships with his siblings Carl, Christine, and Jimmy in his preteen years. He also had numerous neighborhood friends, especially Earl Pittman and David Bandy, who were close friends. Defendant was not close to his eldest siblings, Gloria and Leon, both of whom viewed him as a loner. His stepmother, Laura Mae, viewed him as a loner; she did not live with him for very long. This is not enough evidence to persuade

the Court that Defendant showed "likely" or "obvious" signs of schizophrenia as a young child.

In summary, the Court concludes that Defendant has not shown that his trial counsel failed to discover available evidence of signs of schizophrenia in his early years. Both trial counsel and habeas counsel's investigations disclosed conflicting information concerning whether Defendant had close relationships with peers and family members in his early years. No evidence of inappropriate affect during Defendant's childhood years is stated in the 2002 Psychiatric Report, or otherwise in the record herein. A preponderance of the evidence does not support a determination that Defendant displayed "likely early signs of schizophrenia" as claimed in the 2002 Psychiatric Report or "obvious" signs of schizophrenia as asserted in Defendant's Proposed Findings. Trial counsel did conduct an extensive and adequate social history investigation which covered Defendant's childhood.

*Adolescent Years*

Defendant next contends that his trial counsel failed to uncover available evidence of schizophrenia developing in his adolescence. Again, this contention is put forward in the 2002 Psychiatric Report.

The 2002 Psychiatric Report cites alleged new evidence of developing mental problems during Defendant's adolescence, as follows:

Anthony liked sports and particularly enjoyed basketball. As a teenager, Anthony often came to his sister's house and reported to her that he had gotten into an argument while playing basketball. He said the boys accused him of being a show off. *Anthony's brother, Carl, described Anthony as moody and with an attitude that got worse as he got older.* Leon, Anthony's older brother, said Anthony would argue about a foul in a basketball game, stomp away and

not return until he was calmer. However, there are no reports of physical violence.

Anthony was described by family as a "clown" by behaving inappropriately in social situations. *He would make fun of his brother, Carl, who suffered asthma, or he would make fun of his sister, Carolyn, who had attempted suicide at one point.* Anthony would insult people, but then turn it into a joke. He would make his sisters mad, and then make them laugh. Despite the edge to his humor, his family thought of him as the life of the party. *In retrospect, it is highly likely that what the family describes as [sic] the first signs of the severely inappropriate affect that is a prominent feature of his schizophrenia.* (Emphasis supplied).

2002 Psychiatric Report, Def. Ex. 80 at 5, March 18, 2002 Habeas Hrg.

What the record actually reveals concerning Defendant's behavior during basketball games, is the following:

He also used to tell me that the other boys he played basketball with were jealous of his basketball skills. He told me that they accused him of being a show off.

Gloria Battle Bandy Decl., Def. Ex. 5, March 18, 2002 Habeas Hrg.

He (Defendant) was just like the rest of us in that he'd argue about a foul during a basketball game and stomp off. He'd come back after he calmed down.

Leon Battle Decl.(Defendant's brother), Def. Ex. 21, March 18, 2002 Habeas Hrg.

He had dreams, albeit unrealistic, of playing sports. Anthony stated that he was a good basketball player despite the fact that he is short by their standards. He stated, "Michael Jordan learned some of his techniques from me."

Mem. of Interview of Defendant by Cheryl Abernathy, Court's Ex. 3, April 18, 2002 Habeas Hrg.

Except for the references in the 2002 Psychiatric Report, the record contains no evidence of offensive joking behavior on Defendant's part, despite the fact that family members were interviewed numerous times by two of trial counsel's investigators on separate occasions and also by habeas counsel's investigator. Their statements and declarations are in the record, as follows:

He was the clown of the family. He always kept us going. He would pick on them to make them mad, and then he would crack jokes on them and make everybody laughing [sic]. We had to go along with him because we was about to crack up. He was just the jokester of the family.

Test. of Gloria B. Bandy, Comp. Hrg. Tr. 1280–81.

Anthony was the jokester of our family. He always have been. He always had something. You know, we could be down, and he would just pick on Carolyn or Carl and get all of us laughing or playing. You know, he always would keep us laughing and stuff. You know, he always was joking and carrying on about something.

Trial test. of Gloria B. Bandy, Tr. 4342.

We always said he could be a comedian, because he always made people laugh and he was an upbeat person, outgoing. Everybody liked him. Didn't nobody have nothing bad to say about him. And he was just an all-around guy.

Test. of Christine Battle Parker, Comp. Hrg. Tr. 1309.

Carl (a younger brother of Defendant's) describes his brother Anthony as easygoing, and protective. He joked, and he liked to "play the fool."

Mem. of Interview of Carol Battle by Cheryl Abernathy, Court's Ex. 3, April 18, 2002 Habeas Hrg.

Danny was a bright, talented child. He liked to make people laugh. We all thought Danny would be a comedian. He kept us laughing so much.

Christine Battle Parker Decl.(Defendant's sister), Def. Ex. 3, March 18,2002 Habeas Hrg.

Danny ... had always been a fun loving, joking guy.

Carolyn Battle Decl. (Defendant's sister), Def. Ex. 19, March 18, 2002 Habeas Hrg.

[Danny] was always easygoing. Danny liked to make people laugh and tell jokes.

Melvin Bandy Decl., Def. Ex. 18, March 18, 2002 Habeas Hrg.

The 2002 Psychiatric Report reports "facts" which are contradicted or unsupported by the facts in the trial and habeas record. There is nothing in the record suggesting that Carl believed his brother Anthony was moody or that he had an attitude that got worse when he was a teenager. In fact, Carl's statement to the investigator was to the opposite effect ("easygoing and protective"). The comment attributed to Leon omits a key part of the sentence in Leon's declaration; the exclusion of this changes the gist of Leon's statement. No facts in the record suggest that Defendant made fun of Carl *on account of Carl's asthma.* The record does indicate that Defendant was a big joker and that he made fun of his siblings, including Carl. The 2002 Report's suggestion that Defendant made fun of Carolyn *because she had attempted suicide* is not based on record evidence. Carolyn's suicide attempt occurred when Defendant was almost twenty years old. According to Carolyn's 2001 Declaration, she considered Defendant a "fun-loving guy." Thus, the 2002 Report's conclusion, that it is

"highly likely" that Defendant's behavior at basketball games or joking about family members indicated developing schizophrenia is based on distortion of the facts. 2002 Psychiatric Report, Def. Ex. 80 at 5, March 18, 2002 Habeas Hrg.

In summary, trial counsel did conduct a reasonable investigation into Defendant's behavior during his adolescent years. That investigation did not produce evidence of obvious abnormality. There is no evidence of substance that Defendant showed signs of developing schizophrenia in his teenage years.

*Time Preceding Minnie's Murder*

Referring to declarations filed by various relatives of Defendant in the instant habeas proceedings, Defendant identifies as new information that Defendant had evidenced "uncharacteristic and bizarre behavior, paranoia, depression, jealousy, blackouts, severe headaches, unemployment and drinking" before he murdered his wife in 1987. He contends this too was a sign of developing schizophrenia which was missed by trial counsel's investigation.

The Court accepts as factual that Defendant experienced the referenced problems and accepts that these kinds of symptoms could be a sign of developing mental disorder. However, both trial counsel and the defense experts did have the 1987 and 1996 Psychiatric Reports which documented Defendant's heavy drinking, drug abuse, blackouts and unemployment before Minnie's murder. Thus, the cited new evidence mostly is not new, but rather was known to defense counsel and their expert witnesses. In addition, some of these problems—the blackouts, paranoia and headaches—could be explained just as well by the heavy drinking and drug abuse. The suspiciousness, depression and jealousy also could be explained by Defen-

dant's troubled relationship with his wife Minnie preceding her murder.

The relevant facts concerning Defendant's relationship with Minnie, as told by Defendant's relatives, are as follows: Defendant began living with Minnie Foreman and her mother Bessie in 1985. At that time Defendant was 23. He was employed at a Georgia Pacific lumber mill. Minnie was still in high school. She enlisted in the Marines upon high school graduation, and moved to Camp LeJeune, approximately 100 miles away. In the fall of 1986, she announced that she was pregnant and that she needed to marry Defendant in order to keep her job. Defendant did not want to marry, but agreed to do so. The marriage was in early October, 1986 and their son was born in late October, 1986. Minnie returned to Camp LeJeune. Defendant and their infant son continued to live with Minnie's mother, a strong-minded woman who did not like Defendant. Defendant quit his job at the lumber mill, intending to move into an apartment near Camp LeJeune which Minnie was to obtain. However, she refused to let him come live with her. At times she would promise to come home on the weekend and then change her mind. One weekend she brought a man home with her. She accused Defendant, who was financially dependent on her[42], of not being "man enough." Defendant believed she was having an affair with someone at Camp LeJeune. At the time of Minnie's death in March 1987 she was pregnant again. Defendant's relatives suspected Defendant was not the father.

Defendant's relatives all agree that once Defendant and Minnie began living together, Defendant changed for the worse. Both Minnie and Defendant drank a lot. Particularly after the marriage Defendant

---

**42.** The view of Minnie's family was that Defendant was a slacker. Once he quit his job, he lived on Minnie's income and spent it on alcohol and illegal drugs.

drank very heavily, sometimes blacking out. Defendant was angry, depressed, jealous, and suspicious. According to Gloria, Minnie announced she was seeking a transfer to Hawaii. She wanted a separation from Defendant, and planned to take her mother and the baby with her.

Defendant was evaluated in 1987 at FCI–Butner before his trial for Minnie's murder. Defendant's behavior in the months preceding Minnie's death was scrutinized. The 1987 Psychiatric Report as well as the 1996 Psychiatric Report noted Defendant's heavy drinking in the time preceding Minnie's death, as well as his self-reported use of marijuana and cocaine. Because both psychiatric reports were in the hands of defense counsel, and indeed were provided to the defense's mental health experts, there was no failure of investigation on trial counsel's part.

*Findings*

The Court finds that defense counsel conducted a reasonable and fully adequate investigation seeking mental health evidence. First, they hired mental health experts who evaluated Defendant. They utilized investigators employed by the Federal Defender Program to investigate Defendant's background. They hired an outside investigating firm to do the same. They also had the benefit of the information in the 1987 and 1996 Psychiatric Reports and the 1987 presentence report. Habeas counsel's investigation has not uncovered information concerning Defendant's development in his childhood, teenage or early adult years which is materially different from that discovered by trial counsel.

## C. Pesticide Exposure

Defendant contends his counsel unreasonably failed to investigate his childhood exposure to pesticides, and to present expert testimony showing that chronic exposure to pesticides can damage the central nervous system including the brain and can increase the likelihood that a person who is otherwise predisposed to schizophrenia may develop it and that it can worsen the course of the illness.

Defendant relies on the supplemental declaration of Stephanie Kearns which states in pertinent part:

> We knew that the Battle family were sharecroppers and that Anthony, like other family members, worked in the fields from a very early age. I knew that exposure to pesticides could cause brain damage and would be an area to investigate for the mitigation case.... Our failure to investigate pesticide exposure was not a strategic decision but rather the result of the dysfunction in our defense team.

Kearns Decl., Def. Ex. 51, March 18, 2002 Habeas Hrg.

Additionally, Defendant relies on the declaration of Donald J. Ecobichon, Ph.D., who was retained by habeas counsel to investigate and express an opinion as to Defendant's exposure to pesticides and the pesticides' possible effect on his mental condition. Dr. Ecobichon basically found that Defendant had been exposed to agricultural pesticides in utero and subsequently was often brought into the fields while family members worked. He also noted that by age 6 to 9, Defendant was working in the fields where the pesticides were used. He did not determine exactly what pesticides Defendant had been exposed to, but expressed an opinion that the probable types were insecticides, specifically Toxaphene and DDT. While Dr. Ecobichon recognized that there is currently no consensus in the scientific community that pesticide exposure causes schizophrenia, he went on to express the following opinion:

> In conclusion, based on the materials provided to me by Mr. Battle's current

counsel, it is my opinion, which I hold to a reasonable degree of scientific certainty, that Mr. Battle was chronically exposed to organochlorine, organophosphate and carbamate-ester neurotoxicants from the gestational period until his arrest in 1987. The spectrum of organophosphate, organochlorine and carbamate-esters to which he was exposed included some of the most potent insecticides ever developed and used. Based upon the physiological and behavioral descriptions, it is my opinion that Mr. Battle's chronic exposure would have caused damage to his central nervous system; such central nervous system damage may present through mood changes, irritability, inappropriate responses to minor stimuli, mistakes in judgment, aberrant behaviors, depression, unpredictable behavior, suspiciousness and a withdrawal from reality.

Ecobichon Decl., Def. Ex. 81, March 18, 2002 Habeas Hrg.

Dr. Ecobichon's opinion probably would not have been admissible, certainly not at the guilt-innocence phase of the trial and probably not at the penalty phase. He did not opine, nor was he qualified to do so, that Defendant actually was injured either physically or mentally by being exposed to pesticides as a child. Neither was he qualified to conclude whether specific symptoms demonstrated by Defendant (*e.g.,* mistakes in judgment, aberrant behavior), were caused by pesticide exposure. Therefore, Defendant was not prejudiced by counsel's failure to pursue an investigation in this area.

Further, accepting Kearns' opinion that there was dysfunction in the defense team, the Court still does not believe that defense counsel had a constitutional obligation to pursue an investigation into pesticide exposure. For one thing, all of Defendant's family members had worked in the fields during the time the pesticides

were apparently used, and there is no indication that any of them had suffered any brain damage or developed any psychosis. In addition, trial counsel arranged for numerous cognitive, neuropsychological, and personality profile tests to be administered to Defendant by mental health experts. These tests showed Defendant has normal cognitive function. In summary, there were insufficient red flags to warrant an investigation into Defendant's exposure to pesticides.

### D. Defendant's Odd Behavior While in Prison Before the Murder

Defendant next contends that his trial counsel inadequately investigated his behavior and demeanor while in prison; he argues that had they done so, they would have found numerous inmate witnesses who would have attested to his strange behavior prior to Officer Washington's murder, especially at USP–Atlanta. These inmates' declarations were admitted into evidence at the March 18, 2002 habeas hearing to demonstrate what additional evidence could have been uncovered by a more thorough investigation. The declarations variously claimed that Defendant behaved oddly, was paranoid, stayed alone most of the time, mumbled or talked to himself, paced around, thought people were out to get him, was distant, talked to himself, stared constantly, kept his cell in a mess, never washed his clothes, took another inmate's clothes from the dryer, waved and snapped his hand as though he was swatting flies, cut strange patches in his hair, kept to himself most of the time, mixed all his food together, was poorly groomed, stared at the ceiling, stared into the distance, looked blank, thought he was being followed or being watched, wouldn't talk much to other people, stayed mostly in his cell, seemed very nervous, was quiet and didn't bother people, and screamed and hollered. *See* Declarations of Charles

Allen, Def. Ex. 9; Royal Allen, Def. Ex. 14; Norman Braxton, Def. Ex. 27; Robert Bunner, Def. Ex. 8; Andreas Concepcion, Def. Ex. 33; Ernest Carter, Def. Ex. 30; Leonard Dismuke, Def. Ex. 36; Wade Foster, Def. Ex. 38; Dwayne Glover, Def. Ex. 41; Dexter Graham, Def. Ex. 42; Shanton Hunter, Def. Ex. 45; Napoleon Johnson, Def. Ex. 47; Stanley Johnson, Def. Ex. 48; Ernest Parker, Def. Ex. 660; Alexander Paul, Def. Ex. 61; Jose Ramos, Def. Ex. 64; Willie Sneed, Def. Ex. 69; Tony Thomas, Def. Ex. 71; Charles White, Def. Ex. 75, all admitted at March 18, 2002 Habeas Hrg.

Defendant contends that the foregoing evidence should have been presented at the sentencing hearing as mitigation evidence.

The Government in response shows that inmate witnesses called by Defendant at trial did testify to Defendant's odd and paranoid behavior which predated Officer Washington's murder. The defense called Eldson McGee a former federal inmate and friend of Defendant's, who testified that while at USP–Leavenworth and USP–Atlanta Defendant was a loner, and would stare for hours. Defendant would "get in a corner with his back up against a wall." Tr. 1599. Also, Dexter Graham, a BOP employee at USP–Atlanta, testified that Defendant's eyes "appeared to be wandering"; Defendant was a loner; he mumbled to himself and he appeared to be disoriented. Tr. 1629–1630. Inmate Willie Shirley testified that at USP–Atlanta Defendant never spoke to anyone and never socialized. Tr. 1647. Dr. Stephen O'Hagan, Ph.D., testified that when he interviewed Defendant his cell was "a hovel" and smelled bad, and that Defendant's personal hygiene was poor. Tr. 1713. The Government did not cross-examine these witnesses regarding the cited instances of odd behavior, and never questioned the accuracy of these accounts.

The Court finds that the additional inmate testimony now offered by Defendant is more extensive, and therefore more impressive than that which was presented by Defendant's witnesses at trial. However, in evaluating the issue of prejudice it should be noted that the Government's position at trial was not that Defendant is normal. Rather, the Government argued that the Defendant has a personality disorder, namely a mixed personality disorder with schizotypal, paranoid and antisocial features. Some degree of odd behavior would be expected of someone with this disorder. Also, the Government did not question the evidence of Defendant's odd behavior which actually was presented at trial. Therefore, accepting all of the new evidence as accurate, the Court finds that its omission at trial did not deprive Defendant of a fair determination of his sentence and that it had very little prospect of changing the outcome had it been presented. Thus, Defendant suffered no prejudice from the omission of this evidence at trial.

### E. Defendant's Complaints of Implants before Washington's Murder

Defendant argues that had his trial counsel conducted an adequate investigation, they would have discovered that he had complained of having implants in his body which were used by the guards to monitor and harass him and that these complaints were made before Washington's murder. The Government argued at trial that it was suspicious that Defendant had not complained of implants until after Officer Washington's murder. This tied in with the Government's experts' testimony that Defendant was malingering or making up his claimed belief that he has implants.

#### 1. *Complaints to Inmates*

At trial no evidence was presented that Defendant had ever complained of im-

plants to other inmates before Washington's murder. In response to the question, "Tell me the name of one inmate who you told about your implants, your voices and your pains." Defendant replied, "I never told one inmate." Tr. 1468. Defendant testified at trial that his first complaint to anyone of same was either to an FBI agent on January 26, 1995 (denied by the agent) or in his first visit with his attorney, Kearns, in February 1995. This enabled the Government to argue effectively that the claim of implants was faked.

Habeas counsel's investigation uncovered inmate testimony that Defendant had said he had implants which were used to harass him prior to Washington's murder.

The declaration of trial counsel Stephanie Kearns addresses the subject of the failure to find the new inmate testimony. She explains that under the division of work arranged between her and co-counsel Jack Martin, she was in charge of the investigation. The plans for the investigation included interviewing inmates. Such an investigation was conducted by in-house investigators. The declaration does not address how many inmates were contacted but states generally that many inmates did not want to speak with the investigators. Also, there was turnover of investigators at the Federal Defender Program's office and vaguely specified poor performance of investigators observed by Kearns. Her declaration states in part:

> The information in the declarations obtained by post-conviction counsel from various inmates is the kind of information we wanted to find, but failed to find, primarily because of my failure to direct and pursue the proper investigation of this case. Just as these inmates were located and interviewed by post-conviction counsel, they could and should have been located by me. We had the C Cell House rosters as well as the names of several of the post-conviction declarants from other sources.

Kearns Decl. ¶ 6, Def. Ex. 50, March 18, 2002 Habeas Hrg.

The testimony of each inmate witness providing new information will be considered individually. All these witnesses testified live either at the habeas hearing on in depositions which were videotaped.

Robert Bunner testified he had known Battle at both USP–Atlanta and USP–Leavenworth. During that time he had had four or five face-to-face conversations with Defendant. He testified, as did other inmates, that Defendant talked to himself, screamed and hollered and exhibited other unusual behavior. He also testified that Battle had "hallucinated." When asked what he meant by "hallucinated" he explained that he meant that Defendant was "talking out loud, screaming and hollering." Tr. 28. The Court finds Bunner's testimony credible, but does not believe it is of particular help to Defendant. Bunner did not testify about implants.

Charles Allen, who knew Defendant at USP–Leavenworth and USP–Atlanta, did give testimony about implants, but the Court notes his testimony began with a statement that Battle had told him that he had "plates" in his head, his arms and his back. Following that statement habeas counsel asked him "Where were you when he first told you about the implants?" Tr. 53. At that point Allen testified that Battle had told him he had implants that would "make him fly and wings come out of him and stuff like that." Also, the implants would "make him walk like a robot." Tr. 68. Allen also testified Battle had told him that the implants would make him "turn flips all the time." Tr. 69. Allen stated he actually did see Battle turning flips in the air at USP–Leavenworth.

Allen would have made a poor witness at trial. When he testified he hung his head

and his hair fell around his face. He twisted back and forth in his chair. He mumbled and was hard to hear. Also, he was led by habeas counsel's questioning. Finally, his testimony was not credible. No other witness has described the effects of the implants as did Allen. Defendant himself has never made such lavish claims. While Defendant may have turned flips in the air at USP–Leavenworth, the Court is unconvinced that he told Allen that he was doing so on account of his implants.

Mike Grissom also testified live at the habeas hearing. He knew Battle at USP–Leavenworth and USP–Atlanta. Grissom was defensive and overtly hostile to the Government. When asked about his convictions, he refused to admit the underlying conduct, specifically, that he had possessed a weapon in the two armed robberies to which he had pled guilty and for which he served time. He testified that Defendant had commented about implants that the BOP had placed in him. Because Grissom was so hostile, the Court finds he would not have been an effective witness for Defendant at trial. The Court finds he is not a credible witness.

Two inmates testified by videotaped deposition: Carlos Hill and John McCullough. Hill had been in Cell House C with Battle at USP–Atlanta. In part, he testified that Battle thought BOP was putting "computer chips or things in his brain to find out what he knew. . . ." Tr. 7. In response to habeas counsel's question, "Q: implants?" Hill said "Yeah. Transplants, implants." He related watching a television program with Defendant regarding alternatives to prison. One suggestion was making an aircraft carrier into a floating prison, and implanting devices in the prisoners which would relay their thoughts. At that point, Defendant had said that's what BOP had done to him. Hill further testified Defendant had stated

that the chips monitored his thoughts. Tr. 23. Hill stated that he was not guilty of the kidnapping and second degree murder offense for which he had been convicted following a trial. He received a 60–year sentence in that case. He admitted he had been disciplined for having numerous fights with inmates and an incident with an officer. Each time he was transferred to a different prison. The Court finds Hill's credibility with a jury would be low due to his bad prison record and his denial of culpability for the crimes for which he is serving time. The Court finds Hill is not a credible witness.

The Court also viewed the video deposition of John McCullough, who is incarcerated at USP–Springfield. He is serving a life sentence for kidnapping and conspiracy and is at Springfield's medical facility for dialysis treatment. He testified he had served in Vietnam, was honorably discharged, received two Bronze Stars, a Silver Star, and a Purple Heart as a result of his service. He is coming up for parole on his federal sentence but then will have to serve a consecutive New York state life sentence. He has been in prison since 1980. In 1994, he was transferred to USP–Atlanta where he saw Battle occasionally. He had met Battle previously at USP–Leavenworth where they worked together on a prison job. McCullough also knew Eldson McGee, Robert Bunner, and Mike Grissom at USP–Leavenworth. They were all in a veterans group together. At USP–Atlanta, McGee, Bunner, Grissom and McCullough all continued in the same veterans group. They invited Defendant to attend their meetings but he declined.

McCullough related that Battle had told him the Government had put "some kind of thing in his head, listening device. . . ." Tr. 22. Battle allegedly told him this had been done while he was at USP Leaven-

worth. Tr. 23. He stated Battle had made these statements "at least 30, 24 to 30 times." Tr. 24. He also stated Battle claimed to see people who were not there. Tr. 26.

McCullough admitted he had been convicted of conspiracy and kidnapping in a federal court in Connecticut. He was also convicted in New York State of murder arising from the same series of transactions. In the New York case, he was also convicted of intimidating a juror. He received life sentences in both cases.

McCullough testified that the persons who had been kidnapped or killed had been drug dealers but that he had not been involved in the drug business himself. In fact, he stated, "I don't get along with drug dealers too well." Tr. 39. He explained that the kidnaping/murder had occurred because the victims had killed his mother and another relative.

He testified that he had been together with McGee, Bunner and Grissom in the veterans group at USP–Leavenworth and also at USP–Atlanta. He said the four of them had never discussed Battle's problems because they had all seen him and all knew about him. Therefore, it was not necessary to discuss him. Tr. 41.

From a demeanor standpoint, McCullough is more credible than the other inmate witnesses. In discussing his own criminal history he was less grudging in admitting his culpability than the others, although he was still somewhat grudging. The Court is somewhat skeptical of McCullough's claim that he was never involved in drug trafficking himself, but has no information which contradicts this claim.

In support of his contention that he did complain of implants before Officer Washington's death, Defendant also offers the declaration testimony of Charles White, an inmate at USP–Atlanta while Defendant was there. White's declaration, Defendant's Ex. 75, states that prior to Washington's death Defendant had told him "they" had put implants in his head to monitor him. White said Defendant asked him for empty aluminum pie cups so he could make a hat to block the sound and radio waves "they" were sending through his head. White states he refused to testify about these matters [43] because (1) he was afraid of retaliation from BOP guards at USP–Atlanta and (2) Defendant asked him not to give the testimony because it would make him (Defendant) look crazy.

During the trial the Court took considerable testimony from White, other inmates, BOP personnel, and U.S. Marshal's personnel concerning an incident in the U.S. Marshal's lockup which White claimed constituted a threat to him and the other inmates, who were waiting to testify for the defense. After hearing their testimony outside the jury's presence the Court found that there was insufficient credible evidence to warrant a determination that BOP personnel had threatened the inmates. Defendant's motion for mistrial was denied. The Court did, however, recommend that a further investigation be conducted by the U.S. Marshal's Service regarding the incident.

An investigation was conducted by the Office of the Inspector General of the U.S. Department of Justice. A Report of Investigation dated April 19, 2002 ("OIG Report") is in the record under seal as De-

---

**43.** White was writted in to Atlanta by the defense for the trial. He had told defense investigator Susan Miller in a 1995 interview that Officer Washington had been an abusive guard. No memorandum of that interview is in the record. While in the U.S. Marshal's lockup on March 11 or 12, 1996, before testifying, White apparently told Miller he was prepared to testify about Defendant's claims of implants and about his plans to make a metal hat.

fendant's Exhibit 90. The OIG Report concludes that BOP employees made no threatening or intimidating comments to any inmate in the U.S. Marshal's holding cells; however, the inmates may have misconstrued a remark made by Joseph Brookshire, one of the BOP guards, as being threatening. The report contains statements from the inmates, some of which state that White was the source of the rumors that a BOP guard had said that the "goon squad" would be waiting when the inmates returned to USP–Atlanta that evening. They said White used this as a pretext to gain an immediate transfer out of Atlanta. One inmate said he had heard White say, before his closed session testimony, that he was "going to get a play off of this." An inmate stated White had demanded of Stephanie Kearns that she ask him how he had been treated at USP–Atlanta before asking him any other questions. Several inmates including White stated that Kearns had deposited ten dollars to the Atlanta Pretrial Detention Center's accounts for inmates White, Vasher and Shirley to make up for the lack of adequate food at the Pretrial Detention Center.

The Court heard White's testimony several different times at trial and finds him not credible. He first testified on Friday, March 14, 1997 before the jury and in response to Kearns' questions about Defendant's claim of implants and his request for aluminum pie tins, denied having said that Battle had made such a statement. White testified that he would be "unable" to give that testimony because of events which had just transpired in the U.S. Marshal's lockup. Subsequently, in testimony taken outside the jury's presence and after the courtroom had been cleared of spectators including BOP personnel, White stat-

ed he had been afraid to testify truthfully because he feared retaliation from the BOP guards at USP Atlanta. He testified then that Battle "seems to feel that he has been implanted with some type of governmental chip." Tr. 3809. He was not asked about the aluminum pie cups. After a lengthy hearing, the Court directed that all of the inmates who had been in the Marshal's lockup be housed over the weekend at a facility other than USP–Atlanta.

On the following Monday, March 17, White testified again in front of the jury. At this time he was no longer at USP–Atlanta but rather was being held at the Atlanta Pretrial Detention Center.[44] The testimony White gave the jury at that time was that he had never told anyone, including the defense team, that Defendant had mentioned implants or aluminum pie tins to him. He testified he could not recall testifying before the Court on the previous Friday about the implants.

In his current declaration, White states that when he returned to testify before the jury for the second time, he still was afraid to tell about the implants and strange behavior of Defendant, because he was "worried about my safety when I left Atlanta." White Decl., Def. Ex. 75, March 18, 2002 Habeas Hrg. At the time White gave his second round of testimony before the jury, there were no BOP staff in the courtroom, just as there had not been when White testified before the Court outside the jury's presence on the preceding Friday. White's explanation for his discrepant testimony is unsatisfactory and not credible.

The Court also is skeptical of the other reason stated by White in his declaration for not testifying regarding Defendant's alleged claims of implants during his second testimony before the jury. White

---

**44.** This is an annex to the City of Atlanta Jail. The U.S. Marshal uses the facility pursuant to a contract.

states that Battle had asked him not to testify because of Battle's fear that the testimony would "make him look crazy." The Court doubts Battle said this to White; Defendant's claim that he has implants is a major theme he has repeated throughout the case. There is no reason why Defendant would not want White to testify concerning his alleged prior statements.

In summary, White is a manipulative and crafty individual whose testimony is not trustworthy. The Court notes that the defense did not seek to impeach White's denial that he had previously told Susan Miller (Federal Defender Program investigator) about the pie tins and his plans to make a metal hat. Miller was present at the trial and presumably could have testified that White did make this statement. However, the defense team did not call her. The Court presumes that defense counsel had some reason for this decision, and will not simply assume that their failure to call Miller was an oversight.

*Summary and Findings of Fact*

Overall, Defendant's evidence that he had complained to inmates of his implants before Washington's death is not credible. First, the post-conviction testimony of inmates who state that Defendant made such remarks is not credible. Secondly, Defendant himself testified at trial that he had never mentioned implants to other inmates before Washington's murder. Third, Eldson McGee, the only inmate who identified himself as a friend of Defendant's, and who met Defendant two to three times a week for coffee, testified Defendant had never told him about implants. McGee's testimony was very credible. It is hard to believe that Defendant would have mentioned implants to McCullough, who he barely knew, "24 to 30 times" but never mentioned this to McGee. Defendant has failed to show by a preponderance of the evidence, that his trial counsel failed to conduct a reasonable investigation or that they failed to discover available evidence. No prejudice has been shown.

### 2. *Complaints to Family Members*

At trial and at the competency hearing two of Defendant's sisters, Christine Battle Parker ("Christine") and Gloria Battle Bandy ("Gloria") testified about Defendant's mental condition from the time of his incarceration in 1987 up until his incarceration at USP–Atlanta in 1994. They testified Defendant was anxious, stressed, depressed, paranoid, spaced-out, acted in a bizarre manner, and was uncommunicative. Neither one mentioned that Defendant had complained about implants.

At the competency hearing Christine also gave the following testimony:

Q To your knowledge has [sic] any of your brothers and sisters ever complained about hearing voices in their heads?

A No.

Q How about having implants or things in their body that might be—that you would know would be impossible for that to happen?

A Not to my knowledge.

Q How about visual, seeing things that wouldn't be there, nothing like that?

A Not to my knowledge.

Test. of Christine Battle Parker, Comp. Hrg. Tr. 1327.

As previously noted, Defendant's own trial testimony in 1997 was that he had not told anyone about the implants "until lately," although he testified he became aware of the monitoring at USP–Leavenworth in 1992–93. He explained he had not wanted his family to worry. Tr. 1465–1467.

In closing argument during the guilt/innocence phase of the trial the Government pointed out that Defendant's failure to tell

about the implants before Washington's murder strengthened the conclusion that Defendant was malingering or feigning this claim as an excuse for the murder.

In the instant habeas proceedings, numerous family members—Gloria, Christine, Carl, David Bandy and Andrew Bandy, testified that Defendant had complained of implants and monitoring while he was in prison between 1987–1993.[45] Gloria and Christine also claim they mentioned this fact to a Federal Defender staff member at the time of the competency hearing and at the time of trial. They testified at the habeas hearing that they did not mention the implants at trial because the question was not asked.

David Bandy testified at the habeas hearing that he talked to Defendant on the telephone when he was at Butner in 1988–1989, and that Defendant told him then about the implants. Carl Battle testified that when he saw Defendant at Butner in 1988–89, Defendant told him that something had been put in his body. Carl Battle recalled initially that Defendant said it was a transplant; later, in response to leading questions, he identified it as an implant. Andrew Bandy, Gloria's husband, testified that Gloria reported to him that Defendant had mentioned his implants during the time Defendant was at USP–Leavenworth.

Lewis Robinson, an employee of the Federal Defender Program, testified through a declaration concerning conversations he had with Christine and Gloria while they were in Atlanta for the competency hearing and the trial. He was not assigned as an investigator on the case, but performed such tasks as serving subpoenas, providing transportation to family members and other support functions.

Regarding discussions with Gloria and Christine in October 1996 and in March 1997, he stated as follows:

I recall talking with Gloria and Christine on the way to and from the Paulding County Jail in October 1996 about Anthony and his background. At some point during the conversation they told me he had been hearing voices, and that prison officials monitored him through implants that had been put in him. After they visited Anthony, he told me that he was still hearing the voices and was worried about the implants that had been put in him. I already knew about Anthony's complaints about voices and implants from having talked with Anthony and from conversations with the attorneys. I did not think what the sisters told me needed to be put in a memo to the lawyers as they already knew this information.

\* \* \* \* \* \*

I spent an afternoon with Gloria and Christine during March, near the end of the trial when they came back to Atlanta to testify.... Gloria went on to explain that Anthony ... began to think after his surgery that the prison guards monitored him through implants. One of the sisters, I believe it was Gloria told me that Anthony began to complain to her after he had been in prison for a while about the guards messing with him and listening to him through implants.

Robinson Decl., Def. Ex. 11, March 18, 2002 Habeas Hrg.

Defendant also points out that Christine had reported Defendant's 1992–93 complaints of "monitoring" (but not implants) to Cheryl Abernathy, one of the defense's investigators, in May 1996. Abernathy

---

**45.** The last time family members and friends had a personal visit with Defendant was while he was at FCI–Butner in 1989. They never visited him while he was at FCI–Lewisburg, USP–Leavenworth or USP–Atlanta. During that time Defendant spoke to his father, Gloria, and to a lesser extent Carolyn by telephone.

prepared a memorandum which stated in part: "Ms. Parker stated that Anthony always felt he was being monitored by prison officials." Court's Exh. 5, April 18, 2002 Habeas Hearing. She sent it to Kearns. Kearns' declaration commented about the memorandum from Cheryl Abernathy and the claim that Christine and Gloria had spoken to Robinson as follows:

> I am troubled that I did not know about this memorandum before now. I am even more troubled that the member or members of the defense team to whom the Battle family members relayed Anthony's complaints about implants did not communicate this information effectively to the lawyers representing Anthony. That the family's communications were not passed on effectively is symptomatic of the poor communications within the defense team and the lack of continuity between investigators and mitigation specialists that I described in my previous declaration.
>
> Had I known that the Battle family had provided this information, I am confident that I would have made use of it. After the competency hearing, we certainly knew that the Government was making much of the "fact" that Anthony had not begun complaining of implants until after the murder of Mr. Washington. We had the information to rebut this central assertion within our grasp, but because the defense team was so dysfunctional, we did not know we had it.

Kearns Decl., Def. Ex. 50, March 18, 2002 Habeas Hrg.

At the habeas hearing on April 18, 2002 Kearns contradicted the testimony in her declaration about the May 1996 Cheryl Abernathy memorandum. At the hearing she remembered receiving it, stated she felt sure she had read it, and also said she had not thought that the mention of "moni-toring" was significant. Thus, she did not follow up with further investigation.

Defendant argues that an adequate pretrial investigation by the defense team would have uncovered the information that Defendant had complained of implants and monitoring between 1987 and 1993 to various family members, rebutting the Government's claim that Defendant only began complaining of implants and monitoring after Officer Washington's murder. He contends he was prejudiced by an ineffective investigation by the trial defense team.

The Government responds that the defense team conducted a comprehensive pretrial investigation and that the "new evidence" was not available earlier because it was manufactured after trial to aid in setting aside Defendant's conviction and sentence. As is set forth on pp. 95–120, the Court finds the defense conducted an investigation of Defendant's social (including mental health) history which was ample and well above a constitutional minimum. After considering the relevant facts, including the declarations of Stephanie Kearns, Lewis Robinson, Gloria Bandy, Christine Parker, Andrew Bandy and David Bandy, the habeas hearing testimony of the same witnesses [46], the trial testimony of Gloria and Christine, Defendant's trial testimony, plus other relevant portions of the record, the Court also finds that for the most part the "new evidence" probably was not available to the defense team investigators before trial because it did not exist. In reaching this conclusion the Court's reasoning is as follows.

The record shows that the family members were individually interviewed by defense investigators numerous times before trial concerning Defendant's mental state. They were questioned on successive occa-

---

**46.** Except Lewis Robinson, who did not testify at the habeas hearing.

sions by lawyers or staff members of the Federal Defender Program, then by Cheryl Abernathy[47], and finally by Jan Vogelsang, Defendant's mitigation specialist. With the exception of Christine's mention of "monitoring" to Cheryl Abernathy, none of them gave any information to defense investigators concerning Defendant's prior claims of implants and monitoring. Even at the competency hearing—which Gloria and Christine knew pertained to Defendant's mental condition—they never mentioned Defendant's claims of implants. This fact alone tends to impeach their more recent testimony. Moreover, the Court notes that all of the family members who testified at the habeas hearing, with the possible exception of Christine, are impressionable. All of them were led extensively by habeas counsel during their testimony regarding Defendant's alleged complaints of "implants."

Most importantly, Gloria was questioned by Kearns early in the defense investigation about Defendant's complaints and she was unable to recall specific complaints. Kearns' memo to file dated May 22, 1995, reported:

> The family has not seen Anthony since he left Butner. Gloria, Caroline, and Jim Battle, talked with him over the telephone. Caroline less frequently than Gloria and Mr. Battle. While at Leavenworth Penitentiary, Anthony began complaining more about how hard prison life was, and having problems. *Anthony expresses paranoia to his family about his surroundings, but not specifics about who or precisely what people are doing. He talks in general terms about being hassled.* Gloria believes he is mentally ill and that something happened to him when Minnie died. (Emphasis supplied).

> \* \* \* \* \* \*

> *Anthony knows that the guards are inside his mind and know everything he is going to do before he does it. What he cannot figure out is whether they've put something in his food in Butner and then at Leavenworth or they possibly implanted something in him while he was at Butner or whether it was through the pills that they gave him at Butner. He thinks they probably monitor him on the computer, but he is not sure. He believes the central booth in Leavenworth was some sort of a monitoring device.* (Emphasis supplied).

Court's Ex. 1, April 18, 2002 Habeas Hrg.

It is inferable from the May 22, 1995 memo that after Defendant told Kearns about his concerns that the guards were monitoring him through some means, including possibly implants, that Kearns asked Defendant's father, Gloria and Carolyn whether Defendant had ever made such statements to them. As the memo reflects, these family members said they had no recollection of such statements. Rather, they could only remember Defendant complaining of harassment and being suspicious, as the May 22, 1995 memo states. The Court also notes that neither of Kearns' declarations—Def. Ex. 50 and 51, contains a statement that she failed to ask family members about whether Defendant had complained of implants prior to Washington's death. Obviously, she did ask them. Indeed, one of her declarations affirmatively states that family members did not tell her about the implants. *See* Def. Ex. 51, March 18, 2002 Habeas Hrg.

The defense has not offered a declaration of Russell Gabriel, who may have interviewed Defendant's siblings concerning implants in 1995 or 1996. Susan Miller's declaration is silent on the subject of whether she asked about the implants, as

---

**47.** Abernathy questioned some of them twice.

is the declaration of Janet Vogelsang. The Court considers these omissions important, as the declaration of Cheryl Abernathy does state that she was never told to ask family members whether Defendant complained of implants before Washington's death. *See* Def. Ex. 13, March 18, 2002 Habeas Hrg. Obviously, habeas counsel's investigators asked Abernathy this question. It would make sense that trial counsel did not tell Abernathy to ask about implants if they had already asked family members what they knew about the implant claim and recevied a negative response. However, it also would make sense that Jan Vogelsang would have been told to check with family members regarding implants prior to her February 1997 trip to North Carolina which followed the Fall 1996 competency hearing.[48]

Regarding Lewis Robinson's declaration, the Court accepts Robinson's statement that Gloria and Christine discussed Defendant's claims of implants during a trip to and from the Paulding County Jail in late 1996 and on an outing in March 1997. There was considerable testimony and argument about Defendant's claims of implants both at the competency hearing and during the, trial; therefore, it is not surprising that Defendant discussed this topic with Gloria and Christine or that Gloria and Christine mentioned this topic to Robinson. However, this adds nothing; the critical question is whether Gloria and Christine said or implied to Robinson that Defendant had complained of implants *be-*

*fore* Washington was killed. In this respect, the Court is unconvinced of the correctness of Robinson's recollection. First, there is a five year time lapse between Robinson's declaration and the date of the conversation. Second, the claimed statement is different from what Gloria told Kearns in 1995, well before the time of the competency hearing and trial. At that time, she could not recall Defendant making any specific complaints. Third, Christine's competency hearing testimony that none of her brothers and sisters had ever complained of implants was given within a week after her visit to the Paulding County Jail when she and Gloria allegedly discussed Defendant's old complaints of implants with Robinson. *See* Tr. 1321.

Christine did tell Cheryl Abernathy that Defendant had complained of "monitoring" while he was at USP–Leavenworth. Christine, who is the most articulate and the most intelligent of Defendant's relatives, gave this information to Abernathy in early 1996 when she may not have known of its potential significance. Therefore, the Court does not believe this report by Christine was manufactured. However, this statement by Christine is of marginal value because of its ambiguity. That an inmate would be "monitored" by prison guards is not surprising or noteworthy. Only if the monitoring is done in some unusual manner, *e.g.*, through implants, microchips, or other bizarre means, is it noteworthy.[49]

48. In fact the record contains a telling item of information on that score. Prior to Vogelsang's trial testimony defense counsel Martin indicated the Defendant's father had said that Defendant had implants in his head. The Court ruled in limine that this statement could not be included in Vogelsang's social history testimony as Defendant's father was not present at trial. Tr. 4392. Obviously this information was acquired by Vogelsang from Defendant's father on her trip to North Car-

olina in early 1997. Vogelsang must have asked him what he knew about Defendant's claim of implants. It would make sense that she would have asked Gloria and Christine questions about the implant claims as well.

49. Defendant's complaint that he was being monitored is consistent with the Government's assessment of his mental health: that he has a mixed personality disorder, with schizotypal, paranoid and antisocial features.

## F. Findings and Conclusions

The Court finds that trial counsel conducted an investigation of Defendant's social and mental health history that was objectively reasonable and well above a constitutional minimum. While this finding above is alone fatal to Defendant's claim of ineffective assistance of counsel based on insufficient investigation, the Court further finds that Defendant suffered little prejudice from the fact that the investigation was not more extensive than it was, inasmuch as the most important part of the evidence Defendant claims should have been found did not exist. The additional evidence of Defendant's odd behavior while in prison and the evidence of his complaint to Christine about being "monitored" had no reasonable chance of making a difference either in the success of Defendant's insanity defense or in the outcome of the sentencing phase of the trial. The Government's evidence of the prison assaults committed by Defendant, in addition to the murders of Minnie Foreman and Officer Washington, plus the clear and rather shocking evidence of Defendant's lack of remorse for Washington's murder was strong enough that the additional evidence clearly would have had no chance of making a difference in the outcome of the sentencing phase. Defendant's claims of ineffective assistance of counsel based on lack of investigation are without merit.

## VI. FAILURE TO PROVIDE INFORMATION TO MENTAL HEALTH EXPERTS

■ In this section, the Court will assume without deciding that defense counsel had a duty to provide to the mental health experts information in counsel's possession which counsel knew or reasonably should have known was needed by the experts to properly perform their work.

## A. Disciplinary Records

Trial defense counsel obtained Defendant's complete BOP file from the Government in their pretrial investigation. The complete BOP file includes not only Defendant's medical and mental health records, but also his disciplinary records and institutional transfer records as well. The disciplinary records are physically maintained separately from the medical/mental health records and are part of the Central Inmate File. Defendant's disciplinary records included documentation of incidents in which Defendant refused work orders and direction to share a cell, as well as several incidents of violent behavior toward inmates or guards. Apparently, trial counsel provided the medical and mental health but not the disciplinary records to the defense's mental health experts. According to Defendant's Proposed Findings of Fact and Conclusions of Law ("Def.Prop.Find."), the disciplinary record was "filled with descriptions of pre-crime behavior consistent with schizophrenia." Def. Prop. Find. at 18. Defendant cites Dr. Woods' declaration in support of this assertion.

Dr. Woods' declaration does not identify specifically what information in the disciplinary records would have been helpful. Rather, it simply states:

> I was not provided with Mr. Battle's prison disciplinary records. These would have assisted me in reviewing his incustody behavior for signs and symptoms of illness that preceded the killing.

Woods Decl. ¶ 10, Def. Ex. 77, March 18, 2002 Habeas Hrg.

With one exception, Defendant does not identify what information in the disciplinary records would have been helpful in making a more convincing diagnosis of schizophrenia or in presenting Defendant's behavior in a more sympathetic light.

The only entry in the disciplinary records specifically identified by Defendant is a March 1990 incident at USP–Lewisburg. *See* Def. Ex. 79, March 18, 2002 Habeas Hrg. A staff member noted that Defendant seemed confused following an incident in which he fought with his cellmate over a mattress. An evaluation of Defendant was ordered to determine whether Defendant was competent to understand the nature of the violation charged. It was then determined that Defendant was competent to proceed with the disciplinary hearing.

The Court finds that defense counsel's decision to provide Defendant's medical and mental health records, but not his disciplinary records, to Dr. Woods was not unreasonable. Defendant's complete BOP file is quite lengthy, and the portion most pertinent to a psychiatric evaluation is the medical and mental health record. Counsel had no reason to believe that the disciplinary record would be helpful to the mental health experts.

Further, Defendant has failed to demonstrate prejudice. Dr. Woods does not state whether the disciplinary records would have changed his diagnosis, how they would have helped him to persuade the jury that Defendant suffered from paranoid schizophrenia, or how they would have assisted him in presenting Defendant in a more favorable light to the jury. Indeed, Dr. Woods' declaration does not even state a familiarity with the contents of the disciplinary records.

## B. Chaotic and Violent Environment at USP–Atlanta

Defendant argues that the atmosphere at USP–Atlanta was chaotic and violent at the time he murdered Officer Washington. He argues that the environment contributed to the deterioration of his mental health and was a factor in Washington's murder. Defendant contends that his trial counsel was aware of the chaotic and violent environment by virtue of the news accounts following Washington's murder; however, defense counsel failed to provide this information to their mental health experts.

Dr. George Woods states:

I also was not provided information relating to the conditions of Mr. Battle's confinement at USP Atlanta. This information would have been very important in understanding his behavior at that facility as compared to another facility. The chaotic and unstructured nature of USP Atlanta when Mr. Battle was housed there would have brought on a deterioration of his functioning because of his illness, and that is information that I should have been provided as part of the social history.

Woods Decl., Def. Ex. 77, March 18, 2002 Habeas Hrg.

The Court accepts, *arguendo*, Defendant's contention that USP–Atlanta's environment was more violent and less structured at the time of Officer Washington's death than most other federal prisons.[50] Also, the Court accepts the commonsense notion that stress and environment may impact an individual's mental state or aggravate a mental disorder. What is missing here, however, is some evidence connecting a change in Defendant's mental condition to the atmosphere within the prison. Defendant has offered no statement that he personally observed or even knew of instances of violence or that the environment within the prison bothered him. Declarations of numerous inmates and prison employees admitted at the March 18, 2002 habeas hearing offer exam-

---

**50.** The Court believes that defense counsel, as well as Dr. Davis, knew of the prison's reputa- tion for violence.

ples of USP–Atlanta's chaotic environment prior to Washington's murder:

... a tremendous amount of drugs and alcohol, two poker tables in operation day and night ...

Courtwright Decl., Def. Ex. 34, March 18, 2002 Habeas Hrg.

Inmates had the freedom to go just about anywhere they wanted.

Concepcion Decl., Def. Ex. 33, March 18, 2002 Habeas Hrg.

[There were] drugs everywhere ... prostitution by female staff members....

Glover Decl., Def. Ex. 41., March 18, 2002 Habeas Hrg.

[There were] lots of illegal drugs.

Ramos Decl., Def. Ex. 64, March 18, 2002 Habeas Hrg.

There were basically no rules. Inmates had possession of all types of contraband, such as money, clothing, shoes, drugs, cellphones, portable TVs, jewelry and liquor.

White Decl., Def. Ex. 75, March 18, 2002 Habeas Hrg.

The declarations also state that Defendant usually stayed by himself, mostly in his cell:

Always kept his curtains drawn in his cell ... so no one could look in on or bother him. [He was] always by himself.

Carter Decl., Def. Ex. 30, March 18, 2002 Habeas Hrg.

Battle didn't talk much to people. He was a real loner.

Concepcion Decl., Def. Ex. 33, March 18, 2002 Habeas Hrg.

He was always alone.

Graham Decl., Def. Ex. 42, March 18, 2002 Habeas Hrg.

He stayed in his cell almost all of the time.

Perkins Decl., Def. Ex. 63, March 18, 2002 Habeas Hrg.

He didn't go out of his cell very often and did not really mingle with other inmates.

Ramos Decl., Def. Ex. 64, March 18, 2002 Habeas Hrg.

Also, the declaration of Norman Braxton states that tier four in C–Cellhouse, where Defendant's cell was located, was less noisy than the "flats" (apparently the cells on ground level in C-cellhouse). Braxton Decl., Def. Ex. 27, March 18, 2002 Habeas Hrg.

Defendant has not cited examples of "chaos" which the Court can find would have caused deterioration of Defendant's mental condition. Assuming it is correct that contraband was available and even prostitution, this would not necessarily impact Defendant's mental condition. Also, it is undisputed that Defendant was a loner, who spent considerable time in his cell or otherwise by himself. Without tangible evidence connecting alleged deterioration of Defendant's mental state to his own experience within the prison, Defendant has failed to show that he was prejudiced by trial counsel's failure to bring the evidence of violence and chaos to the attention of the defense mental health experts.

## C. CT Scan Results

Defendant contends that counsel unreasonably failed to provide their mental health experts with a CT scan of Defendant's brain which was taken in January 1997 before the trial. Defendant explains that the CT scan was obtained by his trial counsel for the purpose of convincing him that there were no implants in his brain. Defendant complains that his trial counsel did not show the CT scan to Dr. Woods, the defense team's neuropsychiatrist and did not have a neuroradiologist look at the scan. Defendant contends that a better informed review of the CT scan would have corroborated the diagnosis of schizo-

phrenia and refuted claims that he was faking his implant delusion.

Dr. Woods' declaration states the following:

> I was not shown the CT scan that was apparently conducted in 1997, nor asked to read it or have it read. The CT scan would have allowed me to confirm the diagnosis by means of structural corroboration. Along with the neuropsychological testing that has now been performed, the CT scan would have added corroboration and significant additional evidence of schizophrenia.

Woods Decl., Def. Ex. 77, March 18, 2002 Habeas Hrg.

The Court notes that Dr. Woods does not claim to have actually seen the CT scan at any time, including before signing his declaration. Rather, Dr. Woods apparently is relying on a statement made in the 2002 Psychiatric Report.

In 1997 the defense team arranged for Gary Richter, M.D., to administer a CT scan of Defendant's brain. The CT scan was subsequently interpreted by Dr. Cyrus Cioffi, M.D., a radiologist at Georgia Baptist Hospital, who found the following:

> The overall anatomy of parenchyma and CSF containing spaces is within normal limits for a patient of this age. No intracranial masses or extra-axial collections are identified. No evidence of infarction or bleeding. The visualized portions of base of skull and calvaria showed no abnormality.

According to the 2002 Psychiatric Report, the 1997 CT scan reveals[51] the following:

1. The technical quality of the scan was suboptimal. Sections were taken at 10 mm rather than 8 mm, which means that important additional information on structural brain abnormalities may have been missed.

2. Nonetheless, there is clear mild to moderate cortical atrophy in the frontal regions, not normally observed in a healthy young adult, but consistent with the diagnosis of schizophrenia. This degree of frontal atrophy may also indicate a past history of head injury or other neurodegenerative process (e.g. neurotoxin exposure) as the amount of atrophy is greater than would be expected by schizophrenia alone.

3. There is definitive enlargement of the left temporal horn, also consistent with schizophrenia.

4. There are abnormal choroid plexus calcifications in the temporal horn, usually seen in much older men-behavioral/clinical significance unclear.

2002 Psychiatric Report, Def. Ex. 80 at 11, March 18, 2002 Habeas Hrg.

On page 39 of the 2002 Psychiatric Report the authors define enlargement of the left temporal horn as "loss of tissue in the left temporal lobe."

It was not unreasonable for trial counsel to fail to give the CT scan to their trial experts. The record suggests no reason why this should have occurred to counsel. None of the defense's mental health experts have opined that counsel should have recognized that this would be advantageous. Moreover, it is noteworthy that the defense's chief trial expert, Dr. Woods, did not himself seek to have a CT scan done to check for signs of schizophrenia even though he opined that neuropsychological tests suggested frontal lobe dysfunction. Indeed, Dr. Woods testified at trial that he had conferred with a number

---

51. The 2002 Psychiatric Report does not state who read the CT scan in 2001–2002 and does not say that it was read by a neuroradiologist. The Court therefore infers that the opinion expressed is that of the authors of the 2002 Psychiatric Report.

of other experts, including Dr. Vinogradov (also one of Defendant's post conviction experts and an author of the 2002 Psychiatric Report). Evidently none of these experts thought it important to have a CT scan done. Thus, the Court finds that trial counsel did not act unreasonably and were not ineffective in this manner.

Further, Defendant has not made an adequate showing that he was prejudiced by counsel's failure. For one thing, Dr. Cioffi's conclusion that "the CSF containing spaces are within normal limits" appears to be at odds with the determination of the 2002 Psychiatric Report that the left temporal horn is definitively enlarged. The primary "CSF containing spaces" in the brain are the ventricles. The temporal horn is a major substructure of each lateral ventricle. *See Stedman's Medical Dictionary* 353 (25th ed.1990). Put another way:

> Within the cerebral hemispheres and brain stem is a series of interconnected cavities called ventricles. These spaces are continuous with the central canal of the spinal cord and like it they contain cerebrospinal fluid.
>
> The largest ventricles are the lateral ventricles ... which extend into the cerebral hemispheres and occupy portions of the frontal temporal and occipital lobes....
>
> \* \* \* \* \* \*
>
> ... Most of the cerebrospinal fluid arises in the lateral ventricles....

David Shier, Jackie Butler, and Ricki Lewis, *Hole's Essentials of Human Anatomy and Physiology* 239 (7th ed.2000).

Modern imaging technology has brought about a growing conviction that structural brain abnormalities are often seen in patients with schizophrenia. *See* Barry S. Fogel et al., *Neuropsychiatry* 328–29 (1996). According to one source, increased volume of ventricular cerebrospinal fluid is the most widely accepted image finding in schizophrenia. Charles Kaufmann and Jack Gorman, *Schizophrenia: New Directions for Clinical Research and Treatment* 37 (1996). According to the DSM–IV, "the most common structural abnormalities found in the brains of schizophrenic persons include enlargement of the ventricular system and prominent sulci [52] in the cortex." DSM–IV at 280. Ventricular enlargement has been noted to be associated with types of schizophrenia which display negative symptoms (*e.g.*, apathy, anhedonia, affective blunting and chronicity). Kaufmann, *Schizophrenia* at 37–38. Some research has suggested a negative relationship between temporal horn size and positive symptoms of schizophrenia (delusions, hallucinations). *See* Rubin, P. et al., *Relationship Between Brain Structure and Function in Disorders of the Schizophrenic Spectrum: Single Position Emission Computerized Tomography: Computerized Tomography and Psychopathology of First Episode*, 90 Acta Psychiatr. Scand. 281, 281–289 (1994). An open question is whether ventricular enlargement reflects tissue loss. Fogel, *Neuropsychiatry* at 328–329.

The Court understands the 2002 Psychiatric Report's and Dr. Cioffi's interpretations of the 1997 CT scan to be that there is not general enlargement of Defendant's ventricular system. Also, no finding is made of increased volume of cerebrospinal fluid. Rather, there is only a finding (in the 2002 Psychiatric Report) of significant increase in the size of the left temporal horn. Based on the clinical observations made in 1996 by both sides' experts, it is

---

**52.** Sulci are the grooves or furrows on the surface of the brain. *Stedman's Medical Dictionary* at 1502.

unclear whether increased temporal horn size would be an expected finding in Defendant's case. Put another way, if Defendant is schizophrenic and his main symptoms in 1996–97 were delusions and hallucinations, at least one study would suggest the improbability of a finding of increased temporal horn size. Thus, while the Court accepts that temporal horn enlargement may be associated with schizophrenia, it is not clear that an association would exist in Defendant's case, assuming that he is schizophrenic and that the CT scan indeed shows enlargement of the left temporal horn.

Finally, after reviewing the film of Defendant's 1997 CT scan, Def. Ex. 89(A–C)(36 views), with a lighted viewbox in chambers, the Court is skeptical that it does show left temporal horn enlargement. At least, it does not clearly show such enlargement. The temporal horns which are depicted in two posterior views of Defendant's head are so tiny that it seems unlikely that one could make that conclusion with confidence, absent the use of special measurement techniques. Further, in one view the "dot" which appears to represent the left temporal horn seems larger than the right; in another, the right-hand dot seems larger than the left. As an aid in examining the film of Defendant's CT scan, Def. Ex. 89(A–C), Habeas Hearing, the Court has consulted Paul D. Roy et al., *Temporal Horn Enlargement Is Present in Schizophrenia and Bipolar Disorder*, 44 Biological Psychiatry, 418, 430 Fig. 1 (1998) (depicting, *inter alia*, the temporal horns). The comparison of images does not produce a conviction that Defendant's temporal horn as depicted in Def. Ex. 89(A–C) is enlarged; rather it leaves uncertainty as to whether this is the case. Defendant has the burden of per-

suasion, and he has failed to carry his burden.

With respect to Defendant's claim that the CT scan shows cortical atrophy, there are two "top down" CT scan views which depict the cortex but both—one in particular—are very light and appear overexposed or mechanically defective. It is unclear whether they show enough detail to permit a determination of cortical atrophy.

Assuming *arguendo* that the CT scan shows evidence of frontal cortical[53] atrophy, that does not mean that the atrophy was necessarily caused by schizophrenia and does not refute the Government's claim that Defendant is faking his implant delusions. Substance abuse is a well-known cause of brain damage. *See* John Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Heath Examination,* The Advocate, August 1995, at 5 (". . . early and prolonged use of drugs and alcohol, including organic solvents, can cause permanent brain damage.") (copy admitted into evidence as Court's Ex. 6, April 18, 2002 Habeas Hrg). Heavy substance abuse can cause frontal cortical atrophy. *See* J.S. Krill, G.M. Halliday, M.D. Suoboda, and H. Cartwright, *The Cerebral Cortex is Damaged in Chronic Alcoholics,* 79 Neuroscience 983, 983–998 (1997). Because the evidence shows that Defendant abused alcohol and illegal drugs beginning at a young age, one inference which can be drawn is that any cortical atrophy was caused by substance abuse. The 2002 Psychiatric Report's failure to recognize that substance abuse is at least a possible explanation for any frontal cortical atrophy undermines its credibility.

In summary, the Court makes the following finding of fact and conclusion of

---

**53.** The cerebral cortex is defined as "the gray cellular mantle . . . covering the entire surface of the cerebral hemisphere of mammals." *Stedman's Medical Dictionary* at 359.

law: Trial counsel did not unreasonably fail to provide the 1997 CT scan to the defense mental health experts. Defendant has not shown by a preponderance of the evidence that he has abnormal physical changes in his brain. He also has not shown by a preponderance of the evidence that any changes were probably caused by schizophrenia instead of by other causes. Defendant has failed to show prejudice stemming from his trial counsel's failure to have the CT scan read by another radiologist besides Dr. Cioffi. This claim is without merit.

D. Information Concerning Defendant's Social/Family Background and the Development of his Mental Illness

Defendant contends that trial counsel failed to provide necessary information to his expert witnesses. Specifically, Defendant contends:

> Trial counsel failed to appreciate the often subtle signs of vulnerability to schizophrenia that can be detected early in life, and that the actions of someone suffering from schizophrenia are affected by the environment in which they live. As a consequence of their failure to understand their client's mental illness, trial counsel failed to provide their experts or the jury with critical information about the course of petitioner's life and the development of his mental illness.

Def. Prop. Find. at 24.

Defendant cites the declaration of Stephanie Kearns, in support of his claim that "trial counsel failed to provide their experts with critical information about the course of petitioner's life and the development of his mental illness". Kearns Decl., Def. Ex. 50, March 18, 2002 Habeas Hrg. However, Kearns' declaration does not say that. The declaration does say that "the investigation of the life history of Mr. Bat-

tle ... fell woefully behind and was never completed."

Defendant also cites the declaration of Dr. George W. Woods, which states in part as follows:

> When I was first retained, I asked the trial lawyers to provide me with a comprehensive and thorough social history, including Mr. Battle's medical, behavior, developmental, educational, and employment history, and the same information of Mr. Battle's family.
>
> \* \* \* \* \* \*
>
> The only documents I recall receiving regarding Mr. Battle's history were a four or five page "social history" compiled by Stephanie Kearns and various school records. I was told that the information in this document by Ms. Kearns was all the background and family history information investigators could obtain. I requested more information from the trial attorneys but was not given more.
>
> \* \* \* \* \* \*
>
> In Mr. Battle's situation, the social history information contained in the psychiatric evaluation and declaration submitted by post conviction counsel provides the basis for understanding factors that were critically important to the onset and course of Mr. Battle's illness. The materials I have now reviewed provide the corroboration we were missing at trial concerning the onset and course of Mr. Battle's psychiatric illness.

Woods Decl., Def. Ex. 77, March 18, 2002 Habeas Hrg.

Dr. Woods' statement that he received virtually no social history documents from trial counsel is flatly contradicted by the testimony he gave during the trial. At that time he testified that when he was asked to evaluate Defendant he was provided with a "wealth of material." Tr.2066. He said the background material consisted of the report and testing records

from Drs. Johnson and Coleman's 1987 evaluation of Defendant (the 1987 Psychiatric Report), medical records from Defendant's incarceration at FCI–Butner, medical records from USP–Lewisburg, USP–Leavenworth, and USP–Atlanta, testing data and medical records from Defendant's 1996 evaluation at FCI–Butner, Drs. Johnson and Hazelrigg's report (the 1996 Psychiatric Report) and Dr. Davis' reports. In addition, he said "there were family history records. There were school records. There were interviews with family members. There were interviews with teachers. There were statements by Mr. Battle at the time of the instant offense. I have received materials since that time, but those are the materials I had to start the evaluation." Tr.2067.

Dr. Woods' declaration testimony is unimpressive, not only because of the glaring discrepancy just mentioned, but also because he has failed to identify what new information in the 2002 Psychiatric Report [54] and declarations obtained by post-conviction counsel he finds important, and what effect this information would have had on his diagnosis of Defendant, or his trial testimony. Woods does not address whether he now agrees that Defendant's diagnosis should be undifferentiated schizophrenia. Instead, the declaration vaguely alludes to better defining "the onset and course of Defendant's illness." This part of Dr. Woods' affidavit, like the rest of it, is meaningless by virtue of its generality.

The Court also notes that Kearns' declarations do not state that she failed to furnish Dr. Woods with the interview memoranda prepared by Cheryl Abernathy which document Defendant's social history. *See* Kearns Decl., Def. Ex. 50, 51, March 18, 2002 Habeas Hrg. Kearns states she was disorganized, but never identifies what materials she failed to give Woods which were important to his diagnosis.

The 2002 Psychiatric Report and the declarations do contain some new information which Dr. Woods did not have when he evaluated Defendant in 1996: the statements of family members and prison inmates concerning Defendant's alleged complaints of implants prior to Officer Washington's murder, the additional statements of inmates who observed Defendant's odd behavior in prison, and information concerning Defendant's exposure to pesticides as a child. However, it is clear that trial counsel did not have this information either and thus could not have provided it to the defense's mental health experts. Some of this evidence did not even exist as discussed above, and thus could not have been obtained by counsel.

## VII. MISCELLANEOUS OTHER CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL IN VARIOUS STAGES OF THE CRIMINAL PROCESS

A Defendant has a right to the effective assistance of counsel. Strategic

---

**54.** The 2002 Psychiatric Report concludes that Defendant suffers from undifferentiated schizophrenia, not paranoid schizophrenia. The relevance of the distinction in the context of this case seems to be that delusions and hallucinations are not a required feature of undifferentiated schizophrenia. Also, undifferentiated schizophrenia is associated with an earlier age onset than paranoid schizophrenia. Disorganized speech and disorganized behavior are prominent in undifferentiated schizophrenia but are not features of paranoid schizophrenia. DSM–IV at 285–289. According to the DSM–IV, "The essential feature of the Paranoid Type of Schizophrenia is the presence of prominent delusions or auditory hallucinations in the context of a relative preservation of cognitive functioning and affect ... Onset tends to be later in life than the other types of schizophrenia ... These individuals usually show little or no impairment on neuropsychological or other cognitive testing." DSM–IV at 287.

decisions and trial tactics based on informed choices rarely provide a basis for a determination of ineffective assistance of counsel. *Williams v. Kemp*, 846 F.2d 1276 (11th Cir.1988). This Court's role is not to second-guess an attorney's strategy, but rather to see if that strategy was reasonable. *Zamora v. Dugger*, 834 F.2d 956, 958 (11th Cir.1987). Morever, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

### A. Preindictment Phase

▉ Defendant argues that his trial counsel were ineffective in allowing Dr. Dave M. Davis, psychiatrist retained by the defense team, to examine and diagnose Defendant in August 1995, before any investigation had been done of Defendant's social history by trial counsel. The record reflects that Dr. Davis reviewed the 1997 Psychiatric Report and interviewed Defendant for several hours in August 1995 before rendering a diagnosis of paranoid schizophrenia. Subsequent to that, Dr. Davis again interviewed and evaluated Defendant May 23, 1996, November 26, 1996, and February 8, 1997, each time determining that Defendant suffers from paranoid schizophrenia. Dr. Davis so testified both at the competency hearing in October 1996 and at trial in February/March, 1997.

Defendant cites no authority for this proposition and does not point out what prejudice accrued to him on account of the lack of investigation before his first interview with Dr. Davis. The 1987 Psychiatric Report which Dr. Davis reviewed contains considerable social history. Also, Dr. Davis is an experienced and competent psychiatrist who himself is able to obtain appropriate social history information from

his client. Finally, the Court notes that Dr. Davis' diagnosis was basically the same as that of Dr. Woods, a psychiatrist who testified as Defendant's primary mental health expert at the competency hearing and at trial. Dr. Woods did have substantial social history information which had been gathered by the Defendant's investigators. Both testified Defendant is a paranoid schizophrenic. The only respect in which the two men disagreed was that Woods opined that Defendant does not exhibit antisocial tendencies; Dr. Davis stated that he does. The Court finds this claim meritless.

### B. Pretrial Phase

#### 1. *Limitation on Butner Evaluation*

Defendant argues his trial counsel were ineffective for failing to seek and obtain a limitation on the type of tests which could be performed in connection with Defendant's court-ordered evaluation at FCI Butner in January, February and March of 1996, or to seek a limitation on the scope or length of the Butner evaluation. Defendant argues that Defendant was prejudiced by these failures because the scope of the examination, especially the length of time the evaluation took, gave the Government an unfair advantage. The defense psychiatrists/psychologist only examined and observed Defendant for short periods of time (generally several hours at a time) although each of Defendant's three expert witnesses conducted multiple evaluations of him.

The Court disagrees with Defendant that his counsel were ineffective in this manner. The 1996 examination at Butner was ordered by the Court, not by the Government and it was the Court's intention that the mental health experts at Butner conduct such tests and examination as they deemed appropriate. Generally, such matters are within the province of experts;

it is not the Court or counsel's responsibility to tell mental health experts what tests to perform or how to go about their examination.

### 2. Neurological Examination

Defendant argues that his counsel were ineffective in failing to obtain a neurological examination of Defendant. Def. Prop. Find. at 41–42.

While the defense experts who testified at trial may not have conducted as detailed a neurological exam as did the post-conviction experts they did make neurological assessments. See 2002 Psychiatric Report at 25–27, Def. Ex. 80, March 18, 2002 Habeas Hrg. They all testified concerning Defendant's mental status at the time of each of their evaluations. They also noted Defendant's occasional grimacing and blinking. The information revealed by the 2002 neurological exam does not add appreciably to the testimony of Defendant's and the Government's expert witnesses at the competency hearing and at trial.

Moreover, the defense experts conducted extensive neuropsychological tests in 1996. While neurological tests assess more basic neurological function[55], neuropsychological tests assess higher neurological function.[56] Neuropsychological testing pro-vides information regarding cognitive, perceptual and motor capacities or deficits. From neuropsychological tests inferences may be drawn as to whether an individual may have brain dysfunction and if so, in what area of the brain.

Both Defendant's psychologist, Dr. O'Hagan, and the Butner psychologist, Dr. Hazelrigg, conducted neuropsychological tests. Seventeen different types of neuropsychological tests were performed, some by both sides' psychologists. Also, the 2002 Psychiatric Report lists 25 neuropsychological tests which were performed at that time, some of which are the same as those done before trial by Government and defense experts. None of these tests, either pretrial or post-conviction, implied any global or diffuse brain damage. The 1996 tests generally showed that Defendant has good attention and concentration skills, good visual memory, good visual organizational skills, poor verbal memory, a poor general fund of information and poor vocabulary. The defense psychologist, Dr. O'Hagan, testified that Battle's relatively poor scores on the Wisconsin Card Sorting Test, the Wechsler Memory Scale Revised and the California Verbal Test tend to indicate frontal lobe dysfunction. Tr. 1764. He specified that was a sign of a functional brain disorder. Defendant has not explained what important facts were missed because the defense experts did not conduct a more detailed neurological exam, and how any missed facts may have impacted their diagnoses. The Court finds that Defendant has not demonstrated prejudice.

### 3. Continuance of Trial

 Defendant argues his trial counsel were ineffective for failing to seek a continuance of the trial date when they were not prepared. In that regard, Kearns' February 14, 2002 declaration states:

This case was not ready to go to trial in February, 1997. We had not completed the investigation requested by Dr.

---

**55.** Neurology is the branch of medical science concerned with the nervous system and its disorders. *Stedman's Medical Dictionary* at 1046.

**56.** "Neuropsychology is a specialty of psychology concerned with the study of the relationships between the brain and behavior, including the use of psychological tests and assessment techniques to diagnose specific cognitive and behavioral deficits and to prescribe rehabilitation strategies for their remediation." *Id.* at 1049.

Woods, or the family history necessary for a mitigation specialist to testify and avoid the objections we ultimately confronted during the penalty phase. We should have sought a continuance of the trial date, but did not. At the time, I did not appreciate how inadequately prepared we were to go to trial, in part because of my lack of experience in capital cases, and in part because our defense team did not meet regularly or communicate enough.

Kearns Decl., Def. Ex. 50, March 18, 2002 Hearing.

As previously noted, p. 101, the statement in Kearns' declaration was undercut by her testimony at the April 18, 2002 habeas hearing in which she admitted having received substantial social history material prepared by Cheryl Abernathy, including a family history, well before the trial date.

The Court rejects Defendant's claim that his counsel were ineffective for failing to ask for a continuance. Defense counsel were appointed in February 1995 and the trial did not begin until February 1997. Thus, counsel had two years to prepare the case for trial. The Court also notes that indeed a significant social history investigation had been done well in advance of trial, including a complete family history as gleaned from the large number of interviews of family members and friends. Had the defense sought a continuance, in all likelihood it would have been denied. Based on an analysis of the investigation which had been done well in advance of trial, the Court sees no factual basis for Kearns' opinion that the defense team was inadequately prepared for trial. The Court also is unable to determine what difference more trial experience in capital cases would have made, or what adverse impact a lack of meetings or more regular communication had on the quality of the defense team's presentation. Both trial

experience and good team communication are important, but Defendant has not pointed to what would have been done differently with more capital trial experience on Kearns' part, more meetings or better communication. The Court also notes that Kearns indeed does have a lot of experience in capital cases, specifically § 2254 death penalty cases of which her office handles a large volume pursuant to funding from the Administrative Office of the U.S. Courts.

4. *Exclusion of Robert Willis' Testimony*

■■ Defendant argues that his trial counsel were ineffective for failing to seek the exclusion of the testimony of BOP correctional officer Robert Willis based on a violation of Rule 16, Federal Rules of Criminal Procedure or a due process violation. The Government notified the defense on February 12, 1997, of the existence of this testimony, explaining that it had just come to their attention. The correctional officer, Willis, had not reported this information until a few days prior to that. Kearns' declaration states, with respect to this issue and certain others, "We had no strategic reason for not raising these issues, and simply overlooked them, or [sic] would have raised them to preserve the issues for review." *Id.* at ¶ 16.

On February 13, 1997, the Court held a *Jackson v. Denno* hearing, in which both sides had the opportunity to examine Willis. The gist of Willis' testimony was that he assisted Defendant into the transport van for the trip from USP–Atlanta to FCI–Talladega on the day of Washington's murder. At that time Willis had asked Defendant "Why did you do the man like that? Why did you do Washington like that? Did you have a beef with him?" Willis said Defendant then responded,

"Yeah, I had a dance with him. Fuck him. Do you want to dance?" Tr. 1038–40.

The Court ruled that the foregoing statement was admissible notwithstanding the absence of *Miranda* warnings. Defense counsel did not pursue the claim of a Rule 16 violation; nor did they argue that admission of the testimony violated due process. They did not further seek the exclusion of the testimony.

The Court finds that defense counsel were not ineffective for failing to argue a due process violation or a Rule 16 discovery violation or to seek the exclusion of the testimony. Rule 16(a)(1)(A), Federal Rules of Criminal Procedure, does require the Government to make timely disclosure of statements of the defendant to defense counsel. Rule 16(d)(2) also provides that where a failure to comply with the rule occurs, the Court has the option to "order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." In this case, the Government had a reasonable explanation for late notice. There appeared to be no violation. The Court had the discretion to allow use of the statement with adequate disclosure to the defense. Had the defense argued to exclude the evidence, the Court probably would have taken into the account the fact that the Government had just discovered the evidence; the defense promptly was given full details of the testimony on February 12 and further through the evidentiary hearing on February 13, and Willis did not testify at trial until February 24. Also, the Government already had strong evidence that Defendant had committed the murder. Thus, even if trial counsel were ineffective for not seeking to exclude the evidence, no prejudice was suffered by Defendant.

5. *Appointment of a Treating Psychiatrist*

 Defendant argues that his trial counsel were ineffective for failing to retain a treating psychiatrist for him. Defendant argues that if that had been done, a treating psychiatrist would have prescribed an antipsychotic medication and probably would have persuaded Defendant to take it voluntarily. Defendant argues this would have improved his ability to communicate with his counsel during trial. These arguments are not supported by any evidence in the record.

The record reflects that the Court itself did consider obtaining a treating psychiatrist for Defendant. However, the Court abandoned that idea once it became clear that Defendant had not been taking medication regularly, Defendant was not going to take medication voluntarily, and involuntary administration was too drastic an option. In addition, Defendant objected to taking the medication and the Government did not believe medication was necessary. Defendant offers no authority for his claim that his counsel were ineffective for seeking the appointment of a treating physician, and the Court finds there is no reason to believe that Defendant would have taken his medication voluntarily even if a treating physician had been obtained. Therefore, this claim is rejected both for the failure of a showing that trial counsel did not perform in a reasonably competent manner, and also because of a failure to show prejudice.

The subject of a treating psychiatrist was discussed prior to trial as follows. At a conference on Thursday January 30, 1997, the Court indicated that review of Dr. Davis' testimony at the competency hearing had disclosed that an antipsychotic drug, Risperdal, had been prescribed for Defendant. Jan. 30, 1997, Conf. Tr. 29. Davis' testimony at the competency hear-

ing was that Defendant had been taking Risperdal since mid 1995, although Davis had seen "no significant difference in Defendant's distress level" between mid–1995 to mid–1996. Comp. Hrg. Tr. 324. This was the first knowledge the Court had that Defendant had ever taken antipsychotic medication. The Court indicated it was considering entering an order that would direct the Marshal's Service to make sure Defendant got his drugs each day before coming to Court. Kearns stated that while Defendant had been at the Paulding County Jail (May 1996 to December 30, 1996) he was not taking the medicine, because "Paulding County [was] not delivering it to him." Conf. Tr. 30. Counsel indicated she was unsure whether Defendant was currently receiving the medication and if so whether he was refusing to take it.

The Court also told counsel that in order to prepare for the trial, it needed to review the written reports of Defendant's mental health experts. Jan. 30, 1997, Conf. Tr. 5–7. The expert reports, including those prepared by Dr. Davis, were delivered to the Court on January 31, 1997. [Sealed Doc. 363]. In reviewing Dr. Davis' report dated August 15, 1995, the following was noted:

> Particular considerations should be made in regard to security measures if Mr. Battle is to go to court to stand trial. If not on medication, the possibility exists that he could become violent, considering the nature of his psychosis. This should be taken into consideration.

On Tuesday, February 4, 1997, the Court entered an order directing the U.S. Marshal to insure that Defendant continued to receive his medication, administered either voluntarily or involuntarily.

On February 5, 1997, the Court entered an order finding Defendant competent to stand trial.

On or about February 9, 1997, Defendant reportedly advised jail officials, "Now that I've been found competent I'm not going to take my drugs anymore."

At a further conference on February 13, 1997, defense counsel objected to the Court's February 4, 1997 order. The defense's position was that the Court lacked the authority to direct medication absent a factual finding that Defendant is schizophrenic and that he requires antipsychotic medication. The defense also argued that it should be Defendant's choice as to whether to take the drug or not.

The Court stated it was proceeding on the assumption that the drug would not harm Defendant if he was not schizophrenic, and that it would help him if he was. The defense objected that the Court lacked the expertise to determine that Risperdal would not harm the Defendant. Feb. 13, 1997, Conf. Tr. 69.

On February 18, 1997, the Court had an *ex parte* conference with defense counsel and related the U.S. Marshal's report that Dr. Davis was withdrawing his recommendation for Risperdal at the instruction of defense counsel. Furthermore, when the Court had suggested that the Marshal obtain the assistance of the Bureau of Prisons to assist in the involuntary administration of the drug, he was told that they would not do so. Thus, the Court indicated that "if it is correct that Dr. Davis' prescription has been withdrawn, then what I hope to do it get a psychiatrist to give some type of independent analysis of Mr. Battle to assist me in figuring out what, if anything, to do. My feeling is that if Mr. Battle has been taking Risperdal since sometime in 1995, that it would probably be ill-advised to stop at this point regardless of whether he indeed is schizophrenic." *Id.* at 6–7.

At that point, Kearns stated that Defendant had not been taking Risperdal since

1995 as Dr. Davis had believed. She stated that until Defendant arrived at the Paulding County Jail in 1996, Defendant had not received Risperdal despite the defense's request. Feb. 18, 1997, Ex Parte Proc. Tr. 7. At Paulding County Jail, the treating physician for the facility entered the prescription based on Dr. Davis' recommendation and Defendant then received the medication. This was contrary to Kearns' statement at the January 30 hearing. Also, Kearns stated that there was no injectable form of Risperdal. Involuntary administration would be difficult.

On February 19, 1997, Dr. Davis appeared at the Court's request for a hearing in chambers with counsel for both sides. Dr. Davis confirmed that there was no injectable form of Risperdal. He stated that taking Risperdal would not harm Defendant, even if he was not schizophrenic. He stated that Risperdal has few side effects, unlike some other antipsychotic drugs. However, administering Risperdal involuntarily would require sedation of Defendant and placing a tube down his throat twice a day. *Id.* at 13.

Davis also stated that he had suggested to physicians both at the Paulding County Jail and at the Atlanta Pretrial Detention Center (to which Defendant was transferred on December 30, 1996) that Defendant receive Risperdal. He clarified that he was not Defendant's treating psychiatrist, that he did not know when Defendant was prescribed the medicine, and that he did not know how often Defendant took the medicine.

Kearns then related her understanding that Defendant had started taking Risperdal upon transfer to the Atlanta Pretrial Detention Center on December 30, 1996. However, she also believed Defendant had stopped taking it on February 9, 1997.

On February 19, 1997, the February 4, 1997 Order was vacated to delete the order that Risperdal be administered involuntarily. There never was any involuntary administration of the drug. The Court did continue its order that Risperdal be provided to Defendant during the trial. [Doc. 187].

As the foregoing indicates, the Court's interest in involuntary administration of Risperdal was based on an erroneous belief that Defendant had been receiving this medication for an extended period of time; stopping it during trial might cause him to become violent. The order for involuntary administration was vacated because involuntary administration through a tube was too invasive and drastic. Additionally, by then it had been clarified that Defendant had not been taking Risperdal for a long time. There was no clear evidence that Defendant had ever taken it regularly. Finally, the Government, Defendant and defense counsel objected. Obtaining a treating psychiatrist would have resolved none of these problems. Defense counsel were not ineffective for failing to seek the appointment of a treating psychiatrist, and Defendant suffered no prejudice from this omission.

### 6. *Testimony of Counsel at Competency Hearing*

Defendant contends his trial counsel were ineffective because they failed to testify at the competency hearing regarding difficulty in communicating with him and also that he had claimed he had implants. Defendant points to the declarations of counsel Stephanie Kearns, Def. Ex. 50, Cheryl Abernathy, Def. Exs., 12, 13, Rebecca Cohen, Def. Ex. 32, and Mike Chavis, Def. Ex. 31 (all admitted at the March 18, 2002 Habeas Hrg.) to show what evidence could have been offered at the competency hearing.

Neither the declarations of Mike Chavis or Rebecca Cohen offer any information concerning difficulty in communication

with Defendant. Chavis' declaration does comment that when he visited Defendant, "He ... complained of hearing voices in the T.V.". The declaration of Cheryl Abernathy states: "On every occasion I met or spoke with Anthony he was delusional and out of touch with reality. He was able to help me with gathering his family history, but was often in and out of a rational state. He spoke often of the implants and monitoring and pain they caused him." However, Abernathy gathered a large amount of factual data from Defendant as indicated in the memoranda she prepared. The declaration of Stephanie Kearns states the following on the subject of communication: "Sometimes I could communicate with Anthony, sometimes I could not." Kearns Decl. ¶ 10, Def. Ex. 50, March 18, 2002 Habeas Hrg.

■ Counsel have a duty to their client and to the Court to notify the Court when they believe their client lacks competency to proceed in a criminal case. In this case defense counsel promptly did so. However, Defendant's argument that his counsel should have testified to his claimed incompetency at best is impractical and at worst would be unethical. If counsel were allowed to testify, they would be subject to cross-examination as to the matters covered by the direct examination. Undoubtedly this would raise the issue of waiver of attorney-client privilege. Furthermore, counsel's testimony would not pertain to an uncontested matter. In this case, competency is a contested matter. Counsel can and should advise the Court when there are difficulties in communicating with a client; however, this cannot be done through sworn testimony of counsel. In this case counsel had conferences both with the magistrate judge and with the undersigned District Judge on the very topic of difficulty in communicating with Defendant.

Counsel did call expert witnesses at the competency hearing who opined that Defendant's claimed delusion with respect to his implants was an impediment to assisting his counsel in defending the case. Thus, the Court was fully advised of the defense's contention that Defendant was not able to assist counsel.

Trial counsel could have utilized their investigators as witnesses at the competency hearing, subject to cross-examination. However, the investigators' declarations do not specifically address the subject of communication with Defendant. Furthermore, the memoranda of Cheryl Abernathy's interviews with Defendant suggest by their content that there was good communication between Defendant and Ms. Abernathy.

Clearly, Defendant had complained to Kearns and to Cheryl Abernathy about his implants and physical pain during their visits with him. For the reasons stated above, Kearns could not have testified as a witness at the competency hearing regarding these claims. Ms. Abernathy could have, but her testimony would simply have duplicated the testimony of other witnesses in this regard. The Government did not contest the defense's showing that after Washington's murder Defendant made constant complaints about his implants.

The Court finds that defense counsel were not ineffective in failing to give their own sworn testimony at the competency hearing or in not calling their investigators to testify regarding difficulty in communicating with Defendant. Also, Defendant suffered no prejudice in this regard.

### 7. Daubert *Hearing*

■ Defendant contends his trial counsel were ineffective for failing to seek a *Daubert* hearing on the admissibility of Dr. Johnson's trial testimony that Defen-

dant was malingering or faking his delusion of having implants and his claim of having hallucinations. She testified that Defendant did complain of implants and hallucinations during his 75–day evaluation at FCI–Butner. However, over time he became less committed to the claim of implants; he mentioned the implants less frequently and became able to discuss them with detachment, admitting their improbability. He also was able to laugh about the implausibility of having implants. She said true delusions involve a high degree of commitment by the patient; Defendant did not exhibit this degree of commitment.

With respect to hallucinations, she testified that Defendant discussed his claimed hallucinations during the times he claimed he was having hallucinations. He described what he was seeing or hearing, but he did not seem distracted or bothered by the hallucination. He stayed focused during the conversation, and was not distracted. Also, Defendant reported to her that he was having hallucinations 24 hours a day. However, it was documented that he slept soundly through the night. She testified this was inconsistent with genuine hallucinations.

The Government points out correctly that "malingering" is a disorder recognized in the DSM–IV. *See* DSM–IV at 683. The Court does not believe this is fully dispositive of Defendant's argument, however. Had Defendant requested a *Daubert* hearing on the issue of malingering, the Court might have conducted an inquiry into what body of knowledge exists on the subject of detecting false claims of delusions and hallucinations, and whether this is an area more akin to a treating physician's evaluation of a patient for ailments which are commonly diagnosed by visual or hands-on examination, or rather lends itself to objective analysis through tests.

The Court need not determine whether trial counsel was ineffective for failing to seek a *Daubert* hearing. Defendant has failed to point out what evidence such a hearing would have shown. Also, Defendant has failed to produce any evidence which disputes either the method or the reasoning of Dr. Johnson on the issue of the genuineness of Defendant's claim of delusions or hallucinations. Thus, the Court finds that Defendant has failed to show prejudice arising from the lack of a *Daubert* hearing.

### 8. *Failure to Coordinate Work*

 Defendant contends that his trial counsel failed to coordinate the work of investigators, mitigation specialists and mental health professionals. In particular he cites that there were few team meetings; at least one expert never attended a team meeting and that critical information was not shared between the investigators and experts. The result of this lack of coordination, according to Defendant's Proposed Findings, p. 27, was that the defense mental health experts did not agree among themselves as to the proper diagnosis for Defendant; also, trial counsel were not aware that two of Defendant's sisters had spoken to Lewis Robinson, an employee of the Federal Defender Program, and told him that they knew Defendant had complained of implants before Officer Washington's death. Defendant points out that this information also was not given to the trial experts.

Defendant's point concerning any difference of opinion between the defense experts is an insubstantial one. All of the defense experts agreed that he is a paranoid schizophrenic, and that he was delusional at the time of Washington's murder. The only difference of opinion was that Dr. Davis believed Defendant exhibits antisocial personality traits; Drs. Woods and

O'Hagan do not. It does not necessarily follow that team meetings would have had any effect on this difference of opinion.

Regarding the contention that better organization of the defense team would have resulted in defense counsel's learning of what Defendant's sisters allegedly said to Lewis Robinson concerning implant complaints, the Court has found elsewhere, pp. 141–47, that in fact Defendant's sisters did not make these comments and that Robinson's recollection in this regard is faulty. There was nothing available to be provided either to trial counsel or to the defense experts in this area.

Defendant also alludes more broadly to a claim that lack of coordination and communication deprived the defense's mental health experts of "a wealth of compelling exculpatory, mitigating and other background information," and that this information "could have been provided to defense mental health experts to assist them in exposing and presenting to the jury the true nature of petitioner's mental illness and in overcoming the Government's allegations of malingering (citing the 2002 Psychiatric Report). In sum the truth about petitioner's mental state was never accurately developed at trial." While Defendant's Proposed Findings, p. 27, do not spell out what that means, the Court believes based on the content of the 2002 Psychiatric Report that Defendant's theory is as follows. First, the defense investigators should have met with counsel and the mental health experts before the investigation of Defendant's social history began so as to determine what signs to look for which might represent particular forms of mental illness. Defendant implicitly suggests, but does not specifically state, that the experts would have told the investigators to look for early signs of schizophrenia, which might point toward a form of schizophrenia other than paranoid schizophrenia. Because of the disorgani-

zation associated with some of these forms of schizophrenia, there might have been a better chance of determining that Defendant was not competent to stand trial and that Defendant was out of touch with reality at the time he killed Washington. Instead of doing this, defense counsel allegedly improperly relied on Defendant's self-reported delusions and hallucinations which are not a predominant element of undifferentiated schizophrenia. According to Defendant, this is his true mental illness. Defendant appears to suggest that had counsel followed proper procedures and been organized, his true diagnosis would have been discovered and it is less likely that he would have been found competent to stand trial or found responsible for Washington's murder.

There are significant flaws in this theory. First, even after habeas counsel's exhaustive investigation, there is no evidence of substance that Defendant began suffering from schizophrenia in childhood or in adolescence. He did begin abusing alcohol and drugs at an early age. There is evidence that he exhibited a great deal of erratic behavior in his early twenties which could be suggestive of psychological or psychiatric problems. However, during this period of time he also abused alcohol and illegal drugs heavily. He also had a troubled marriage which was a source of distress. Further, the 1987 Psychiatric Report determined that he was not psychotic at the time of his wife's death, although his symptoms suggested that he could be in a prodromal phase to schizophrenia. Thus, the idea that a better investigation by trial counsel would have led to a diagnosis of undifferentiated schizophrenia is not based on evidence. Neither did the 1996 testing done by both sides' experts reveal that Defendant was experiencing disorganized thinking, a required element of undifferentiated schizophrenia. The tests showed that he had good ability

to concentrate. Accordingly, the Court finds that if it were determined that the defense team should have been better coordinated, there is no evidence to support a finding that Defendant was prejudiced. In fact, the Court finds both that the investigation of trial counsel as to the mental health issues was well above constitutional requirements, and that no demonstrated prejudice accrued to Defendant on account of whatever disorganization existed.

## C. Trial Phase

### 1. *Voir Dire*

Defendant contends that his counsel failed to conduct an adequate voir dire. The Court finds that the voir dire, in which counsel was able to utilize responses from a juror questionnaire, was lengthy and complete. The quality of the voir dire was above the standard required of reasonably competent counsel. Counsel were not ineffective.

Defendant's argument is that the failure of defense counsel to ask follow-up questions to certain prospective jurors after the Court's general questions produced affirmative responses, constituted ineffective assistance of counsel. Some of these individuals actually served on the jury; others did not.

▮▮▮▮ Effective assistance of counsel is required during the voir dire process. *Hughes v. United States,* 258 F.3d 453, 456 (6th Cir.2001). However, deference is to be given to counsel's actions during voir dire, as voir dire is recognized to involve considerations of strategy. *Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir.1995). A defendant claiming ineffective assistance of counsel during voir dire must show that counsel's actions were "so ill chosen that it permeates the entire trial with obvious unfairness." *Id.* (quoting *Garland v. Maggio,* 717 F.2d 199, 206 (5th Cir.1983)). Further, in order to satisfy the prejudice

prong of *Strickland,* Defendant must show that the selection process produced a biased juror. *Hughes,* 258 F.3d at 458.

To attempt to show a constitutionally inadequate voir dire, Defendant has picked out particular juror responses to the Court's general questions as to which there was no follow-up by defense counsel. For example, juror Belcher (who did serve on the jury) responded affirmatively to a general question concerning whether any of the jurors had friends or relatives who are security guards. Belcher stated that she was divorced but that her ex-husband had worked as a security guard for approximately five years. Neither side elected to question Belcher further on this topic. The Court finds that this was clearly an area within the judgment of counsel. Similarly, jurors McGhee and Tooley both responded affirmatively to the question whether any prospective jurors had been arrested or charged with a non-traffic crime. Tooley related that he had spent eight days in jail once for failing to show up for jury duty and that he was "real bitter about it." Tr. 295. McGhee related that she had been arrested on a mistaken theft charge. Tr. 294–295. Defense counsel elected not to ask further questions. While the Court cannot know counsel's actual reasoning, it is plausible that defense counsel had already identified these individuals as persons they wanted to have on the jury and elected not to ask questions which might embarrass them. With respect to other jurors referenced in this section of Defendant's brief, there is no reason to believe that counsel failed to exercise reasonable judgment in omitting to ask further questions.

Near the conclusion of the voir dire, the Court inquired of all prospective members of the regular panel and all prospective members of the alternate panel if any of them had any concerns about whether they

could be fair and impartial jurors in this case. Tr. 402, 629. None of the jurors referenced in Defendant's proposed findings raised their hands. There is no reason to think that any of the jurors who were chosen were biased against Defendant.

In summary, the Court finds there has been no showing of ineffective assistance of counsel on voir dire and no showing of prejudice. Therefore, this claim is without merit.[57]

### 2. Change of Clothes

■ Defendant contends his counsel were ineffective for failing to request time for Defendant to change clothes before voir dire began and to make a motion for mistrial based on the fact that the prospective jurors saw Defendant briefly in his prison clothes. Defendant suffered no prejudice in this respect. *See United States v. Battle,* 173 F.3d 1343, 1346 (11th Cir.1999). The Court also notes that before voir dire began, counsel had told the Court in an earlier *ex parte* conference that Defendant had refused to put on the clothes which had been provided for him by counsel. Feb. 18, 1997, Conf. Tr. 2. It is not at all clear that Defendant would have changed clothes at the beginning of voir dire had he been given an opportunity to do so. No evidence has been offered reflecting that he would have. If a break had been taken for this purpose, Defendant also might have changed his mind again about attending the trial. Arguably, it was better to begin immediately with the voir dire rather than giving Defendant another opportunity to change his mind. Accordingly, the Court finds that counsel's conduct has not been shown to be unrea-

sonable and that Defendant suffered no prejudice.

### 3. Expert Testimony on Effect of Defendant's Mental Illness

■ Defendant contends his counsel were ineffective in not asking his mental health experts to describe the practical effect of Defendant's mental illness on his everyday life, and also to place Defendant's illness "in the context of his whole life." Def. Prop. Find. at 29–30. Defendant contends that powerful mitigating evidence could have been offered in this manner.

The Court agrees generally that this type of evidence is mitigating when it points out limitations on a defendant's ability to function normally in everyday life. There was no trial testimony concerning the practical effect of Defendant's alleged paranoid schizophrenia on his everyday life prior to the time he went to prison in 1987. As previously stated, there was no such evidence available that the jury did not hear. There was testimony that while Defendant was in prison he was a loner, that he had difficulties in personal interactions, that he was suspicious of others, and that his behavior was odd. Defense experts, particularly Dr. Woods, identified this behavior as being consistent with paranoid schizophrenia.

Defendant does not specify whether his argument is based on an assumption that at relevant times he suffered from paranoid schizophrenia (the diagnosis of his trial mental health experts) or undifferentiated schizophrenia (the diagnosis of his post-conviction mental health experts). Neither has Defendant identified the testi-

---

**57.** In ruling on Defendant's motion for a judgment of acquittal, new trial and sentencing hearing, *United States v. Battle,* 235 F.Supp.2d 1301 (N.D.Ga.2001), the Court discussed at some length Defendant's objections to the portions of the voir dire which concern the jurors' attitudes toward the death penalty. The Court found that the voir dire in this area had been constitutionally sufficient.

mony that the experts should have given but did not. Defendant's proposed findings have totally failed to do that, resting instead on the bald assertion that a large amount of mitigating testimony could have been given by the defense's experts which would have persuaded the jury to return a life sentence. Thus, Defendant has failed to demonstrate prejudice.

Defendant's argument that trial counsel failed to explain his mental illness "in the context of his whole life" is also vague. The Court infers that Defendant is referring to his claim that trial counsel did not bring out that he allegedly began suffering with schizophrenia as a child, and that he allegedly has continued to do so throughout his life. However, the Court has found, pp. 108–117, that Defendant's post-conviction argument that he has been afflicted with schizophrenia since childhood, if indeed he is schizophrenic, is not supported by the evidence.

The Court finds that Defendant has failed to show that counsel acted unreasonably and has failed to demonstrate prejudice.

### 4. *Expert Explanation of Outburst in Courtroom and Defendant's May 6, 1995 Telephone Conversation with His Father*

Defendant contends his counsel were ineffective for failing to ask the defense's mental health experts to explain the reason for Defendant's courtroom outbursts (which were mostly directed at his counsel), or to ask them for an explanation of Defendant's May 6, 1995, telephone conversation with his father in which Defendant referred unapologetically to his April 24, 1995 attack on guards at FCI Talladega, his plans to attack the guards again, and small talk concerning an upcoming sports event. Def. Prop. Find. at 25–26. Defendant has not offered any evidence or suggestion as to what this explanation would be. Thus, the Court finds that Defendant has failed to show prejudice.

### 5. *Failure to call John Pannell as a Trial Witness*

Defendant contends his counsel were ineffective for failing to call John S. Pannell, a physician's assistant at USP–Lewisburg in 1990, to testify to his observations of Defendant. Pannell's declaration is in evidence as Def. Ex. 59, March 18, 2002 Habeas Hearing. The declaration states that had he been called to testify, he could have testified concerning a 1990 episode he describes as near-psychotic, to wit:

I remember Mr. Battle wringing his hands and moving his eyes rapidly to the left and right during the entire time I met with him. When he thought I was not looking, he made frequent side long glances at me, sort of checking me out. He continually made furtive glances from side to side as if he thought something was going to suddenly jump out at him. He had an inappropriate affect, which included being withdrawn, evasive and very anxious. He seemed fearful of talking to me and displayed vague paranoid ideation.

\* \* \* \* \* \*

Additionally, Mr. Battle seemed to be responding to internal stimuli, possibly auditory hallucinations. He appeared to me to be listening to someone who was not in the room with us and whom only he could hear, almost as if he was getting a second opinion.

*Id.* at ¶ 4, 6.

The record establishes that Pannell was interviewed by Federal Defender Program investigator Rebecca Cohen prior to trial. He related the same information as stated above. Cohen prepared a memorandum of the interview which is not in the record. Pannell states in his declaration he expect-

ed to be called as a witness, and that he actually had received permission to be a witness from the Bureau of Prisons. He does not know why he was not called as a witness.

The record does not reveal why defense counsel did not call Pannell as a witness. The Court presumes there was some strategic or tactical reason, and notes that the failure to call Pannell is not one of those many matters listed in Kearns' declaration, Def. Ex. 50, which she states was not a strategic or tactical decision. One possible reason the Court can glean from the record is that during both Dr. Woods' direct examination and during Dr. Johnson's cross examination, counsel went through Defendant's BOP medical and mental health records, asking questions about certain entries, including the entry made by physician's assistant Pannell in 1990. The entry Pannell had made in the medical record was discussed and a portion was read out loud. It is possible that counsel did not feel it was necessary to call Pannell. Tr. 2148, 2208, 2209, 2249, 2250, 3091.

The Court finds that Defendant has failed to show, by a preponderance of the evidence, that his counsel were ineffective for failing to call John Pannell as a witness at trial. Also, Defendant has failed to show how he was prejudiced.

### 6. Evidence that the Government Can Safely Incarcerate Defendant

Defendant argues that his trial counsel were ineffective for failing to present evidence that the Bureau of Prisons could safely incarcerate him. At trial the Government presented evidence of Defendant's numerous assaults on inmates and prison guards. The defense is undoubtedly correct in stating that the assaults were probably an important consideration for the jury in determining what sentence to impose.

The defense sought to present evidence along the lines suggested by Defendant by subpoenaing a reporter for *The Denver Post* who had written an article about the administrative maximum (ADX) Bureau of Prisons facility in Florence, Colorado. Their intent was to use the reporter's testimony to establish the high level of security at ADX and supply information concerning ADX's control unit which provides its most secure custody. The reporter appeared at trial, but objected and moved to quash the subpoena on First Amendment grounds. An agreement was reached between counsel for both sides that a ruling on *The Denver Post*'s objection would be held in abeyance, while an employee of ADX was obtained to testify about these matters. The agreement was that if the defense was dissatisfied after hearing that testimony, it would then be able to obtain a ruling on *The Denver Post*'s objection.

The warden of ADX, Gregory Hershberger, appeared at trial to testify in response to the defense's subpoena. He testified that ADX is the most secure facility in the Bureau of Prisons and that it houses the most violent escape prone inmates in the federal system. He described the control unit and the restrictions on inmates in that unit. Tr. 4219–28.

Hershberger also testified that while there was no hard and fast rule about the length of time an inmate who had killed a guard would spend in the control unit, the general practice is to set a period of 72 months, with the understanding that a re-evaluation could be made to shorten or lengthen that time. Tr. 4231.

When an inmate has completed his term within the control unit, he may either be released to the general population at ADX or to general population at other penitentiaries such as Atlanta, Lewisburg, Leavenworth, and others. ADX does not house

any inmates under the influence of psychotropic medication. Such an inmate would be transferred to the USP Medical Center for Federal Prisoners in Springfield, Missouri, a high security prison. Tr. 4232.

There have been assaults in the control unit at ADX. Tr. 4239. The incidence of assaults at ADX per inmate is just about double what it is in open penitentiaries. Tr. 4251.

Hershberger said that if Defendant received a life sentence in the instant case, it would be reasonable to expect that he would be assigned to the control unit at ADX. Tr. 4249. He also opined that if he were assigned to the control unit, he would expect that he would be eligible at some point to go into general population. Tr. 4249. Then, if he met requirements for the step-down program, he could be considered for transition to an open penitentiary such as Leavenworth, Lewisburg, or Atlanta. Tr. 4249. Hershberger said that those decisions would be made by the Executive Panel of the Bureau of Prisons. Tr. 4250. Hershberger concluded by saying that he and his staff did their best to make the facility the most secure facility in the Bureau of Prisons, and to make sure that no one gets hurt. Tr. 4252.

Defendant asserts that Hershberger improperly led the jury to believe that regardless of the danger he presented, Defendant would probably wind up in open population at a prison again. The Court disagrees with this interpretation of his testimony. The Court also has previously held that there was no Government misconduct implicated by Hershberger's testimony. *See United States v. Battle*, 979 F.Supp. 1442, 1464 (N.D.Ga.1997). Defense counsel were not ineffective in allowing Hershberger to testify.

Defendant further argues that counsel were ineffective in failing to demonstrate the Bureau of Prisons' ability to house dangerous inmates by failing to proffer evidence of the conditions of confinement of Tommy Silverstein, an individual who was a witness in a previous case handled by Kearns. Since then Kearns has had contact with him over the years. Kearns Decl. ¶ 14, Def. Ex. 50, March 18, 2002 Habeas Hrg. A declaration of Tommy Silverstein sets out the conditions of his long term confinement in a cell which was specially constructed for him. Silverstein Decl., Def. Ex. 66, March 18, 2002 Habeas Hrg. Silverstein is serving a life sentence for killing a prison guard at USP–Marion. He has been in this specially constructed cell for more than 72 months. Silverstein's declaration describes the cell and in fact attaches a drawing of it.

The case in which Silverstein testified on behalf of Kearns' client is *United States v. Mills*, 704 F.2d 1553 (11th Cir.1983), which involved the murder of a prison inmate at USP–Atlanta by the members of the Aryan Brotherhood, in which both Mills and Silverstein had leadership roles. No death penalty was available at the time of either Silverstein's or Mills' convictions.

The Court finds that defense counsel were not ineffective for failing to bring in evidence of Silverstein's housing conditions. For one thing, this evidence would have emphasized Defendant's dangerousness. In addition, it would have led to cross-examination which showed that in each of the instances in which Defendant has previously assaulted guards, the situation could arise again regardless of the secure conditions of his cell. For example, the assault on a number of guards at FCI–Talladega took place when Defendant was in handcuffs and was being escorted to an attorney visit. The assault at Paulding County Jail occurred when a mop was being given to Defendant so that he could clean his cell. Even in the case of inmates like Silverstein, there would be instances in which guards would have to enter the

cell, for example, to administer medical care or to fix plumbing. The Court does not believe that bringing out the details of Silverstein's confinement would have been helpful to Defendant. Also, the issue is not what the Bureau of Prisons can do in terms of physical arrangements, but rather what it may do, consistent with considerations of the rights of the prisoner, humane treatment, and penological needs in individual cases. The Court finds that defense counsel were not ineffective and that Defendant did not suffer prejudice from their failure to present this argument.

### 7. Conditions of Defendant's Confinement at the Atlanta Pretrial Detention Center

Defendant argues his counsel were ineffective for failing to introduce evidence concerning the manner in which he was held at the Atlanta Pretrial Detention Center (APDC) from December 30, 1996, through late March 1997. Apparently Defendant believes that this evidence would show that Defendant can be safely housed, so that a death sentence would not be necessary. Declarations of staff personnel of the APDC state that Defendant was housed in a maximum security isolation unit, and that pursuant to a special protocol, communication with Defendant was kept to a minimum and no staff was ever to have physical contact with him. They had no trouble with Defendant. See Hampton Decl., Def. Ex. 43, March 18, 2002 Habeas Hrg.; Smith Decl., Def. Ex. 67, March 18, 2002 Habeas Hrg. Also, Defendant complains that the jury did not hear the testimony of Charles Warren, Deputy U.S. Marshal, who states he was careful to deal with Defendant in a gentle manner; consequently, Warren had no problems with Defendant. Warren Decl. ¶ 11, Def. Ex. 88, admitted in part pursuant to order entered on July 12, 2002.

Because Defendant was at APDC for such a short time, the fact that he was not disruptive and did not harm others would not have been particularly helpful. Assuming it is correct that no staff had any physical contact with him, the Court doubts that this would be possible in long term imprisonment. Furthermore, had this testimony or Deputy Marshal Warren's testimony been presented, it would have opened the door for other evidence— for example, the fact that the deputy marshals had to carry Defendant to the transport van during the trial in order to bring him to the courthouse. This line of inquiry also would have emphasized Defendant's dangerousness and could have been disadvantageous. Accordingly, the Court finds that defense counsel were not ineffective in failing to bring out this testimony; also, Defendant suffered no prejudice.

### 8. BOP Role in Bringing About Washington's Death

Defendant argues that his counsel were ineffective for failing to argue that the Bureau of Prisons had a role in causing Washington's death. He argues this would have been mitigating. Defendant argues that contrary to applicable BOP regulations, Defendant was not held in isolation or kept under the maximum custody status his conduct required. The BOP failed to recognize Defendant's potential for violence and that he was a danger to himself and others. In support, Defendant cites the declaration of Walter Buer. Buer Decl. ¶ 5-6, Def. Ex. 28, March 18, 2002 Habeas Hearing.

Buer states in his declaration that he is a corrections consultant, specializing in interpretation of Bureau of Prisons policies and procedures relating to sentencing matters, classification questions, administrative remedies and institutional transfers. Previously he worked for the Bureau of Prisons for 21 years. He has kept current with BOP policies and procedures. He has

reviewed Defendant's central inmate file which contains documents relating to disciplinary actions and institutional transfers.

Buer's opinion is that after Defendant attempted to assault an inmate with an ashtray at Butner on June 20, 1989, and did assault another inmate with a cane at Butner in August 1989, pursuant to BOP regulations he "should have been classified as a maximum custody inmate." He noted that when Defendant was transferred to USP–Lewisburg in 1989, his treating psychiatrist observed:

> Defendant "can quickly react with anger that can be expressed in very compulsive and inappropriate ways.... It is our opinion that he requires placement in a more secure setting, where his unpredictable explosive behavior would have less potential for manifestation".

Buer Decl., Def. Ex. 28, March 18, 2002 Habeas Hrg.

Buer's declaration does not state whether the status of maximum custody inmate should have been in effect in December 1994, given Defendant's behavior between 1989 and 1994. The Court notes that there were no assaults committed by Defendant between August 1989 and December 1994. The record reflects that as Defendant moved from one institution to the next there were evaluations regarding his potential for violence. Buer's declaration does not establish the proposition that the BOP failed to follow its own procedures by not having Defendant in maximum custody in December 1994.

In Defendant's response to the Government's Proposed Findings on the above issue, Defendant states that he is not merely arguing that the Bureau of Prisons should have locked him down permanently. He also states he is arguing that the Bureau of Prisons has failed to deal appropriately with him as a seriously mentally ill inmate. However, the medical and mental health records indicate that the Bureau of Prisons in fact did provide alot of treatment to Defendant for anxiety, depression and other psychological problems. Most but not all of this treatment was between 1987 and 1990. Nonetheless, it is not correct to say as Defendant does that the Bureau of Prisons treated him "like he was a normal prisoner." Def. Rsp. at 37.

The Court finds that defense counsel did not unreasonably fail to argue that the BOP had a role in bringing about Washington's death. Defendant was not prejudiced by the omission of this argument.

9. *Preparation of Defendant to Testify at the Guilt Phase and Penalty Phase of the Trial*

Defendant argues that his trial counsel were ineffective for failing to prepare him to testify during the trial. He admits that counsel advised him not to testify. To support his argument Defendant points to the declaration of Stephanie Kearns, which states in relevant part, "During trial ... he quit talking with us" and "rational communication during trial had become totally impossible with Anthony." Kearns Decl., Def. Ex. 50, March 18, 2002 Habeas Hg.

There is no record evidence that counsel did not try to prepare Defendant to testify. The above-cited quotes do not establish that defense counsel did not advise Defendant concerning his testimony. Absent some evidence, the Court will make no such assumption. The Court notes that many assertions contained in this section of Defendant's Proposed Findings are not supported, or even claimed to be supported, by record evidence.

In the absence of evidence to the contrary, the Court believes that defense counsel did attempt to work with Defendant to prepare his testimony both at the guilt/innocence and penalty phases. That is certainly standard procedure, and defense counsel are very experienced lawyers. In both instances, there was exami-

nation by defense counsel which suggested that counsel had gone over the questions they were going to ask. Admittedly, some of what Defendant said was probably at variance with what counsel expected. However, the Court believes that counsel tried to assist Defendant. Counsel had advised Defendant it would not be in his best interest to testify. Furthermore, the Court urged Defendant to consult with his counsel about his testimony if he did testify, and with respect to Defendant's testimony at the sentencing phase, outlined for Defendant's benefit the typical parameters of allocution.

### 10. *Deterioration of Defendant at Trial*

Defendant claims his counsel were ineffective for failing to bring to the Court's attention Defendant's alleged deterioration during the trial. Defendant contends that had they done so, the Court would have granted a continuance to obtain a further competency evaluation, which would have shown Defendant's incompetence to complete the trial.

Defense counsel did, both before the trial began and at the end of the first day of the trial (while jury selection was still going on), ask the Court to continue the trial so that a further competency hearing could be held. As is discussed on pages 75–78 above, those requests were denied because the Court felt it was preferable to have the opportunity to observe Defendant and speak with Defendant before determining whether any continuance should be granted. The Court's observations of and conversation with Defendant then resulted in a determination that Defendant was competent to proceed with the trial.

Following those initial requests, no further requests were made for the balance of the trial. The declaration of Stephanie

Kearns sets out Kearns' opinion that Defendant's condition deteriorated during the trial to such a degree that counsel's failure to ask the Court to re-evaluate competency was unreasonable. Kearns Decl. ¶ 10, Def. Ex. 50, March 18, 2002 Habeas Hrg.

As is discussed above, pages 69–75, the Court finds that Defendant was competent throughout the trial. The trial was undoubtedly stressful for Defendant, as well as for his counsel. He was a difficult client. Particularly once Defendant was found guilty and the case moved into the sentencing phase, he had little interest in the outcome. The Court finds that counsel was not ineffective in failing to seek a redetermination of competency, and that Defendant was not prejudiced by this failure.

### 11. *Failure to Call Dr. Rogers as Part of Defendant's Case in Chief*

At trial Defendant attempted to call Richard Rogers, Ph.D., a psychologist, as a rebuttal witness in the guilt/innocence stage of the trial. The Court did not allow Rogers to be called at that time, finding that his testimony was not rebuttal testimony.

Rogers did appear as a defense witness at the penalty phase of the trial. At that time, he gave the same testimony he would have given had he testified during the guilt/innocence phase. He testified that he was the author of a test designed to detect malingering, namely, the Structured Interview of Reported Systems, or SIRS test. This test had been administered to Defendant by Dr. Hazelrigg, a Butner psychologist, and Hazelrigg had previously testified at trial that the test results showed a 72.2% probability that Defendant was not malingering his symptom report and that there was a 27.8% possibility that Defendant was faking his symptoms.[58] When

---

**58.** When Hazelrigg testified on direct during the Government's case-in-chief, he said the

test result showed a *27.8% probability* that

Rogers ultimately testified, he provided additional explanatory information about the test and ultimately testified that Hazelrigg had correctly graded the test. The Court therefore finds that Defendant was not prejudiced by Dr. Rogers' failure to testify at the guilt/innocence phase of the trial.

12. *Failure to Investigate, Seek to Set Aside, And Mitigate 1987 Conviction*

Defendant contends his counsel were ineffective for failure to investigate, seek to set aside, and mitigate his 1987 conviction during the 1997 trial. Defendant contends that had they done so, they would have discovered myriad facts which would either have led to the 1987 conviction being set aside or at least would have enabled counsel to present it in a more favorable light to the jury. The facts Defendant contends would have come to light in the investigation are set forth on pages 55–56 of Defendant's Proposed Findings.

None of the facts relied upon by Defendant, either singly or in combination are sufficient to warrant a determination that his trial counsel were ineffective in failing to seek to set aside the 1987 conviction. Much of the evidence would not even have been admissible at the 1987 trial, or would have hurt Defendant's case and therefore would not have been offered. For example, evidence that Minnie Foreman drank a lot and came from a family with a violent reputation would have been inadmissible. Evidence that Minnie regularly taunted and threatened her husband, flaunted her extramarital affairs, was pregnant by another man, vacillated between controlling

Defendant's life by demanding that he quit his job and move to Camp Lejeune and wanting a divorce so she could move to Hawaii, would have been harmful to Defendant on the issue of guilt as it might have established motive. Because the 1987 presentence report is not in the record, it is unclear whether these allegations actually were before the Court when Defendant was sentenced in 1987. Further, much of the claimed evidence set forth in this section of Defendant's Proposed Findings is information from Defendant's relatives who do not have firsthand knowledge of the facts. Finally, and most importantly, this Court has no information concerning what evidence was presented in the 1987 trial and thus could not possibly determine whether the judgment could have been set aside by the allegedly additional evidence to which Defendant alludes. Therefore, Defendant has failed to show that he was prejudiced by his trial counsel's failure to seek to set aside the 1987 conviction.

Regarding Defendant's claim that his trial counsel should have sought to mitigate the 1987 conviction with the same evidence at the 1997 trial, it seems that counsel would have found it difficult to present the evidence in a convincing manner with witnesses who had no first hand knowledge of the facts. Further, some of the evidence Defendant contends should have been presented might actually have been harmful to Defendant. For example, if defense counsel had presented evidence that Minnie Foreman was pregnant by another man at the time Defendant killed her, it might have established (contrary to

Defendant was faking. This was an improper characterization. On cross, Hazelrigg was confronted with this misstatement. Initially he said, "Possibility or probability mean the same thing, that he's malingering at 27 percent." Tr. 2726. Then Hazelrigg said, "On this particular test, as I testified, it does not

clearly show that he is malingering. It shows there is some possibility that he is." Tr. 2726–27. Given that correction, and Dr. Rogers' subsequent testimony that Hazelrigg had correctly graded the test, there was nothing for Rogers to rebut regarding Hazelrigg's administration of the SIRS test.

Defendant's own testimony) that his motive was revenge. Defendant's own testimony at the 1997 trial was that he had not meant to kill his wife. Defendant's argument that evidence could have been offered at the 1997 trial which would have suggested that Defendant stabbed his wife in self defense likewise would have produced dubious results. Because Defendant was convicted of intentional murder in 1987, the Government surely had access to evidence would could have been offered in 1997 to rebut any self defense claim. In all likelihood, there were bloody pictures of Minnie which could have been shown to the jury. In presenting evidence of the 1987 conviction, the Government did not go into the facts behind the conviction. Opening this door at the 1997 trial probably would not have been beneficial to Defendant, assuming this had been permitted. Accordingly, the Court finds that Defendant has failed to show that this failure on counsel's part was below the standard of reasonably competent counsel; also, no prejudice has been shown.

### 13. *Exclusion of Donovan Testimony*

██ Defendant contends that his counsel were ineffective for failing to object to the testimony of Kevin Donovan, a psychologist at FCI–Talladega, when Donovan was asked to relate statements made to him by Defendant on the day of the murder. Defendant was in custody and had not been advised of his right to counsel or right not to incriminate himself when Donovan questioned him. In addition, Defendant contends that because defense counsel did not promptly object and move to exclude certain surprise testimony Donovan gave, the testimony triggered an outburst by Defendant which prejudiced him in the eyes of the jury.

Donovan was called by the Government as a rebuttal witness during the guilt phase of the trial. Tr. 2522. The Government's purpose was to elicit testimony concerning Defendant's mental status on the same day the attack occurred. Donovan said Defendant was fully oriented to person, time, place and situation. Tr. 2528–29. Donovan further testified that Defendant answered "no" to his question whether he had ever heard voices when he was in a room by himself. Tr. 2529. He said Defendant stated he did not recall the attack on Washington. Tr. 2530. Donovan also gave his opinion that Defendant was arrogant, that he lied when he said he could not remember the assault, and that Defendant showed no remorse. Tr. 2529, 2531.

Donovan's surprise testimony was elicited by a question on cross-examination. In seeking to impeach Donovan, defense counsel suggested that the part of his written report which had stated that Defendant had killed three people was incorrect. Donovan replied that the report was correct, because the murder of Defendant's wife had also killed an unborn fetus. Tr. 2546. Defense counsel asked Donovan if he realized how much guilt Defendant had experienced over that occurrence; Donovan said he did not. Tr. 2546. Donovan's examination continued for approximately ten more minutes. He was excused. Tr. 2560. The Court then discussed the testimony of an upcoming witness at sidebar with counsel, Tr. 2560–2570, and a short break was taken. As the undersigned re-entered the courtroom following the break, Defendant was making an announcement to the jury as follows:

> THE DEFENDANT: Ladies and gentlemen of the jury, what you heard about me killing my wife's kid, it wasn't discovered that my wife was several weeks pregnant, five or six weeks pregnant, okay?
>
> THE COURT: Mr. Battle—
>
> THE DEFENDANT: And you don't know anything about the law. In 1987

there wasn't anything in the law charged about killing a baby. That law was just put in effect three or four years ago.

I'm just trying to get things clarified with this jury, ma'am. These people are lying. There wasn't a law saying you could be charged with killing a fetus in 1987. You shouldn't have told these people that. That's a lie. That is a fucking lie. You did tell them that. There wasn't a fucking law that said you could be charged with killing no fetus in 1987.

Tr. 2570.

After the jury was excused, the Court conferred with Defendant and counsel for both sides as to what action should be taken. Defense counsel stated he had elected not to make an issue of Donovan's statement because "it just would have made it worse." Tr. 2573. Pursuant to agreement with counsel and the Defendant, the Court then instructed the jury that Defendant was correct in his statement that he was never charged with or convicted of infanticide. Tr. 2581.

Regarding the question whether counsel should have moved to exclude Donovan's testimony based on the absence of *Miranda* warnings, the Court concludes that his testimony concerning Defendant's mental state was admissible under *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). *Harris* holds that non-Mirandized admissions of a defendant are admissible to rebut contrary evidence admitted during defendant's case. In the instant case Defendant had introduced evidence through experts that he was delusional and/or hallucinating at the time of Washington's murder. Counsel was not ineffective in failing to object because the objection was without merit.

Donovan's opinions that Defendant had lied, was arrogant, and lacked remorse perhaps could have been stricken as inadmissible opinion evidence. However, any prejudice accruing from this failure was more than overshadowed by Defendant's own testimony during the penalty phase of the trial in which he expressed a lack of remorse for the killing. Tr. 4496.

Regarding Donovan's surprise testimony, it is possible that a prompt objection by defense counsel would have resulted in a prompter out-of-court hearing which might have avoided Defendant's outburst. However, counsel's course of action—to seek to downplay the testimony—cannot be said to be an unreasonable choice of strategy. The Court finds that defense counsel was not ineffective in choosing this strategy.

14. *Jury Instruction On Unadjudicated Criminal Conduct*

██ Defendant complains that his trial counsel were ineffective for failing to request that the Court give the jury an instruction on unadjudicated criminal conduct to the effect that the Government was required to prove each element of each claimed offense[59] beyond a reasonable doubt. The specific instances of conduct involved were (1) Defendant's assault on an inmate with a metal walking cane on August 5, 1989; (2) an April 1995 assault on a Bureau of Prisons staff member at FCI–Talladega with a homemade weapon; (3) an April 29, 1995 assault on two BOP staff members at FCI–Talladega by throwing hot coffee on them; (4) a December 30, 1996 assault on a jailer at Paulding by stabbing him with a sharpened pencil; (5) an August 25, 1995 possession of a weapon, a sharpened toothbrush handle; (6) a De-

---

**59.** Actually the Government did not refer to any of these incidents as "crimes." They were presented as instances of conduct which supported the existence of the aggravating factor of being a danger to others.

cember 31, 1986 assault by Defendant on Bernard Pittman; (7) a December 31, 1986 attempted assault on Minnie Foreman's family members; and (8) a March 7, 1987 assault on Minnie Foreman by threats and discharging a firearm.

Defendant contends that such a jury instruction was required under *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The Court first notes that *Apprendi* was not decided until 2000, several years after the trial of the instant case. Even so, *Apprendi*'s ruling is not apt to the facts of this case because the referenced instances of conduct are not aggravating factors in themselves.

Moreover, the Court did instruct the jury as required by federal statute, 18 U.S.C. § 3593(c), that the aggravating factor relied upon by the Government which is pertinent to all of the cited instances— that Defendant is a danger to others and has a low chance of rehabilitation—had to be proven beyond a reasonable doubt. In fact, the verdict form furnished to the jury spelled this out. All of the instances of assaultive or threatening conduct recited above were put in evidence to support that aggravating factor.

Because *Apprendi* does not and did not require the legal instruction Defendant argues should have been sought by his trial counsel, and further because the Court would not have given the request had it been requested, the Court finds that defense counsel were not ineffective and that there was no prejudice to Defendant.

15. *Jury Instruction that Life Sentence Defendant Was Serving was a Parolable Offense*

The prosecutor said in closing argument in the penalty phase: "[H]e is already serving a life sentence. These are natural life sentences. He can only serve one. Adding a second one, even consecutive to the first one won't mean anything. He's not likely to be released from prison. He wouldn't likely have been released from prison even had you found him not guilty. So adding a second life sentence even without the possibility of parole is not going to punish him." Tr. 4561.

Defendant argues that his trial counsel were ineffective for failing to request an instruction from the Court that the sentence Defendant was serving at the time of the murder of Officer Washington was a parolable sentence.

The Court cannot rule out the possibility that if it had been requested to give an instruction of some type on this issue, that it would have. However, an instruction on this issue would have been a delicate matter. For that reason, the Court would never seek to craft such an instruction without the input of counsel. The reason is that such an instruction by the Court could be misconstrued by the jury as encouragement to give a death sentence. Because habeas counsel has not provided the Court with a precise statement of what instruction should have been given, the Court will not speculate as to whether or not it might have given such instruction.

The Court further notes that the jury knew Defendant was serving a parolable sentence. Defendant had so testified without contradiction. Tr. 1408.

D. Appeal

In Defendant's Proposed Findings of Fact and Conclusions of Law, p. 122, he argues that his trial counsel, who also represented him on his direct appeal, were ineffective in failing to raise a number of claims on appeal. Specifically, the omitted claims are identified as follows: (1) Government discovery and due process violation regarding Petitioner's statement to Robert Willis; (2) whether malingering meets the *Daubert* standard; (3) the ad-

mission of Dr. Donovan's testimony despite the *Estelle v. Smith* violation; (4) sleeping jurors and the trial court's failure to act when she became aware that jurors were sleeping; (5) limitations on social worker Jan Vogelsang's testimony; (6) the failure to discharge the alternate jurors at the conclusion of the guilt phase; (7) the dismissal of Juror Craft during the penalty phase; (8) the failure to instruct on the consequences of a not guilty by reason of insanity verdict; (9) the failure to instruct that unadjudicated criminal conduct had to be proven beyond a reasonable doubt; (10) the failure to instruct that the life sentence Petitioner was serving at the time of the crime was a parolable sentence; (11) insufficient evidence of the "heinous, cruel and depraved" aggravating circumstance as applied; (12) the several instances of prosecutorial misconduct which occurred through the course of the trial; and (13) the jurisdiction of the magistrate judge to preside over the competency proceedings. *See* Def. Prop. Find. at 122–123.

In support of this argument, Defendant simply asserts "appellate counsel's failure to raise the issues on appeal does not meet applicable professional norms." Def. Prop. Find. at 123. All of the issues are addressed elsewhere in this order as they were asserted in the instant habeas petition as substantive claims or claims of ineffective assistance of counsel at trial. Because all of the claims have been determined to lack a factual or legal basis, and taking into account the sparse nature of Defendant's arguments as to these claims, the Court finds that trial counsel were not ineffective for failing to raise these issues on appeal. Likewise, Defendant has failed to show that he was prejudiced by counsel's failure to raise these issues. Accordingly, the Court concludes that this claim is without merit.

## VIII. JUROR MISCONDUCT

### A. Jurors Sleeping

Defendant argues that he was denied a fair trial due to the Court's failure to make an inquiry into the matter of sleeping jurors. To establish this claim, Defendant points to two occasions when counsel brought the issue of sleeping jurors to the Court's attention. The first instance occurred on Thursday, February 27, 1997, during a conference prior to the opening of court. Government counsel voiced concerns about a juror who had appeared to be dozing on the preceding day. Tr. 1590–91. The Government attempted to identify the juror but neither the Court nor defense counsel were able to determine which juror was being referenced. Government counsel stated that a Court Security Officer had indicated to her that he had also noticed the juror's behavior and had "from time to time" touched her in order to make sure she was not dozing. After noting counsel's concerns the Court stated: "I watch the jurors pretty closely, and if this had continued for any period of time, I would have seen it." Tr. 1591–92. The Court also responded that the Court would "keep a lookout" for the possibility that jurors were sleeping and requested that counsel assist with information concerning the juror's attire on February 27. No information in that regard was furnished by counsel. Trial counsel did not request that the Court make any inquiry of the jurors or take any further action.

On the second occasion, Tuesday, March 4, 1997 defense counsel noted that one of the jurors appeared to be sleeping during the Government's cross-examination of Dr. O'Hagan. Tr.1982. The Court stated that the Court had seen the juror close her eyes from time to time and thanked counsel for bringing the matter to the Court's attention. Again, trial counsel did not re-

quest that the Court conduct an inquiry of the jury.

The testimony of Dr. O'Hagan, a psychologist, was lengthy, repetitious, and obscure. See Tr. 1689–2049. O'Hagan began testifying after the lunch break on Thursday, February 27 and concluded in the late afternoon on Tuesday, March 4. Court was not in session on the afternoon of Friday, February 28, on the weekend, or on Monday, March 3. Thus, O'Hagan's testimony covered roughly two trial days. He testified, as did Dr. Davis and Dr. Woods, that Defendant's proper diagnosis was paranoid schizophrenia. O'Hagan's main function was to administer cognitive and neuropsychological tests to Defendant. His testimony consisted not only of relating the results of those tests—which were mostly unsupportive of Defendant's claim of insanity—but also consisted of describing the tests—particularly the MMPI—in great detail. He discussed the validity scales on the MMPI and also a "negative F minus K" calculation not prescribed by the makers of the test which he contended undercut the importance of Defendant's normal profile on the test, the scoring of the Rorschach Ink Blot Test and Defendant's "subtest scatter" on the WAIS–R. Although regular breaks were taken, see Tr. 1745, 1854, 1995, 2026, the Court could tell that some of the jurors were struggling to stay focused on his testimony. Occasionally, a juror or two closed her eyes but only momentarily. In the case of one juror seated at the end of the jury box (next to where the Court Security Officer was positioned), the intervention of the Court Security Officer was required occasionally to make sure that the juror did not fall asleep. From time to time cups of water were passed to certain jurors by the Court Security Officer.

In support of his argument concerning sleeping jurors, Defendant offered declarations of former jurors Jones, Jackson, Craft, Weldon and Dixon, Def. Exs. 49, 46, 35, 74 and 37, which address this subject. These declarations were tendered by defendant at the March 18, 2002 habeas hearing and at that time the portions pertaining to sleeping jurors were admitted by the Court. However, subsequent to the hearing an order was issued on March 27, 2002, requesting that counsel further address the subject of admissibility of the declarations in light of Rule 606(b), Federal Rules of Evidence. Both sides filed briefs. After further considering this matter, the Court by order of April 7, 2003, excluded these portions of the affidavits. Thus, these portions have not been considered as evidence.

At the conclusion of the trial, the Court addressed the jurors as follows:

THE COURT: Ladies and gentlemen, I want to thank each of you personally for serving on the jury in our case. The case has taken a lot of your time and attention, and I know that your decision was not an easy one.

Throughout the trial you paid close attention to the evidence and the presentation of counsel. I believe your deliberations were careful and thorough, and I respect your decision in this case. You performed your duties well, and you should be proud of your jury service.

Tr. 4668–4669.

▮ A trial court has broad discretion in determining whether to conduct an interrogation of the jurors based on allegations of juror misconduct. United States v. Hernandez, 921 F.2d 1569, 1577 (11th Cir.1991). An investigation is not required simply because there has been an allegation of misconduct. See id. In order to warrant a new trial based on juror misconduct, a defendant must show actual bias or prejudice. Id. at 1578.

 The record shows that the Court was attentive to the concern about juror misconduct. On the first occasion the Court stated that it had been watching the jurors closely and would have noticed if the conduct occurred for any length of time. Tr. 1592. The Court also noted that it would remain watchful for inattentive jurors. On the second occasion, the Court acknowledged that it had seen the juror close her eyes "from time to time." Tr.1982. There is no substantial indication in the record that the jurors were actually sleeping on either occasion. In addition, the Defendant has failed to show how he might have been prejudiced by juror misconduct or his attorney's failure to ask for a hearing. No juror slept through any significant portion of the trial, therefore, Defendant has failed to establish that there was a need for the Court to conduct a hearing on juror misconduct.

### B. Other Juror Misconduct

#### 1. *Presence of Bible and Discussion of Religious Scripture During the Trial*

Defendant contends that he was denied a fair trial because one of the jurors read the Bible during breaks. He also contends that jury members discussed religious matters and sought guidance from scripture while reaching the verdict. There is no evidence in the trial or habeas record supporting either of these allegations. There is also no evidence that any extraneous materials, including a Bible, were brought into the jury room. The Court notes that defense counsel used biblical references in his closing argument. Tr. 4612–4614. Thus, it would not be surprising if these references were discussed by the jury.

 Under the Sixth Amendment, a defendant has a right to a trial before an impartial jury that issues a verdict based on the evidence presented at trial without reliance on extraneous materials. When seeking to invalidate a verdict based on a claim of juror misconduct a "defendant must do more than speculate; he must show 'clear, strong, substantial and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred.'" *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir.1990) (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir.1989)). Therefore, Defendant must show that the jury actually received improper information and that there is a reasonable possibility that the verdict was affected by the outside materials. *See Hunt v. Tucker*, 875 F.Supp. 1487, 1526 (N.D.Ala.1995).

Federal Rule of Evidence 606(b) limits the ability of jurors to testify in regard to matters occurring during jury deliberations.[60] While jurors may testify with respect to extraneous prejudicial information brought to the jury's attention or outside influences brought to bear on jurors, testimony regarding discussions between jurors or intrajury influences or pressures does not fall within the exceptions provided for in Rule 606. Fed.R.Evid. 606(b). As there is no evidence that the jurors brought a Bible into the jury room, the Court concludes that Defendant has not shown that any outside influence or any information about the case not admitted into evidence influenced the verdict. The mere fact that the jury may have discussed

---

**60.** The declaration of former juror Weldon states that one juror quoted from the Bible during deliberations and other jurors also used biblical references. This declaration, Def.Ex. 73, was offered at the March 18, 2002 habeas hearing. The portions relied upon by Defendant were stricken as they do not show that extraneous materials were brought into the jury room.

biblical references, if they did, is irrelevant.

### 2. *Presence of Alternate Jurors During Guilt Phase Deliberations*

Defendant also contends that the presence of alternate jurors in the jury room during the guilt phase deliberations injected an extrinsic influence on the deliberations. Defendant appears to rely on statements made by jurors Dixon and Weldon in their respective declarations that they were alternates on the jury panel during the guilt and penalty phase deliberations and that they participated in the decision during the guilt phase. *See* Def. Exs. 37, 73, admitted in part, March 18, 2002 Habeas Hrg.

However, the record is clear that neither Dixon nor Weldon participated in the guilt phase deliberations. As the members of the regular panel were being sent into the jury room to begin the guilt phase deliberations, the Court addressed the alternates as follows:

> THE COURT: Also, we have four alternates on the jury, and I need to give you some special instructions at this point. The alternates in order are Linda Weldon, Michele Dixon, Dan Harman, and Robert Rolland. Do any of you have things in the jury room you need to get, an umbrella, a book?
>
> JUROR: A book.
>
> THE COURT: Any of you who need to, step on into the jury room and get your things, but then I would like the alternates to come back and sit in the jury box, and the rest of you may go on into the jury room.
>
> (Whereupon, the jury was excused from the courtroom, and the following proceedings were held out of their presence)
>
> \* \* \* \* \* \*
>
> [Addressing the alternates]

> Ladies and gentlemen, first of all, I want to thank all of you for serving on our jury. All of you paid very close attention throughout the trial, and we appreciate it. We know it was a big chunk of your time, and I know you have many other pressing things you needed to do.
>
> Even at this point I am reluctant to totally discharge you from jury duty. I am going to go ahead and let you all go on home or to your businesses, or whatever you need to do today. However, there is a possibility that we may need you at a later point. If the Defendant is found guilty of first degree murder, there will be a penalty phase where more evidence will have to be presented. During both the guilt/innocence phase and any penalty phase that follows, we must have 12 jurors in order to obtain a verdict. There is always a possibility that somebody will get sick, or that some emergency will occur.
>
> So, what I'm saying is the possibility exists that we will need to call you back to listen to the evidence at the penalty phase of the trial, and for that reason even though I'm going to go ahead and excuse you to leave, and we are going to go ahead and thank you, because I may not see you again, I am going to instruct you, and I do instruct you not to discuss this case even at this point with anybody, and to continue to avoid any media coverage so that in the event we need to use you, we would be able to.
>
> So, thank you again, and we may or may not see you at a later point. You all can go on out that back door.
>
> JUROR: So, we don't have to report here tomorrow?
>
> THE COURT: That is correct. You have their numbers?
>
> THE CLERK: I do.

THE COURT: We have got your phone numbers, and we will call you if we need you.

JUROR: All right.

THE COURT: Thank you.

(Alternate jurors excused from the courtroom).

Tr. 3286–88.

After the guilty verdict was received on March 13, alternates Weldon and Dixon were requested to return to the courthouse. The following colloquy occurred.

THE COURT: Ms. Weldon and Ms. Dixon, I wanted first of all to thank you for coming back. We appreciate it. I want to show you the verdict that was rendered by the jury yesterday just so you will know what happened. Let me just hand this to you, Ms. Weldon, so you can take a look at it, and then give it to Ms. Dixon.

Tr. 3378.

Despite the contrary statements in the declaration of jurors Weldon and Dixon, the clarity of the record itself compels the conclusion that Dixon and Weldon were confused when they signed their declarations. The Court finds that no alternate juror participated in the jury deliberations during the guilt-innocence phase of the trial.

### 3. *Premature Penalty Deliberations*

Defendant further contends that his constitutional rights were violated because the jurors engaged in premature penalty discussions during the guilt phase of the trial. Defendant fails to point to any record evidence supporting this claim.

The Court instructed the jurors throughout the trial that they were not to discuss the case with others or among themselves until deliberations began at the close of evidence. There is no indication that external matters influenced the jury in its decision or that the jury decided the case prior to the close of evidence. As

Defendant offers no evidence, much less any "strong, substantial and incontrovertible evidence" that premature deliberations took place, he has not shown that jury misconduct occurred. *See Cuthel*, 903 F.2d at 1382–83 (noting that court is not required to investigate when allegations are speculative or unsubstantiated).

### 4. *Cumulative Effect of Jury Misconduct*

Defendant also contends that the cumulative effect of the alleged jury errors violated his right to a fair trial. However, Defendant's claim fails as he has not shown any misconduct or error, much less a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)(quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

## IX. TRIAL COURT ERRORS

### A. Limitation on the Penalty Phase Testimony of Defense Social Historian and Social Worker Jan Vogelsang

Defendant argues that the Court's limitation on Jan Vogelsang's testimony violated his Eighth Amendment right to jury consideration of relevant mitigating factors. Defendant maintains that the Court's limitation prohibited the jury from hearing about all factors in his background that might mitigate against the imposition of the death penalty and that the hearsay testimony that was not allowed is information that should be admissible as the type of information reasonably relied on by an expert in reaching her opinion.

Prior to Vogelsang's testimony, defense counsel assured the Court that she would not be testifying as to a psychiatric diagnosis but would be providing testimony about Defendant's life history and how his life

experiences affected him.[61] Tr. 4351–52. The Court allowed Vogelsang to testify but limited the social history testimony on the emotional and mental problems of Battle family members other than Defendant because of concerns about the reliability of the information.[62] The Government contends that the Court's ruling did not limit the presentation of mitigating evidence on the defendant's background or character because the fact that other family members suffered from emotional or mental problems was not relevant nor did it keep the jury from considering the mitigating evidence of Defendant's mental and emotional problems.

■ A defendant is entitled to have a sentencing jury hear and consider relevant mitigating evidence. *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). This includes evidence which might not be considered admissible during a criminal trial. However, a trial court has the discretion to limit or exclude testimony if the evidence is unreliable. *See Alderman v. Zant,* 22 F.3d 1541, 1557 (11th Cir.1994). In this case, the information in regard to mental problems of Defendant's father was not based on any identifiable source. The Court addressed this allegation in its opinion of December 28, 2001, *United States v. Battle,* 235 F.Supp.2d 1301, 1339–50 (N.D.Ga.2001), in the context of a motion to disqualify the undersigned. The order states:

> The record reflects that Jan Vogelsang, the defense's social historian, gave extensive testimony concerning the Defendant's upbringing and the connection it had to his ultimate involvement with the law. Ms. Vogelsang was not permitted to testify that the Defendant's father was a paranoid schizophrenic, when the family members present did not so testify and there were no medical or other records backing up this claim. In fact, the Court was never informed of the source of the information that Defendant's father is paranoid schizophrenic. While hearsay evidence is admissible at a sentencing hearing, some threshold of reliability is required, particularly where the evidence is very prejudicial. Because there was a sharp conflict of opinion as to whether Defendant was suffering from paranoid schizophrenia, the social worker's bald contention that his father was a paranoid schizophrenic was properly disallowed.

*Id.* at 1348.

Extensive evidence was presented regarding Defendant's mental and emotional

---

**61.** Vogelsang's declaration, states however that one of her services is to "provide the picture of a Defendant's life history that supports ... a psychiatric diagnosis." Vogelsang Decl.¶1, Def. Ex. 72, March 18, 2002 Habeas Hrg.

**62.** The Court stated:

When you look at the witness' testimony as being focused on explaining the Defendant's conduct, it is important that the underlying data that she is using be reliable, and that it be subject to cross examination. There is no way for me to know whether the characterizations of the traits of various family members that were made to her presumably by other family members, or neighbors, or friends were proper characterizations.... I don't think that it is appropriate for her to come in and give testimony about the profile of these various family members which is not based on testimony that has been received in court through witnesses who are reliable like the family members who just testified. I do realize that with respect to expert witnesses, it is permissible for an expert to rely on the type of evidence that is ordinarily used in one's own field, and it is not required that the underlying evidence be admitted in court, but I think social history that is gathered outside court is not inherently reliable. It is not like a chemist who relied on a particular lab test that somebody else has done. Tr. 4357–58.

problems during the sentencing phase of the trial. Defendant has not specifically identified what testimony Vogelsang was prepared to give which she did not give. The limitation on the evidence presented by Vogelsang did not render the process fundamentally unfair. *See McGinnis v. Johnson*, 181 F.3d 686, 693 (5th Cir.1999)(exclusion of certain mitigating testimony during the penalty phase was not unnecessarily limiting nor did it render trial fundamentally unfair).

The Court further notes that a partially redacted version of Defendant's Exhibit 78, which Vogelsang identified, was admitted into evidence at trial during the testimony. This exhibit is a multi-generation chart pertaining to Defendant's family which states that Defendant's father was abusive, his mother was a battered wife, and which also contains zig-zag or lightening bolt markings (suggesting mental illness) above the names of some family members but which are. not specifically labeled as such on the redacted version. Def. Ex. 78, Trial. Unlike the originally tendered version of Def. Ex. 78 (an oversized chart), this version omits reference to Defendant's father being mentally ill or paranoid schizophrenic.

### B. Discharge of Jurors Craft and Tooley

█ Defendant contends that the Court discharged jurors Tooley and Craft without just cause. The Government argues that the Court did not abuse its discretion and Defendant was not prejudiced by the Court's actions. The decision on whether to remove a juror is left to the sound discretion of the trial judge and will not be disturbed "absent a showing of bias or prejudice to the defendant." *United*

States v. De La Vega, 913 F.2d 861, 869 (11th Cir.1990)(internal citations omitted). Prejudice is shown if a defendant can establish that a juror was discharged without factual support or for a legally irrelevant reason. *Id.*

█ Juror Tooley repeatedly voiced concerns about lost income and asked to be discharged because of the financial hardship he was experiencing because of jury service. As noted in the undersigned's previous order "[t]he record reflects that the Court went to great lengths to obtain juror Tooley's voluntary cooperation, and only discharged him when he threatened, more than once, that he would be 'biased' absent some financial relief." *See United States v. Battle*, 235 F.Supp.2d 1301, 1348–49 (N.D.Ga.2001) (referencing Tr. 1311–12, 1592–93, 3614–24).

Juror Craft, an African American female, was foreperson of the jury until she was excused during the penalty phase of the trial. Ms. Craft was excused at that point due to her failure to function as a responsible juror. On two occasions, juror Craft sent notes to the Court, allegedly on behalf of the jurors, requesting that the jury be given time during the day for personal business or that the Court start at a later time.[63] After receiving the second note, the Court brought the jury into the courtroom and asked the jurors if they wanted to start court at a later time the next day. The jurors responded that they wished to continue to start at 9:30. Tr. 4179–80. The next morning Ms. Craft did not arrive at 9:30. The Court waited for a short time and asked the court clerk to make calls in an attempt to locate her. The clerk left a message on juror Craft's phone at 9:50 a.m. At 9:57, Ms. Craft called

---

**63.** Generally, court sessions began at 9:30 a.m. and proceeded until 5:00 p.m. On Friday, March 14, 1997, the Court received a note asking that the jury members be given

time during the day to complete personal business. A second note requesting that the court sessions begin at a later start time was received on Monday, March 17, 1997.

and left a message that she was at the DeKalb County tag office getting her license tag renewed and that she should arrive by 10:30. Tr. 20, 4200. Ms. Craft had said nothing to the Court regarding her need to renew her car tag nor had she indicated that she had any reason to arrive late on the morning of March 18, 1997. When Ms. Craft had not appeared by 10:30, the Court replaced her with an alternate and continued the trial. When Ms. Craft arrived at 10:55 a.m., she was informed that she had been discharged from jury service.

Defendant contends that Ms. Craft was treated disparately from Dedra Grant, a white juror who was also late one morning. However, in juror Grant's case, she was delayed when inbound traffic was stopped due to a suspicious knapsack being found on the expressway. While the record does not record the exact time the juror arrived, it appears that there was only a short delay until the proceedings began. Tr. 2869.

In the case of both Juror Tooley and Juror Craft, the record contains factual support that both jurors were impaired in their ability to fulfill their role in a proper manner. Although Defendant notes that both jurors were African American the record contains no evidence of racial bias or that the Court's actions manipulated the composition of the jury. *See United States v. Brewer*, 199 F.3d 1283, 1286 (11th Cir.2000) (mere assertion that court's action diluted the racial makeup of the jury does not establish actual prejudice). Therefore, Defendant has not established the prejudice necessary to succeed on this claim.

C. Refusal to Permit Juror Craft to Attend the Trial after She was Dismissed as a Juror

■ Defendant argues that juror Craft's exclusion from the courtroom after

her dismissal as a juror violates his right to a public trial. The Government contends that Ms. Craft was properly excluded from the courtroom.

Although a defendant has a Sixth Amendment right to a public trial, that right is not absolute. *United States v. Brazel*, 102 F.3d 1120, 1155 (11th Cir. 1997). This right ensures fairness to a defendant and ensures that judges, lawyers, and jurors perform in a responsible manner. *Waller v. Georgia*, 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). However, a "trial judge may impose reasonable limitations on access to a trial in the interest of the fair administration of justice." *Bell v. Evatt*, 72 F.3d 421, 433 (4th Cir.1995)(citing *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 n. 10, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). When a proceeding is only partially closed, only a "substantial reason" is needed to justify the restriction. *Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir.1984).

Ms. Craft's appearance in the courtroom after being discharged from jury service would likely have been distracting to the remaining jurors. In addition, the Court had concerns about possible contact between Ms. Craft and the remaining jurors. Per the jurors' request, they were being allowed unsupervised breaks and lunch hours for the remainder of the trial so contact could occur whether inadvertent or intentional. The most effective way to alleviate the above concerns was to request that Ms. Craft leave the courthouse, which she apparently did. At no time was the trial closed to the public; many observers watched the trial. As the reasons for the restriction of ex-juror Craft were substantial and the restriction was minor, Defendant's right to a public trial was not violated.

**D. Failure to Instruct the Jury on the Consequences of a Not Guilty by Reason of Insanity Verdict**

■■■ Defendant asserts that his due process rights were violated by the Court's failure to instruct the jury on the consequences of a Not Guilty by Reason of Insanity (NGRI) verdict. The Government points out that this issue was raised in Defendant's motion for new trial and decided adversely to Defendant based on *Shannon v. United States,* 512 U.S. 573, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994). In *Shannon,* the Court held that neither the Insanity Defense Reform Act of 1984 nor general federal practice requires a district court to instruct the jury as to the consequences of a NGRI verdict.

In the previous order denying Defendant's motion for new trial the undersigned stated:

> In *Shannon,* the Supreme Court did hold that where a jury appears to be operating under a misconception as to the consequences of an NGRI verdict, the court should step in to correct such a misconception. Id. at 587–88, 114 S.Ct. 2419. However, there is no reason to believe that the jury was misinformed as to the consequences of an NGRI verdict in this case. The jurors knew that the result of an NGRI verdict would not allow the Defendant to be released; he is already serving a life sentence. This fact was underlined in the prosecutor's closing argument. A jury instruction as to the consequences of an NGRI verdict was not necessary or appropriate.

*United States v. Battle,* 979 F.Supp. 1442, 1467 (N.D.Ga.1997).

Defendant argues that the jurors were left without critical information and the guidance necessary to make their decision. However, informing jury members of the possible sentencing consequences prior to deliberations draws the jury's focus away from the issue to be decided of whether a defendant is guilty or not guilty based on the facts. *See United States v. Thigpen,* 4 F.3d 1573, 1577 (11th Cir.1993). Defendant argues that his case is distinguishable from *Shannon* because it is a capital case in which the jury has a sentencing function. While it is true that in capital proceedings juries also impose sentences, the trial consists of a guilt/innocence phase and a sentencing phase. The issue of whether a jury should receive an instruction on a NGRI verdict would only arise in the guilt/innocence phase of the prosecution. The Court in *Shannon* noted that providing sentencing information prior to a determination of guilt or innocence could distract a jury from its factfinding responsibility and create confusion. *Shannon,* 512 U.S. at 579, 114 S.Ct. 2419. This logic also holds true during the initial phase of a capital trial. Therefore, there is no reason to think that the consequences of a NGRI verdict are relevant to a jury's task during the guilt/innocence phase of a capital case. The Court finds, in accord with its previous determination, that it was not necessary to charge the jury on the consequences of a NGRI verdict in this case.

The Court further notes that the charge requested by the defense on the subject of the consequence of a NGRI verdict was an erroneous or misleading charge because it omitted reference to the possibility of parole. Specifically, the text of that request to charge was as follows:

> It is proper that you be informed of the consequences of a verdict of not guilty only by reason of insanity. If the Defendant is found guilty then we shall proceed to the sentencing phase of this case. However, if the Defendant is found not guilty only by reason of insanity at the time of the offense charged, the law provides for a different procedure.

When a person is found not guilty only by reason of insanity at the time of the offense charged, the defendant is then committed to a suitable medical or psychiatric facility until such time as the Defendant can prove to the Court by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a then present mental disease or defect. This Court would make that determination at a hearing at which the Government and the defense would be entitled to present evidence on this issue. Until such time as the Court is convinced by clear and convincing evidence that the Defendant's release would not create a substantial risk of bodily injury to another person or serious damage or [sic] property of another due to a present mental disease or defect of the Defendant, the Defendant will remain in custody in a suitable medical or psychiatric facility. The Defendant would still have to serve out any sentence he is presently serving.

18 U.S.C. § 4243

Def. Supp. Request to Charge, No. 25, March 10, 1997 [Doc. 232].

■ A charge tailored to this case would have to refer to the fact that Defendant is serving a paroleable life sentence. An accurate, balanced charge would have to take into account the fact that Defendant would have to serve his life sentence unless and until paroled. While the Court is skeptical that Defendant would be paroled, it would be inappropriate to incorporate this belief into an instruction to the jury. It is counsel's obligation to submit an appropriate request to charge; it was not the Court's obligation to craft an appropriate charge. Finally, an appropriate, even-handed charge would not have been helpful to the Defendant as it would have required reference to the possibility of parole.

E. Insufficient Evidence of "Heinous, Cruel, and Depraved" Aggravating Circumstance

■ Defendant asserts that the evidence presented is not sufficient to support the heinous, cruel, or depraved aggravating factor. Defendant argues that Officer Washington's killing did not involve "torture or serious physical abuse" as Officer Washington did not see his attacker and may not have been conscious during the attack. In judging the sufficiency of the evidence presented at trial, a court is required to review the evidence in the light most favorable to the prevailing party and accept all reasonable inferences that tend support the jury's verdict. *United States v. Howard,* 918 F.2d 1529, 1534 (11th Cir.1991).

In order to prove this statutory aggravating factor, a jury must find that the offense was committed "in a especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." 18 U.S.C. § 3592(c)(6). The evidence presented at trial showed that Officer Washington died as the result of three hammer blows to the back and side of his head which were delivered with tremendous force. Tr. 1071–74. It could not be established that Officer Washington was or was not unconscious after the first blow but any of the blows could have stunned him. Tr. 1077, 1081. The first two blows were to the back of the victim's head and the last blow was apparently struck to the side of his head while he was on the ground.

Defendant relies on a decision by the United States Court of Appeals for the Tenth Circuit in which that Court granted habeas relief based on the state's failure to establish "conscious suffering" as required

under Oklahoma's heinous, atrocious, or cruel aggravating factor. *See Thomas v. Gibson*, 218 F.3d 1213, 1226–27 (10th Cir. 2000). While the element of consciousness may play a role in a jury's determination of whether an offense is committed in a "heinous, atrocious or cruel" manner it has not been established that a finding of "conscious suffering" is necessary under the Federal Death Penalty Act. Even if the Court applied this standard, the evidence in this case does not compel a finding that Officer Washington was rendered unconscious by the first blow. Therefore, the jury could permissibly make the inference that the murder was committed in a heinous, cruel, or depraved manner in that it involved serious physical abuse of the victim.

This claim was not specifically raised at trial. The Court did deny Defendant's Rule 29 motion. Assuming that it included the instant argument, the motion was properly denied because there was enough evidence to support this aggravating factor.

## X. BIAS OF TRIAL JUDGE

Defendant alleges that bias on the part of the judge denied him a fair trial. Due process requires that a defendant be tried before a "fair and impartial tribunal." *Porter v. Singletary*, 49 F.3d 1483, 1487–88 (11th Cir.1995). A petitioner challenging his conviction based on a due process claim of judicial bias or prejudice must show that the judge was actually biased or prejudiced against the defendant. *See Nichols v. Sullivan*, 867 F.2d 1250, 1254 (10th Cir. 1989); *Dyas v. Lockhart*, 705 F.2d 993, 996 (8th Cir.1983). The bias must stem from personal or extrajudicial sources and not from information learned during judicial proceedings. *See Wiley v. Wainwright*, 793 F.2d 1190, 1193 (11th Cir.1986).

Defendant alleges that the trial judge made numerous rulings which demonstrat-

ed a bias against him. These allegations were previously addressed in the undersigned's order of December 28, 2001, and the court adopts the rulings of that order. See *United States v. Battle*, 235 F.Supp.2d 1301, 1339–50 (N.D.Ga.2001). As stated in the previous order:

> The mere fact that the Court has carried out its statutory and legal obligations in a manner not preferred by defense counsel does not mean that the judge is biased against the Defendant. It certainly does not mean that the judge harbors an aversion or hostility to the defense or the Defendant, nor does it reflect a state of mind 'so resistant to a fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings.'

*Id.* at 1343–44 (quoting *Liteky v. United States*, 510 U.S. 540, 557–58, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). The Court further noted that "[w]hile the unpredictability of the Defendant's behavior and his intermittent unruliness made the trial more difficult than it would have been otherwise, the record reflects that all of the participants in the trial—including the Defendant and his counsel—were consistently treated with respect and dignity by the Court." *Id.* at 1349.

 The only issue raised by Defendant that has not been previously addressed is that judicial bias was shown because the judge took no action to require BOP employees to wear civilian clothes while in the courtroom. The record does not reflect that any such request was made by defense counsel at any time. Neither does the trial or habeas record reflect how many BOP employees were in the courtroom, for what period of time they were present, or the precise nature of their attire. The record does reflect that on two

occasions when inmates were testifying the BOP employees were required to leave the courtroom at defense counsel's request.

The Court does recall that some BOP employees did attend portions of the trial as spectators and that either some or all of them may have been attired in some type of uniform, perhaps a blazer and slacks. There was no "show of force"; had there been, the Court would have taken action even in the absence of a defense request. The Court also believes defense counsel would have been quick to complain about a "show of force", which they did not do. Defendant's allegations of judicial bias are without merit.

## XI. PROSECUTORIAL MISCONDUCT

■ Defendant raises the following as instances of prosecutorial misconduct: 1) that the Bureau of Prisons interfered with the investigation of the case and suppressed exculpatory information; 2) that the Bureau of Prisons intimidated inmate witnesses; 3) that the Government presented misleading testimony by ADX Warden Hershberger and presented false and misleading argument on the testimony during the penalty phase; 4) that the Government failed to provide timely notice of the nature of BOP staff testimony; 5) that the prosecutor misled the jury during closing argument in remarks concerning the life sentence Defendant was serving; 6) that the government violated discovery; and 7) that the Government intentionally solicited testimony about Minnie Foreman's pregnancy. On collateral review, relief for prosecutorial misconduct is appropriate when the conduct renders the trial so fundamentally unfair that the resulting conviction is a denial of due process. *Davis v. Zant,* 36 F.3d 1538, 1545 (11th Cir.1994) (citing *Donnelly v. De-Christoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "Although it is not the task of the habeas court to retry the defendant, the standard for reviewing prosecutorial misconduct requires a weighing of the nature and scope of the instances of misconduct against the evidence of guilt against the accused." *Id.* at 1546.

Defendant first claims that the Bureau of Prisons employees refused to be interviewed by defense investigators and because of the delay the defendant was not able to interview BOP employees who knew Defendant had a serious mental illness and could have provided favorable evidence to the defense. Defendant argues that this failure to provide exculpatory evidence within the possession of BOP employees and BOP records, and suppression of favorable BOP employee testimony violates the Government's responsibility to disclose favorable evidence pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defendant also alleges that a *Brady* violation occurred because the Government failed to provide relevant evidence regarding the BOP's ability to safely house two other inmates who have killed staff members.

■ In order to show a *Brady* violation, Defendant must establish "(1) that the [G]overnment possessed evidence favorable to the defense, (2) that the defendant did not possess the evidence, and could not obtain it with any reasonable diligence, (3) that the prosecution suppressed the evidence, and (4) that a reasonable probability exists that the outcome of the proceeding would have been different had the evidence been disclosed to the defense." *Moon v. Head,* 285 F.3d 1301, 1308 (11th Cir.2002) (citations omitted). Defendant implies that because the BOP employees are connected with the Department of Justice that the prosecution team constructively possessed exculpatory information that could have been within the knowledge of BOP staff. Certainly, an "individual prosecutor has a duty to learn of any favorable evidence known to the

other acting on the government's behalf in the case." *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). However, this mandate does not extend beyond members of the prosecution team such as "investigative and prosecutorial personnel" or "the prosecutor or anyone over whom he has authority." *Moon,* 285 F.3d at 1309 (quoting *United States v. Meros,* 866 F.2d 1304, 1309 (11th Cir. 1989)). Even if the Court assumes that some members of the BOP staff did possess favorable information that alone does not impute knowledge to the prosecution team. *See id.* (citing *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998))("[K]nowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis.") While the prosecution team may have included investigators from the BOP there is no indication that any of the correction officers or staff who had contact with the Defendant played a role in the investigation of this offense.

Furthermore, even if the prosecution team were defined that broadly, there is no indication that any BOP employee withheld any evidence. Defendant alleges that BOP employees knew that Defendant had a serious mental illness and was mentally ill long before Officer Washington was killed. In support of his claim, Defendant relies on the declarations of several BOP employees.

John Pannell, a physician assistant at USP–Allenwood, states that Defendant was referred to him for an assessment in January 1990. Pannell Decl., Def.Ex. 59, admitted in part, March 18, 2002 Habeas Hrg. He indicates that it is his belief that Defendant was "leaning towards a psychotic episode" at that time. Pannell also states that he was contacted by a defense investigator in 1996 and he discussed this information with the investigator at that time. Pannell was willing to testify and received permission to be a witness but was never contacted again by the defense team. This evidence does not establish a *Brady* violation as it was in the possession of trial defense counsel.

Dexter Graham, a BOP employee at USP Atlanta, indicates in his declaration that Defendant was "a loner," "had a shabby appearance," and often appeared to mumble. Graham Decl., Def. Ex. 42, March 18, 2002 Habeas Hrg. Graham did testify at trial as a defense witness and gave the same description of Defendant as a "loner." He further stated that Defendant mumbled and that his eyes wandered. Tr. 1628–29. This evidence obviously was not withheld by the government.

Defendant points to information contained in other post-trial declarations of BOP employees (obtained by habeas counsel) to identify information which should have been turned over in pretrial discovery, even though unknown to the government prosecution team.

Defendant argues that the government failed to give defense counsel information regarding the BOP's ability to safely house inmates who have killed BOP staff. Defendant offers the declaration of Tommy Silverstein, an inmate who was convicted of killing a BOP guard, explaining how he is being confined in high security at USP Leavenworth. In order to establish a *Brady* violation, Defendant must show that the information was not possessed by the Defendant and it could not be obtained with reasonable diligence. Trial counsel indi-

cates in her declaration that she had been in contact with Silverstein over the years and knew of his confinement conditions. Kearns Decl. ¶ 14, Def. Ex. 50, March 18, 2002 Habeas Hrg. Therefore, this information was available to defense counsel and does not establish a *Brady* violation.

Other evidence in the possession of BOP employees was not clearly exculpatory. Russell Mabry, a chaplain at USP Atlanta, recounts that he remembered Defendant because he had an odd look in his eyes but he never had a conversation with Defendant. Tr. 442. James Austin, a case manager at USP–Atlanta, notes that he once tried to speak to Defendant while Defendant was in his cell and Defendant would not respond. At a later time, Austin patted down Defendant during a search for contraband at the prison and Defendant went "totally rigid and tense" during the pat down. Another BOP employee, Debra Rankin states that, as a unit manager, she reviewed Defendant's file when he was assigned to her unit but the only interaction with him that she recalled was once when he asked her not to speak to him in the mornings. Other than that she recalled him as being quiet and off to himself but stated that she did not consider him strange. *See* Def. Exs. 84, 87, admitted by

Order dated July 12, 2002; Debra Rankin Dep. filed May 13, 2002.

Defendant also points to testimony by Naeem Hasan, the case manager during the time Defendant was incarcerated at C-cellhouse. When Defendant was transferred to C-cellhouse, the case manager from D-cellhouse told Hasan to watch out for Defendant, that he was a "walking time bomb." Hasan Decl. Def. Ex. 83, admitted by Order dated July 12, 2002. Hasan states that he took the comment to mean that he should be careful in dealing with Defendant.[64] During his deposition, Hasan also stated that he had never seen Defendant do anything that would be considered strange or different.

The foregoing testimony falls short of the compelling testimony that Defendant claims it to be. Even if it was *Brady* evidence, it had no prospect of changing the outcome of either phase of the trial. *Moon,* 285 F.3d at 1308. Two of the witnesses never even had a conversation with Defendant, two had only minor contact with Defendant during incidents that may or may not be tied to Defendant's mental health defense, and Hasan's testimony could also have been used to support the

---

64. Defendant also contends that Hasan committed perjury because in his deposition testimony he stated that no one had spoken to him about Defendant but the Government later informed defense counsel that Hasan had informed the prosecutor of the above statement relating to Defendant's behavior. Hasan's deposition transcript reads as follows:
 Defense counsel: Did any guards or inmates ever complain to you about Anthony Battle?
 Hasan: No.
 Defense counsel: Did they ever make any comments to you about Anthony Battle?
 Hasan: No.
 \* \* \* \* \* \*
 Defense counsel: Did anybody ever, before Officer Washington was killed or after he was killed, tell you anything about Anthony Battle,

anything that had happened to them, anything that he has said or done with them?
 Hasan: I don't remember.
 Hasan Dep. at 24–26, [Doc. 417].
 The deposition took place on March 26, 2002. On March 29, 2002, the Government contacted defense counsel by phone and indicated that Hasan's testimony was incorrect. The Government stated that Hasan had previously informed the prosecutor and a BOP attorney of the remark made by the D-cellhouse counselor. Hasan filed a follow-up declaration in which he recounts the incident and states that he was nervous during the deposition and forgot to mention the conversation.

Government's argument that Defendant posed a future danger.

Defendant next claims prosecutorial misconduct based on the alleged intimidation of inmate witnesses by BOP employees during the trial. This matter is discussed at pp. 132–135 above. Defendant alleges that during a tour of the lockup facility at the U.S. Marshal's office, a BOP employee made threatening remarks that intimidated inmate witnesses and caused the witnesses to refuse to testify. The allegation of witness intimidation was originally brought to the Court's attention during trial.

 Government use of intimidating tactics to interfere with a defense witness's testimony violates a defendant's due process rights. *United States v. Schlei*, 122 F.3d 944, 991 (11th Cir.1997) (citations omitted). A defendant must prove the interference by a preponderance of the evidence. *See United States v. Bin Laden*, 116 F.Supp.2d 489, 494 (S.D.N.Y.2000). " 'A defendant's constitutional rights are implicated only where the prosecutor [uses] . . . intimidating language or tactics that substantially interfere with a defense witness's decision whether to testify.' " *Id.* (quoting *United States v. Vavages*, 151 F.3d 1185, 1189 (9th Cir.1998)). When the defense witness does testify, a due process violation occurs only if exculpatory evidence is withheld due to the alleged threat. *See Schlei*, 122 F.3d at 992–93.

In this case there is no credible evidence that the conduct of BOP employees deprived Defendant of any helpful evidence.

Defendant also contends that the Government violated his due process rights by presenting false and misleading testimony by Warden Herschberger and then compounded that error by remarking on the testimony during closing argument. This issue was previously raised in Defendant's motion for new trial and the undersigned held that Warden Herschberger's testimony was not materially false nor intentionally misleading. *See United States v. Battle*, 979 F.Supp. 1442, 1463–64 (N.D.Ga.1997). The evidence presented by Hershberger is also discussed at pp. 192–194 above. As stated, Defendant has made no showing that Hershberger gave any false or misleading testimony.

Defendant next argues that during discovery the Government misrepresented the testimony to be given by USP–Atlanta correctional officers and failed to give timely notice on the true nature of the officers' testimony. The pretrial notice of the testimony stated that the officers were to testify on Officer Washington's character. Defense counsel discovered during a chambers conference on the first day of sentencing proceedings that the officers were to testify about the effect that Officer Washington's murder had on the inmates and the penitentiary staff. Defendant states that had he received timely notice of the subject of the testimony he could have investigated and presented rebuttal testimony to this evidence. The Government notes that this issue was addressed on appeal.

This claim was raised on direct appeal and decided adversely to Defendant. While agreeing that Defendant had short notice, the Eleventh Circuit stated that if defense counsel needed time to find and prepare rebuttal witnesses that it was his duty to request a continuance at that time rather than seek a reversal after the verdict. *United States v. Battle*, 173 F.3d 1343, 1350 (11th Cir.1999). As there was no motion for continuance, the Eleventh Circuit held that the trial court did not err in allowing the testimony. *Id.*

Although the Government's initial notice was misleading, defense counsel could have requested a delay either when he first learned of the nature of the testimony in chambers or when the officers were testifying in court. Therefore, the govern-

ment's conduct did not render the trial so fundamentally unfair that he was denied due process.

Defendant argues that the prosecutor misled the jury by suggesting that he was not eligible for parole on his first sentence and that a life without parole sentence in this case would impose no additional punishment on Defendant. During the penalty phase summation the government argued: "He is already serving a life sentence. These are natural life sentences. He can only serve one. Adding a second one even consecutive to the first one won't mean anything. He's not likely to be released from prison. He wouldn't likely have been released from prison even had you found him not guilty. So, adding a second life sentence even without the possibility of parole is not going to punish him." Tr. 4561. The Government responds that this information about the nature of Defendant's first sentence was neither misleading nor improper.

The Court finds that the Government's argument was not improper. Government counsel did not state that Defendant was ineligible for parole but that it was unlikely that Defendant would be paroled regardless of the outcome of this case. As the jury had previously found that Defendant had killed a prison guard while serving a life sentence it is a proper inference that he was unlikely to be released from prison. Accordingly, the Court concludes that the remarks did not prejudice Defendant or render the trial fundamentally unfair.

Defendant argues that the Government committed misconduct when it violated discovery by failing to notify defense counsel of a statement made by Defendant to correctional officer Robert Willis. During the trial, USP Atlanta correctional officer Rob-

ert Willis testified that while he was transporting Defendant from Atlanta to Talladega on December 21, 1994, he asked Defendant about the incident with Officer Washington. Tr. 1039. Willis stated that Defendant responded "Yeah, I had a dance with him. Fuck him. Do you want to dance?" Tr. 1040. Defense counsel was informed of this testimony on February 12, 1997, only five days prior to the start of trial. This matter has been addressed at pp. 169–171 above. Because government counsel themselves did not have the information about Willis' statement until shortly before February 12, it follows that no prosecutorial misconduct occurred. Defendant alleges prosecutorial misconduct based on the cross-examination testimony of a government witness during the guilt phase of the trial. The government called Kevin Donovan, a psychologist at FCI–Talladega, to testify regarding Defendant's mental status while he was at Talladega. On cross-examination, defense counsel questioned Donovan's statement in a written report that Defendant had killed three people. Donovan responded that Defendant had also killed the unborn child his wife was carrying at the time of her murder, as well as Officer Washington. Defendant states that this testimony was intended to prejudice Defendant.

The testimony to which Defendant objects was literally true. However, because of its very prejudicial nature, the Court would have disallowed mention of the unborn fetus had it had an opportunity to do so. The jury did not know until Donovan's testimony that Defendant's wife was pregnant when she was murdered. Also, no evidence was presented that Defendant knew she was pregnant. However, Defendant does not make any showing of how the Government was involved in this testimony being presented to the jury.[65] It

---

**65.** After a conference with the attorneys, the Court informed the jury that Defendant was never charged with or convicted of infanticide.

appears to have been unexpected by counsel for both sides. No prosecutorial misconduct occurred.

Defendant also argues that collectively, the alleged incidents of prosecutorial misconduct had a substantial effect on the determination of an appropriate sentence. The Court finds no instances of prosecutorial misconduct on the individual claims and therefore necessarily finds that on a collective basis, the incidents did not rise to the level of rendering the trial so fundamentally unfair that the Defendant was deprived of due process. Therefore, the claims based on prosecutorial misconduct do not warrant Section 2255 relief.

## XII. CONFLICT ISSUES

### A. Drs. Johnson and Hazelrigg

■ Defendant alleges that he was prejudiced by the examination and subsequent testimony of Drs. Johnson and Hazelrigg as they had a conflict of interest because they were employed by the BOP, as was Officer Washington, the victim. During the time Dr. Johnson evaluated Defendant and at trial, she was employed as a U.S. Public Health Officer assigned to the Federal Bureau of Prisons, and the chief psychiatrist and the Associate Warden for Heath Services at FCI–Butner. Tr. 2908. At the time Dr. Hazelrigg evaluated the Defendant and during trial, he was employed by the Bureau of Prisons as a clinical psychologist at FCI–Butner. The Government argues that witnesses who may possibly have an interest in the outcome of the litigation routinely testify in court and there is no basis for deeming these particular witnesses incompetent to testify. The Government further notes that the jury was aware that Drs. Johnson and Hazelrigg were employed by the BOP and therefore, the testimony did not violate Defendant's rights under the Sixth Amendment Confrontation Clause.

The Court finds that this issue does not offer a basis for relief. Although Drs. Johnson and Hazelrigg were employed by the BOP, this fact in itself is not so suspect that their evaluations and testimony should be rendered per se unreliable. Witnesses who have some interest at stake in the proceedings routinely testify in court, whether it is a cooperating defendant or a expert being paid by a party.

Defendant was given a full opportunity to cross-examine the witnesses and make the jury aware of any potential bias or conflict of interest. Dr. Johnson was cross-examined about bias and whether loyalty to the BOP played a part in her assessment of Defendant's mental state. Tr. 3034–35. Likewise, Dr. Hazelrigg was cross-examined about any potential conflict of interest that might occur. Tr. 2710–17. He testified that he was aware of the issue and strove to maintain his objectivity during the process. Tr. 2717. Dr. Hazelrigg also testified that he was not pressured by anyone at the BOP to reach a particular result. Tr. 2593. Whether and to what extent the witness's employment by the BOP created a conflict of interest is a factor for jury consideration as to the weight and credibility of the testimony.

### B. Trial Counsel

Defendant alleges that his trial counsel had a conflict of interest in representing him as they were witnesses to his mental status and that he had an irreconcilable conflict with them because he did not wish to present an insanity defense. To demonstrate a Sixth Amendment violation, Defendant must show that " 'an actual conflict of interest adversely affected his lawyer's performance.' " *Buenoano v. Singletary,* 74 F.3d 1078, 1086 (11th Cir.1996)(quoting *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). A conflict must be "actual,

not merely hypothetical or speculative" as a "mere possibility of conflict of interest" is not substantial enough to violate the Sixth Amendment. *Id.* at 1086. This circuit has stated that "[w]e will not find an actual conflict unless [a defendant] can point to specific instances in the record to suggest an actual conflict." *Smith v. White*, 815 F.2d 1401, 1404–05 (11th Cir. 1987) (citations omitted).

▆ Defendant's allegations that a conflict existed because of disagreement over the presentation of the insanity defense are insufficient to show a conflict of interest. The Court has already found, p. 93 above, that while Defendant may have voiced some ambivalence in respect to the insanity defense that he did at least tacitly consent to the defense. In any event the fact that there was some disagreement between counsel and Defendant does not mean there was a conflict of interest.

Defendant also argues that a conflict existed because counsel were necessary witnesses to his deteriorating mental condition and should have stepped down as his counsel in order to testify as witnesses. This matter is discussed above at pp. 176–179, and as noted, there is no showing that counsel had information in this regard that was not presented through other witnesses. Any testimony from counsel would merely have been cumulative as both mental health professionals and lay witnesses testified with respect to Defendant's mental condition and actions. Counsel was able to perform effectively without the addition of their testimony concerning Defendant's statements that implants existed in his body. Therefore, relief is not warranted on this claim.

## XIII. VIOLATION OF RIGHT TO MEANINGFUL APPELLATE REVIEW

Defendant contends generally that the Court of Appeals violated his constitutional right to meaningful appellate review by disposing of nine of the thirteen issues he raised on direct appeal in a footnote. Also, he complains that one of the issues was resolved in two paragraphs. Def. Prop. Find. at 124. Defendant presents no other argument. He cites reliance on his claim as set forth in his § 2255 motion and states that he does not intend to waive consideration of this issue.

The Court determines that Defendant's failure to more fully explicate this claim results in its abandonment, notwithstanding his statement that he does not intend to waive it.

## XIV. NEW TRIAL REQUEST

Defendant argues that he is entitled to a new trial based on newly discovered evidence that BOP employee Brookshire testified falsely at the mid-trial hearing on possible inmate witness intimidation. *See* pp. 132–133 above. Brookshire did not testify as a trial witness before the jury.

During the OIG investigation, Brookshire stated in his affidavit that he recalled making a comment either to Deputy Marshal Richard Kennedy or to one of the other BOP employees as he was exiting the cellblock that the inmates had been loud and disruptive when transported back to the prison on the previous night and that he may have mentioned that additional staff would be needed that evening when the inmates returned. OIG Report, Brookshire Aff., Def. Ex. 90, [Sealed Doc. 460]. The OIG investigator concluded that this remark by Brookshire may have been heard and misinterpreted by one or more of the inmates in lockup as a threat. Defendant contends that the statement made in the affidavit contradicts Brookshire's previous testimony and that he is entitled to a new trial on the basis of newly discovered evidence.

**1208**

The Court has examined Brookshire's hearing testimony with the affidavit he gave to OIG and finds no conflict in the testimony Brookshire gave at the hearing versus that in the affidavit. Perhaps Brookshire may be criticized for failing to volunteer the additional testimony during the court hearing; it is not entirely clear whether or not he should have thought to do this. A logical explanation for the lockup incident would be that one or more of the inmates overheard Brookshire's remark and either misunderstood it or consciously chose to distort it in the interest of amusement. The OIG investigation report does suggest that some of the inmates thought inmate White's testimony to the Court about claimed threats was funny. OIG Report, Def. Ex. 90 [Sealed Doc. 460].

■ To obtain a new trial based on newly discovered evidence a defendant must show that (1) the evidence was discovered after the trial, (2) the failure to learn of the evidence at the time of trial was not due to defendant's lack of diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material, and (5) based on the evidence a new trial would probably produce a different result. *United States v. Lee,* 68 F.3d 1267, 1273–74 (11th Cir.1995). All five elements must be satisfied. *United States v. Starrett,* 55 F.3d 1525 (11th Cir.1995).

■ While Brookshire's remark about the need for additional staff may be relevant to what the inmate witnesses may have overheard, a new trial is not warranted because the evidence is not material to any issues that were determined by the jury. The Court held a hearing out of the jury's presence, in part to determine what testimony helpful to the defense the inmates were prepared to give before the "lockup incident." The Court is satisfied that none of the inmates actually were intimidated so as to alter their testimony. Only one of the inmates, Shirley, actually

seemed intimidated but he nonetheless testified as a defense witness before the jury and gave the testimony which had been expected. Inmate White, who claimed to be intimidated, was faking so as to expedite the conclusion of his holdover status. The testimony the jury heard from the inmates called by the defense was not curtailed by the "lockup incident." Therefore, a new trial based on Brookshire's statement to the OIG investigator is not warranted.

■ Defendant also alleges in an amendment to his § 2255 motion that he was denied a fair trial and due process of law based on the Government's failure to correct this allegedly false or misleading testimony. In order to show that his conviction was obtained in violation of due process, Defendant bears the burden of proving that the testimony was false, that it was material, and that the prosecution either made knowing use of the false testimony or failed to correct what became known as false testimony. *See Moon v. Head,* 285 F.3d 1301, 1314 (11th Cir.2002); *Jacobs v. Singletary,* 952 F.2d 1282, 1286–87 (11th Cir.1992).

■ Defendant contends that the statement made in the affidavit contradicts Brookshire's previous statement that he had not made any threatening statements to the witnesses and is therefore evidence of witness perjury and government misconduct. As noted above, Defendant has not shown that Brookshire's statements at trial were false or that his statement in the affidavit directly contradicts his previous testimony. Neither has he shown that the Government knew or should have known during trial that Brookshire recalled making additional statements. Even the fact that a witness's previous testimony is inconsistent with later testimony does not establish perjury or that the prosecutor made knowing use of false testimony. *See*

*United States v. Wolny,* 133 F.3d 758, 763 (10th Cir.1998) (citing *United States v. Holladay,* 566 F.2d 1018, 1019 (5th Cir. 1978)); *see also United States v. Tanner,* 61 F.3d 231, 236 (4th Cir.1995) (variation in witness's statements more than a year apart does not prove that witness lied).

## XV. CUMULATIVE EFFECT OF ER-RORS

■■■ Defendant contends that even if each individual claim is deemed insufficient to warrant collateral relief that the cumulative effect of the trial errors produced a trial that was fundamentally unfair. The Court has carefully reviewed each issue raised by Defendant in this proceeding and has concluded that none are meritorious. For the totality of the errors to warrant collateral relief Defendant must show that the circumstances rendered the trial fundamentally unfair. After a review of the issues, the Court concludes that Defendant received a fair trial. Therefore there is no basis for relief on this claim.

## XVI. DEATH PENALTY CRUEL AND UNUSUAL

■■■ Defendant also contends that the application of the death penalty in his case is cruel and unusual punishment because he is mentally ill and his ability to conform his conduct to the requirements of the law at the time of the offense was significantly impaired.

In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court held that the death penalty does not per se violate the Eighth Amendment. In this instance, the punishment imposed is not out of proportion to the severity of the offense for which Defendant was convicted. Defendant committed a brutal murder and is likely to commit further acts of violence notwithstanding the fact that he is already serving a life sentence for a previous murder.

In determining the sentence, the jury fully considered all aggravating and mitigating circumstances as they existed at the time of commission of the offense until the time of trial. While either one or more jurors did find that Defendant was significantly impaired at the time of commission of the offense, the jury unanimously found after considering the aggravating and mitigating factors that a death sentence should be imposed. In making this determination the jury followed the procedures prescribed in 18 U.S.C. §§ 3591–3593. No reason exists to disregard the jury's fact-finding.

## XVII. CONCLUSION

Accordingly, the Court having ruled upon Defendant's motions pursuant to 28 U.S.C. § 2255 and Rule 33, Federal Rules of Criminal Procedure, and finding that Defendant's claims for relief are not meritorious, said motions [Docs. 333–1; 339–1, –2] are hereby DENIED.

Pursuant to 18 U.S.C. § 3596, the Attorney General is directed to release the Defendant no sooner than 45 days and no later than 60 days to the custody of the United States Marshal for execution. The United States Marshal shall supervise implementation of the sentence in the manner prescribed by law. The execution is to occur no later than sixty (60) days from the date of entry of this order. A timely appeal from this Order shall stay the release and the execution.

### APPENDIX

*GOVERNMENT'S TRIAL EXPERT WITNESSES*

**Sally Johnson, M.D.**

Employed by Bureau of Prisons as Chief Psychiatrist and Associate Warden for Health Services at FCI, Butner, North Carolina. Received undergraduate degree

in science from Pennsylvania State University and medical degree from Jefferson Medical College in Philadelphia in 1976. Received specialty training in psychiatry at Duke University Medical Center in North Carolina which was completed in 1979. Began employment at Butner in July 1979. Board certified in Psychiatry and Neurology, and subspecialty board certified in Forensic Psychiatry. Member of American Medical Association and American Psychiatric Association. Teaches Psychiatry and Law as adjunct at Duke University Medical Center and also serves as adjunct at University of North Carolina and at Duke School of Law.

**Mark Hazelrigg, Ph. D.**

Employed as Clinical Psychologist with BOP at FCI, Butner, North Carolina. Received Bachelor's degree from University of Kansas, Master's degree in Art Therapy from Emporia State University in Kansas, Master's in Clinical Psychology from University of Missouri, and Doctorate in Clinical Psychology from the University of Missouri in Columbia, Missouri in 1988. First employment as psychologist was from 1987–1990 at Fulton State Hospital in Missouri where he served as supervisor of psychology services in the geriatric center. Performed pretrial evaluations on defendants in the forensic unit and neuropsychological evaluations on patients throughout the state hospital system. Started at FCI Butner in 1990. Member of American Psychological Association and diplomate of the American Academy of Forensic Psychologists.

## DEFENDANT'S TRIAL EXPERT WITNESSES

**David Davis, M.D.**

Received undergraduate degree in German Literature attending University of North Carolina and Gurten University in Germany. Graduated from medical school at Chapel Hill, University of North Carolina in 1963. Did internship at University of Florida and a psychiatric residency at Harvard. After that was drafted and served as psychiatrist in the United States Army during Vietnam. Upon return went to Emory and completed two more years of training in psychiatry and began practicing in 1969. Board certified in Clinical Psychiatry (1971), Psychiatric Administration (1976), Forensic Psychiatry (1973), and as a Disability Examiner. First Board Certified Forensic Psychiatrist in Georgia. Licensed in Georgia, North Carolina, and Massachusetts. Published approximately 30–35 articles or book chapters.

**George Woods, M.D.**

Physician, specializes in psychiatry, and practices in Oakland, California. Graduated from Westminister College in 1969 and from the University of Utah Medical Center in 1977. Medical internship at Alameda County Hospital and psychiatric residency in San Francisco at Pacific Presbyterian Hospital. Chief Resident during Senior year. Then received Fellowship for National Institute of Mental Health. Special projects during senior year include course in Neurology and Neuroanatomy at U.C. and course at Alameda County Forensic Services doing evaluations for the Alameda County Court system. Worked as Medical Director and Geriatric psychiatrist at the Family Service Agency in San Francisco, CA, in addition to private practice. Also worked for nine years at two locked facilities in CA for extremely ill (schizophrenics) and committed individuals. Practiced for three years as family practitioner and in medical emergency rooms. Member of several Superior Court Board of Medical Experts in San Francisco County. Teaches at University of California at Davis in Department of Psychiatry, Postgraduate Department of Forensic Psychiatry. Has

private practice performing outpatient psychotherapy with victims of trauma, and forensic practice doing civil work in discrimination cases and evaluations in criminal cases. Board certified in Psychiatry by American Board of Psychiatry and Neurology, Diplomate of the American Board of Forensic examiners. Lectured on forensic and schizophrenia issues at several colleges in CA. Ongoing training in neuropsychiatry, neuroanatomy and neuropharmacology.

## Stephen O'Hagan, Ph.D.

Clinical Psychologist, practices in Decatur, Georgia. Attended Manhattan College in New York and graduated with a B.A. in Psychology in 1969. Received Master of Science in Psychology in 1972 and Doctor of Philosophy in Clinical Psychology in 1974 from Florida State University. This time included a one year pre-doctoral internship at the University of Oregon, Health Science University in Portland. Worked for three years in the Federal Correctional Institution in Tallahassee while obtaining Ph.D. Administered tests and provided psychological services for the inmates/residents under the supervision of the chief psychologist.

After receiving degree took appointment at Emory University School of Medicine in the Psychiatry department and was Stationed at Grady Hospital in the psychiatry department as staff psychologist in addition to faculty duties. Established the Neuropsychology laboratory at Grady. He primarily performed differential diagnostic evaluations but also worked on grant and helped establish a clinic for treating affective disorders. Became a tenured associate professor at Emory. Worked for two years in Gainesville at Northeast Georgia Medical Center where he was in charge of Neuropsychology program. Then went into private practice. Member of American Psychological Association, National Academy of Neuropsychology.

## Richard Rogers, Ph. D.

Professor of Psychology at the University of North Texas and consultant in forensic psychology. Received Bachelor's degree in English from Wooster State College, Master's in Psychology from Assumption College, and Ph.D. in Clinical Counseling Psychology in 1976 from Utah State University. Began clinical forensic work at Chester Mental Health Center in Illinois. In 1978, helped form Isaac Rey Center as part of the psychiatry and the law section at Rush University Medical School in Chicago and worked as assistant professor of psychiatry and psychology. From there, worked at University of Toronto for six and one-half years as assistant, then associate professor of psychiatry/psychology. Then moved to University of North Texas as associate professor then full professor of Psychology. Board certified in Forensic Psychology. Research has been primarily focused on malingering and the assessment of malingering. Published more than 90 articles in area of forensic psychology and psychiatry, approximately half of which were specific to malingering issues. Author of the Structured Interview of Reported Symptoms (SIRS) test and has written four books, three focusing on insanity evaluations and one on the specific issue of malingering, which won the American Psychiatric Association's book award for the Year's Outstanding Contribution to Forensic Psychiatry in 1990.

## *Defendant's Post Conviction Expert Witnesses*

## L. Alison McInnes, M.D., M.S.

Associate Professor of Psychiatry and Human Genetics at Mount Siani School of Medicine where she manages a research laboratory in neurogeneticds of serious mental illness. Dr. McInnes graduated

from Columbia College of Physicians and Surgeons and completed her residency in Psychiatry at the University of California, San Francisco. She has received numerous awards in recognition and support of her research into the genetic basis of psychiatric disorders and has authored numerous papers on the genetic/biological basis of same. Dr. McInnes has clinical experience working with forensic populations in the San Francisco jail system and with chronically psychotic, psychiatrically complex homeless patients.

**Sophia Vinogradov, M.D.**

Associate Professor of Psychiatry in Residence at the University of California, San Francisco, and Associate Chief of Research and Education of the Mental Health Service of the San Francisco Department of Veterans Affairs Medical Center. Dr. Vinogradov received her medical degree in 1983 from Wayne State University and completed her psychiatric residence at Stanford University School of Medicine in 1987, completing two additional years of specialty training in clinical research of schizophrenia. She is a clinical researcher who specializes in the neurocognitive aspects of psychotic orders and manages a teaching clinic that provides psychopharmacologic treatment for patients with serious mental disorders.

**Karen Bronk Froming, Ph.D., ABPP–ABCN**

Board certified neuropyschologist and Assistant Clinical Professor of Psychiatry at the University of California in San Francisco where she teaches clinical interviewing, differential diagnosis, case conceptualization, neuropsychological assessment, and brief therapy and supervises fellows in clinical psychology and residents in psychiatry. She graduated from the University of Florida Health Sciences Center where she completed her degrees in Clinical Psychology with specialization in Neuropsychology and completed a postdoctoral fellowship in Neuropsychology. Dr. Froming serves as an Expert Reviewer in Neuropsychology for the State of California Board of Professional Psychology and the American Board of Clinical Neuropsychology. She is the recipient of a grant from the National Academy of Neuropsychology to study emotional processing in brain injured individuals.